# In the United States Court of Federal Claims

### No. 19-102C
### Filed: March 28, 2025

```
* * * * * * * * * * * * * * * * * *
                                   *
TPMC-ENERGY        SOLUTIONS       *
ENVIRONMENTAL SERVICES 2008,       *
LLC,                               *
                                   *
              Plaintiff,           *
                                   *
v.                                 *
                                   *
UNITED STATES,                     *
                                   *
              Defendant.           *
                                   *
* * * * * * * * * * * * * * * * * *
```

**Ryan Klein**, Taft Stettinius & Hollister LLP, Colorado Springs, CO, for plaintiff.

**Patrick Angulo**, Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for the defendant. With him was **Patricia M. McCarthy**, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC. **Gary M. Fremerman**, Senior Counsel, Natural Resources and Environment Division, Office of the General Counsel, United States Department of Agriculture, Washington, DC, and **Major Estefania Mishkin**, Litigation Attorney, Legal Services Agency, United States Army, Fort Belvoir, VA, of counsel.

## O P I N I O N

**HORN, J.**

Plaintiff, TPMC-EnergySolutions Environmental Services 2008, LLC (TPMC or TES), is a limited liability company and Small Business Administration-approved (SBA) Mentor Protégé Joint Venture formed between TerranearPMC, LLC, which, at the relevant time, was an 8(a) certified small, disadvantaged business approved by the SBA and EnergySolutions Federal Services, Inc., which is an SBA-approved mentor. Defendant is the United States of America, acting by and through the Department of the Army.[1]

---

[1] This case involves multiple Army commands, including Army Contracting Command-Rock Island (ACC-RI) and Joint Munitions Command (JMC). While the parties and witnesses may refer to a specific Army command, the court simply refers to the Army.

On September 8, 2009, defendant issued Solicitation W52P1J-09-R-0118 to procure remediation services for the decommissioning and license termination of the Low-Level Radioactive Burial Site (LLRBS) at the United States Department of Agriculture's (USDA) Agricultural Research Service, Henry A. Wallace Beltsville Agricultural Research Center (BARC), located in Beltsville, Maryland. Under the Nuclear Regulatory Commission's (NRC) final rule titled "Timeliness in Decommissioning of Material Facilities," the process to decommission the LLRBS required the USDA to submit a decommissioning plan. The NRC would not terminate a license unless remediation activities had been completed in accordance with an approved decommissioning plan. See Timeliness in Decommissioning of Material Facilities, 59 Fed. Reg. 36026, 36039 (Jul. 15, 1994) (to be codified at 10 C.F.R. pts. 2, 30, 40, 70, 72).

In response to the Solicitation issued by the Army, plaintiff submitted a proposal, and defendant awarded Contract Number W52P1J-11-D-0001 (Contract) to plaintiff on November 9, 2010. The awarded contract was a firm-fixed-price, three-year Indefinite Delivery Indefinite Quantity (IDIQ) service contract, with task orders, to perform the nine tasks outlined in the Performance Work Statement (PWS), to be awarded later. The Solicitation, and later the Contract, established that Tasks 1, 2, 8, and 9 were to be "Firm Fixed-Price Line item[s]" and Tasks 3, 4, 5, 6, and 7 were to be "Fixed Unit Rate line item[s.]" (alterations added; capitalization in original). Defendant issued three Task Orders under the base contract, each with subsequently issued modifications. Following completion of its work at the site, plaintiff submitted a request for equitable adjustment to the contracting officer on August 11, 2015. Prior to the contracting officer issuing a final decision on plaintiff's request for equitable adjustment, plaintiff filed a Complaint with the United States Court of Federal Claims 135 days after requesting an equitable adjustment.[2] Almost two and one-half years later, on June 17, 2018, defendant filed a motion to dismiss for lack of subject matter jurisdiction. On July 2, 2018, plaintiff filed a motion for dismissal without prejudice. The court granted plaintiff's motion for dismissal without prejudice on July 9, 2018.

Following dismissal of its first Complaint, plaintiff submitted a certified claim to the contracting officer on July 19, 2018, requesting an equitable adjustment of $7,177,045.68. The contracting officer issued a timely, final decision on November 20, 2018.[3] The

---

[2] Case No. 1:15-cv-01566-MBH was filed on December 23, 2015.

[3] The statute at 41 U.S.C. § 7103(f)(2) provides that:

> **(2) Claim of more than $100,000.**--A contracting officer shall, within 60 days of receipt of a submitted certified claim over $100,000--
> **(A)** issue a decision; or
> **(B)** notify the contractor of the time within which a decision will be issued.

41 U.S.C. § 7103(f)(2) (2018) (emphasis in original).

contracting officer's final decision evaluated fourteen distinct claims for compensation, determining that none of plaintiff's claims warranted compensation.

Thereafter, plaintiff filed a Complaint in the United States Court of Federal Claims, case number 19-102C, which alleged five claims for relief: (1) equitable adjustment based upon Type I Differing Site Conditions, (2) breach of contract based upon Superior Knowledge, (3) breach of contract based upon breach of the Covenant of Good Faith and Fair Dealing, (4) equitable adjustment based upon Changes, and (5) Defective Specifications.[4] Plaintiff filed an Amended Complaint on March 11, 2022, which does not include plaintiff's claim of Defective Specifications. Plaintiff subsequently withdrew its claim for equitable adjustment based upon Changes.

After withdrawing its claims for Defective Specifications and an equitable adjustment based upon Changes, plaintiff's remaining claims pursue damages for breach of contract, including attorney fees and permitted interest, plus monetary relief in the amount of $7,177,045.68.[5] Plaintiff argues TPMC is entitled to breach of contract relief under the Tucker Act, 28 U.S.C. § 1491, FAR 52.236-2 (1984), and the Contract Disputes Act, 41 U.S.C. §§ 7101-7109.

The parties engaged in extensive and time-consuming discovery. Discovery was also impacted by the length of time between when plaintiff completed the work and the initiation of discovery and the subsequent, twelve-day trial.

---

[4] The statute at 41 U.S.C. § 7104(b) provides in part:

> **(b) Bringing an action de novo in Federal Court.**--
> **(1) In general.**--Except as provided in paragraph (2), and in lieu of appealing the decision of a contracting officer under section 7103 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary.
>
> …
>
> **(3) Time for filing.**--A contractor shall file any action under paragraph (1) or (2) within 12 months from the date of receipt of a contracting officer's decision under section 7103 of this title.
> **(4) De novo.**--An action under paragraph (1) or (2) shall proceed de novo in accordance with the rules of the appropriate court.

41 U.S.C. § 7104(b) (2018) (emphasis in original).

[5] Plaintiff's post-trial brief requests monetary relief in the amount of $7,177,584.92.

## FINDINGS OF FACT

The facts in this case are largely uncontested. In 1910, the USDA purchased a 475-acre farm near Beltsville, MD, and the BARC was established in 1934. See OFFICE OF TECHNOLOGY ASSESSMENT, AN ASSESSMENT OF THE UNITED STATES FOOD AND AGRICULTURAL RESEARCH SYSTEM (1981). Today, the facility is known as the Henry A. Wallace BARC, encompasses 6,600 acres, and is designated by the Environmental Protection Agency (EPA) as a superfund site.

The BARC is used to conduct research involving soil, water, and air conservation, plant sciences, animal sciences, commodity conversion and delivery, and human nutrition. The research on plant and animal sciences generated low-level radioactive wastes (LLRWs) which were disposed at LLRBS. The LLRWs generated at the BARC "included dry solid materials such as gloves, paper, and syringes; other solid materials in the form of sealed sources and electron capture detectors; glass and plastic liquid scintillation vials [(LSVs)] containing scintillation liquids; aqueous and organic bulk liquids, plastic bags containing decomposed rat and chicken carcasses, bedding, and excreta; and other radioactively contaminated laboratory wastes." (alteration added).

The USDA was permitted to dispose of LLRWs at the LLRBS under NRC License Number 19-00915-03, originally issued by the Atomic Energy Commission (AEC). While the South Field does not appear to have been used for burials, LLRW burials in the North Field began in 1949, and the last burial pit was closed May 28, 1987. Each of the two fields is approximately 150 feet by 200 feet. Reportedly, the North Field contained fifty areas designated for use as burial pits, forty-six of which were believed to have been used for waste disposal.

Under the NRC regulations at 10 C.F.R. Parts 2, 30, 40, 70, and 72, the USDA was required to decommission the LLRBS because "[n]o principal activities ha[d] been conducted for a period of 24 months in any separate building or outdoor area that contains residual radioactivity such that the building or outdoor area is unsuitable for release in accordance with NRC requirements." See 10 C.F.R. § 72.54(d)(3) (1994) (alterations added); see also Timeliness in Decommissioning of Material Facilities, 59 Fed. Reg. 36026, 36039 (Jul. 15, 1994). Because the USDA could not verify that the LLRBS met the unrestricted radiological criteria for release for unrestricted use, the USDA was required to initiate the NRC decommissioning process under the regulation at 10 C.F.R. 30.36(d). See 10 C.F.R. 20.1402.

At trial, the parties jointly moved to admit into evidence the "REVISED FINAL DECOMMISSIONING PLAN," which described the NRC decommissioning process, as the process applied to the LLRBS:

The steps in the process (based on current regulations and guidance) are as follows:

1.   Stop operations, either in a specific area or building or for the entire facility.

2.   Notify NRC of the decision within 60 days.

3.   Determine locations and concentrations of remaining radiological contamination.

4.   If necessary, develop a Decommissioning Plan that includes all of the following:

   a)   the current radiological contamination at the site;

   b)   the criteria for the final condition of the site;

   c)   the activities to remediate existing contamination that are not currently authorized by the license;

   d)   procedures to protect workers;

   e)   decommissioning cost estimates;

   f)   the final survey method to demonstrate compliance with NRC criteria; and

   g)   the schedule for remediation activities and license termination.

5.   If necessary, provide environmental information for NEPA [National Environmental Policy Act] Compliance.

6.   Clean up contamination, as needed.

7.   Conduct Final Status Survey (FSS) to show compliance with dose limits for license termination.

8.   Request that NRC terminate the license (NRC, 2006).

(alteration added; capitalization in original).

At trial John Jensen, a radiation safety officer at the USDA and the employee who personally submitted the Decommissioning Plan to the NRC for approval,[6] testified that

---

[6] Mr. Jensen testified that the Decommissioning Plan, when submitted to the NRC, would be accompanied by a cover letter. Mr. Jensen further testified that the cover letter would

the USDA, contracting through Army Contracting Command-Rock Island (ACC-RI), hired Cabrera Services, Inc. (Cabrera) "to get a sense of the materials in the site." Pursuant to their contract to survey the LLRBS, Cabrera produced the "DRAFT FINAL LOW LEVEL RADIATION BURIAL SITE WASTE CHARACTERIZATION SURVEY" (Draft Waste Characterization Survey) and the "FINAL LOW LEVEL RADIATION BURIAL SITE FINAL STATUS SURVEY DESIGN PLAN" (Final Status Survey Design Plan). (capitalization in original). The Waste Characterization Survey,[7] which the parties jointly moved to admit into evidence, states that Cabrera's Waste Characterization Survey work plan included the following tasks:

- Geophysical surveys in the North Field to delineate the footprint of individual burial cells, and in the South Field to confirm the widely-held belief that no burials have taken place there

- Gamma and beta walkover surveys to map potential near-surface radiological materials

- Groundwater sampling and analysis of selected wells around the Site to assess migration of contaminants away from source materials

- Excavation, radiological characterization, segregation, and packaging of soils and waste materials in 4 of the 50 documented waste cells (one of the cells designated during this field program was extended to an adjacent area prior to completion of the field program)

- Sampling surface and subsurface soil along the floor of each excavation (from 0 to 2 ft below the excavation floor), and installing a temporary well in each pit to sample groundwater

- Backfilling all excavations with clean fill and restoring the site to pre-characterization survey conditions

(formatting in original). The Final Status Survey Plan,[8] which the parties jointly moved to admit into evidence, included the following tasks:

- Beta and gamma walkover surveys to map potential near-surface radiological materials

---

state: "Attached is our decommissioning plan" and the sender would be identified as "John T. Jensen, radiation safety officer, USDA."

[7] The Draft Waste Characterization Survey, Joint Ex. 002, is dated July 2008 on the title page, but most of all other pages are individually dated August 2007.

[8] The Final Status Survey Design Plan, Joint Ex. 003, is dated October 2008 on the title page, but most of all other pages are individually dated July 2008.

- Excavation, radiological characterization, segregation, and packaging of soils and waste materials in the remaining waste cells or disposal pits

- Sampling surface and subsurface soil along the floor of each excavation (from 0 to 2 feet below the excavation floor), and installing a temporary well in each disposal pit to sample groundwater

- Backfilling all excavations with clean fill and restoring the site to pre-disposal conditions

(formatting in original).

Cabrera executed field operations at the LLRBS from November 2005 until March 2007. Cabrera's field operations included the excavation of at least four of the LLRBS's fifty designated pits, including Pits 1, 14, 26, and 34. Additionally, Cabrera excavated Pit 34C, which may have been an extension of Pit 34 or a separate pit altogether; Mr. Jensen testified that "we called one area of excavation 34 and then another area 34C because we thought it was perhaps part of 34, but we weren't too sure."[9] According to the testimony of Dana Jackson, the senior remedial project manager for the USDA Superfund Program at the BARC, Cabrera and the USDA chose to excavate Pits 1, 14, 26, and 34 "to get a cross-section of materials [in the pits] through time" because, "if you're trying to reduce – to do a removal action, you'd like to get a very good estimate of what you might be anticipated to encounter in the subsurface for costing purposes." (alteration added).

Appendix F of the Waste Characterization Survey contains a selection of Cabrera's daily and weekly field reports. The daily reports for April 19-27, 2006, detail Cabrera's excavation of Pit 1. Pertinent to this case, the Daily Report for April 19, 2006, states that Cabrera discovered "a layer of stone found at 3.5' depth, noticed some dark soil on what may be the edges of the pit," but the Daily Report for April 20, 2006, states that "continue [to determine] pit location" and that "at about 5.5' depth we spot some ceramic & glass debris on pit edges," with no mention of debris found between the surface and five and one-half feet. (alteration added). The Daily Report for April 20, 2006, eventually places the "[p]it depth at about 8'." (alteration added). The Daily Report for April 25, 2006, characterizes the quantity of debris buried in Pit 1 as "[v]ery minimal debris or waste items found." (alteration added). The quantity of debris found in Pit 1 was so little that the USDA asked Cabrera "to fluff the soils some more & continue contaerizing [sic] a few more soil drums to ensure a thorough investigation of the pit area." (alteration added).

Cabrera's Weekly Project Summary for the weeks ending April 21 and April 28, 2006, further characterize Cabrera's survey of Pit 1. These two project summaries state that Cabrera identified Pit 1 "by small pieces of glass and metal debris" that were "located about 5 feet below ground surface." Cabrera removed material from Pit 1 that filled forty

---

[9] According to TPMC's certified claim, Pits 26 and 34C were mislabeled by Cabrera: "Pit 26 was actually Pit 19. Pit 34C was actually Pit 27."

55-gallon drums, of which were "2 drums of debris and 38 drums of soil." Cabrera characterized Pit 1's waste as "primarily of dry soil with small amounts (less than 10%) of glass, rusted metal, and ceramic. No indications have been found of liquids, carcasses, biological materials, or sealed sources."

Cabrera's daily reports covering May 3-5, 2006, discuss the excavation and characterization of Pit 14.[10] Cabrera found that "[t]he top [sic] Pit #2 is about 6-7' below surface grade" and "[t]here are no signs of liquids or other solid material other than bones." (alterations added). Cabrera noted that:

> The only true signs of any biological contamination, besides the bones, appears [sic] to be the plastic that lines the pit. the plastic is covered with a reddish brown substance presumably blood. Anyone working near this plastic is given green nitriles to handle the plastic. We have also encountered very minimal debris other than bones. We have discovered a 35 gallon trash can lid, and a few pieces of terracotta pipe.

The Project Summary for the week ending May 5, 2006, states that the Pit 14 excavation lasted only two days and "revealed no liquids or scintillation vials, as had been expected. Instead, the pit contained bones representing the apparent remains of three cows, along with some plastic wrapping."[11]

Cabrera's excavation of Pit 26 began May 17 and ended May 25, however, only the Daily Reports covering May 22-25 and the two corresponding weekly summaries are included in Appendix F of the Waste Characterization Survey. The Weekly Project Summary for the week ending May 19 states that the "[w]aste encountered in the pit included liquid scintillation vials, 1-gallon glass jugs full of liquid, needles and other biological materials, and other debris," including "[d]rums and fiber boxes." (alterations added). This summary also identifies a changed field condition of perched water, explaining that "[u]pon breaking the wall of Pit 26, water poured out in a heavy stream, and continued to flow through Thursday morning." (alteration added). According to the summary, "[t]he water level at approximately 8 foot depth, and thus saturates waste within the pit." (alteration added). This summary also states that Cabrera encountered waste "within 1 foot of the surface" and that "there was no clear boundary of 5 feet of clear soil separating Pit 26 from the next pit to the west. "There may initially have been a boundary, but the boundary has been saturated with water and undergone slumping over the years, resulting in elimination of clear pit boundaries." Because "the volume [of water] continued to flow" and "as it became clear that there was no soil boundary between Pit 26 and

---

[10] The Daily Report for May 3, 2006, initially refers to Pit 14 as Pit 2, but adopts the name "Pit 14" within the report and for all subsequent reports.

[11] Cabrera expected to find liquid waste and "1000 vials" in Pit 14. A liquid scintillation vial (LSV) may be made from glass or plastic, is approximately two and one-eighth inches tall, is approximately eleven-sixteenths of an inch in diameter and utilizes a screw-on top.

adjacent pits," Cabrera speculated "that the water is a larger volume reservoir that saturates numerous pits." (alteration added).

The Daily Report for May 22, 2006, states that "[w]ater is still infiltrating the pit" such that Cabrera "laid pallets of wood onto the pit floor to give our entrants a working platform." (alteration added). The May 22, 2006, Daily Report also states that "[t]he debris in the north wall and pit floor is consistent with that found in earlier activities. LSV[s] (bagged & boxed), loose pipettes & other broken glass debris, lab packs with containerized liquid waste, plastic bottles and misc. debris." (alterations added). The Daily Report for May 23, 2006, states in part:

> Pit #26 is now defined by an area ~ 10' squared and to a depth of about 8'. The bottom of this pit lies on top of perch water, and if excavated further could lead to situations for which we aren't suited to handle. USDA personnel has seen pit #26 and is aware of the perch water situation. The volume of waste is equal to earlier pit excavations and the type of waste has been consistent during characterization activities for this pit (LSV & Lab packs). Client reps agree that we have met our goals for characterization activities for this pit and accepted our proposed methods for sampling the pit floor.
>
> The southern wall of this pit shows no debris within the visual plane of the wall which indicates a defined boundary. The western wall shows signs of debris, as does the northern wall, indicating undefined boundary, thus there exists a potential of increasing the size of this pit. It is assumable that the pit floor is actually a layer of soil covering ~2' layer of waste. As with earlier pits, before backfilling begins we will bind our activities with a layer of geotech fabric.
>
> . . .
>
> We were able to segregate four Pit #26 debris drums into 6 categories of Sharps/Animals, Soil (wet/dry), LS vials, Macro debris (wire, pipe, wood, plastic, metals), DAW [Dry Active Waste] (PPE/RCRA M/T containers), & paint waste.

(capitalization in original; alteration and omission added). The Weekly Project Summary for the week ending May 26 states that "the volume of waste removed was increased due to the presence of waste materials within 1 foot of the surface, instead of at 5 feet, as planned. Overall, the volume of waste materials removed exceeded the planned volume."

Only Cabrera's Daily Report for June 6, 2006, of the daily reports included in the Waste Characterization Survey, discusses the excavation and characterization of Pit 34, stating in part:

Started searching for Pit #34. Locating activities started at the southern most [sic] boundary of the proposed location and proceeded in a northerly direction. The pit was found about 20' from this southern boundary line. Top of the pit was aprox 4' below grade and the pit is aprox. 10'x 12' square, as proposed by USDA personnel. Waste contents are mainly DAW [Dry Active Waste] w/some lab packs and LSV. Animal/Biological wastes have not been identified in this pit. Pit# 34 is the best defined pit we have characterized to this point. The edges are clearly definable and we have no water infiltration at this time.

(abbreviations and capitalization in original; alterations added). According to the Weekly Project Summary for the week ending June 9, 2006, Cabrera excavated "70 drums of debris, scintillation vials, and other wastes" from Pit 34 and "***DIFFICULTIES ENCOUNTERED***" were "[n]one." (alteration added; capitalization emphasis in original).

Appendix C of the Waste Characterization Survey, prepared by Cabrera, contains six relevant photographs captured during Cabrera's site investigation. These six relevant photographs include one photograph that appears to depict a vial among the Pit 1 debris and five photographs that appear to depict vials and LSVs among the Pit 26 debris. The six photographs are:



Pit 1 debris consisted primarily of pieces of plastic, small plastic vials and tubes.

10



Pit 26  vials identified west of original location.

MAY 17 2006

Liquid scintillation vials and other various debris in Pit 26

MAY 19 2006

Home



Liquid scintillation vials and debris being removed from Pit 26

MAY 19 2006

Home

Excavation of Pit 26 debris

MAY 19 2006



Various debris (vials, tubes, needles, and plastic) extracted from Pit 26

None of the photographs included in the Waste Characterization Survey depict Pits 34 or 34C, or any of the waste that was buried in Pits 34 or 34C. According to the Decommissioning Plan, Pits 34 and 34C accounted for more than two-thirds of all LSVs remediated by Cabrera during the LLRBS Waste Characterization Survey.[12]

Cabrera prepared the Waste Characterization Survey and Final Status Survey Design Plan, following its field operations at the LLRBS. The information contained in the Waste Characterization Survey and the Final Site Survey Design Plan was used to develop a draft decommissioning plan for submission to the NRC. Cabrera also developed, with the USDA, the 2009 Draft Decommissioning Plan, incorporating the findings of the Waste Characterization Survey. Of note, Mr. Jackson stated, in a December 11, 2008 email, that "I found that the DP [Decommissioning Plan] was prepared by someone who was never actually on site and the on site PM [Project Manager] has since left the company." Mr. Jackson testified at trial that his opinion – that the author of the Decommissioning Plan was never actually at the LLRBS – was "because some of the information seemed to not – not to be exactly as some site conditions existed."

---

[12] According to the 2009 Decommissioning Plan, "Table 4 summarizes the volumes of wastes recovered [by Cabrera]." (alteration added). According to Table 4, the remediation efforts during the Waste Characterization Survey yielded 1.9 cubic yards (CY) from Pit 26, 2.7 CY from Pit 34, and 1.9 CY from Pit 34C.

About two years and nine months after Cabrera completed its field operations and about nine months before the Army issued the Solicitation, Mr. Jackson conducted a "surface visual survey" of the LLRBS. During the survey, conducted after the LLRBS had been recently mowed, Mr. Jackson discovered what he described as "some broken glassware." At the time, according to Mr. Jackson's testimony, Mr. Jackson "still didn't know what scintillation vials were." Therefore, according to Mr. Jackson, when he sent an email on December 2, 2008, to Pete Jovanovich, who at the time was an environmental protection specialist at the USDA, describing the discovered glassware, he stated he "was objective in what I saw on the ground in a few places." In the email, Mr. Jackson stated that "there seems to be a statistically significant amount of broken and intact lab glassware on the surface on areas of [Cabrera's] excavation." (alteration added). Mr. Jackson later testified that "I think we saw a total of, like, three scintillation vials that were broken or intact at the surface in one location" and that "from my recollection, the entire site was not littered with debris. It was just a small area."

Having created a draft decommissioning plan[13] and developed a PWS, the USDA determined to engage a contractor to execute the decommissioning plan. "[R]ather than blazing its own path," according to defendant's counsel, the USDA "asked the Army Contracting Command at Rock Island to help it out" because the ACC-RI is "a part of the Army that deals a fair bit with cleaning up and disposing of dangerous and hazardous waste." (alteration added). Additionally, according to Mr. Jensen, the USDA "had been working with them [ACC-RI] for many years on many of these types of projects, and other more routine radioactive waste disposals from various facilities." (alteration added).

On January 23, 2009, Derek Cornette, a health physicist[14] formerly employed by the Army, emailed a revised memorandum to USDA and Army personnel, which was created for the purpose of requesting a solicitation for the "Decommissioning and License Termination of the" LLRBS. (capitalization in original). The memorandum specified that responsive proposals should include "a cost estimate and technical proposal based on the SOW [statement of work] and DP attached to this letter." (alteration added). Also attached to the memorandum was the Final Site Survey Design Plan and Waste Characterization Survey generated by Cabrera. The SOW states that "[t]he contractor will bid on all aspects of work in the DP and FSS [Final Site Survey]. The SCS [Waste

---

[13] The USDA first submitted a draft Decommissioning Plan to the NRC on December 1, 2005.

[14] As a health physicist, Mr. Cornette was responsible for "[t]he safe handling of radioactive material, disposal, packaging of radioactive material," providing training related to "site remediations" to personnel on military bases, and "decommissioning [radioactive burial sites]." (alterations added).

Characterization Survey] is provided for historical information and to assist with the proposal."[15] (alterations added).

Defendant issued Solicitation Number W52P1J-09-R-0118 on September 08, 2009.[16] The Solicitation states that "[t]he solicitation will result in a single award of a three-year Indefinite Delivery Indefinite Quantity Contract. Task orders may be awarded as firm fixed-price or Labor Hour or Time and Material Effort, such as a fixed unit rate." (capitalization in original). The Solicitation also states:

> The PWS is currently supported by a draft Decommissioning Plan (DP) that is under review by the Nuclear Regulatory Commission (NRC). Offerors are instructed to develop their proposals based on the information contained in the draft plan, however some of the work will not commence on this contract until final approval is obtained from the NRC. If there are significant changes contained in the final DP that impact price, the contractor may submit a request for equitable adjustment.

The Solicitation later reiterates that "[o]fferors shall submit their proposed approach for completing the work called out for each task in the Performance Work Statement (PWS) based on the guidelines in the draft Decommissioning Plan (DP)." (alteration added). Section J of the Solicitation lists the following documents as attachments: PWS, Technical Estimate Spreadsheet, and Price Estimate Spreadsheet.

Section I of the Solicitation identifies clauses applicable to the Solicitation, including FAR 52.216-18 Ordering (OCT 1995), FAR 52.216-22 Indefinite Quantity (OCT 1995), FAR 52.236-2 Differing Site Conditions (APR 1984), FAR 52.243-1 Changes-Fixed-Price (AUG 1987) – Alternate I (APR 1984),[17] and FAR 52.243-3 Changes-Time-

---

[15] The court notes that Joint Ex. 003, the "FINAL LOW LEVEL RADIATION BURIAL SITE FINAL STATUS SURVEY DESIGN PLAN," is dated "October 2008" on the title page, is dated "July 2008" on pages i through forty-two, includes Figures 1-4, and includes Appendix A, "Estimation on Minimum Detectable Concentrations (MDC)," and the final two pages of Appendix A appear to be incorrectly sequenced. (capitalization and emphasis in original). The court also notes that Joint Ex. 005, "REVISED FINAL DECOMMISSIONING PLAN," is dated July 2009 and labels Appendix C as the "Final Status Survey Plan." (capitalization in original). The Final Status Survey Plan appended to Joint Ex. 005 is titled "LOW LEVEL RADIATION BURIAL SITE FINAL STATUS SURVEY DESIGN PLAN," is dated "August 2007" on the title page, is dated "August 2007 on pages i through forty-two, includes Figures 1-3, and includes Appendix A, "Estimation on Minimum Detectable Concentrations (MDC)." (capitalization and emphasis in original).

[16] Solicitation W52P1J-09-R-0118, Joint Ex. 008 in the record before the court, is unsigned.

[17] The clause at FAR 52.243-1 – Alternate I provides, in pertinent part:

and-Materials or Labor-Hours (SEPT 2000).[18] (capitalization in original). The clause at FAR 52.216-18, as written in the Solicitation, which was incorporated into the Contract, and the Contract, provides in pertinent part:

——————————————

> (a) The Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this contract in any one or more of the following:
> > (1) Description of services to be performed.
> > (2) Time of performance (i.e., hours of the day, days of the week, etc.).
> > (3) Place of performance of the services.
>
> > . . .
>
> (c) The Contractor must assert its right to an adjustment under this clause within 30 days from the date of receipt of the written order. However, if the Contracting Officer decides that the facts justify it, the Contracting Officer may receive and act upon a proposal submitted before final payment of the contract.

FAR 52.243-1 Changes-Fixed-Price (AUG 1987) – Alternate I (APR 1984).

[18] The clause at FAR 52.243-3 provides in pertinent part:

> (a) The Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this contract in any one or more of the following:
> > (1) Description of services to be performed.
> > (2) Time of performance (i.e., hours of the day, days of the week, etc.).
> > (3) Place of performance of the services.
> > (4) Drawings, designs, or specifications when the supplies to be furnished are to be specially manufactured for the Government in accordance with the drawings, designs, or specifications.
> > (5) Method of shipment or packing of supplies.
> > (6) Place of delivery.
> > (7) Amount of Government-furnished property.
>
> > . . .
>
> (c) The Contractor shall assert its right to an adjustment under this clause within 30 days from the date of receipt of the written order. However, if the Contracting Officer decides that the facts justify it, the Contracting Officer

(a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the individuals or activities designated in the Schedule. Such orders may be issued for a period of three (3) years from the date of contract award.

(b) All delivery orders or task orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order or task order and this contract, the contract shall control.

The sub-clause at FAR 52.216-22(d), as written in the Solicitation (and Contract), provides:

"(d) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractors and Governments rights and obligations with respect to that order to the same extent as if the order were completed during the contracts effective period; provided, that the Contractor shall not be required to make any deliveries under this contract after three (3) years.

The clause at FAR 52.236-2, which was incorporated by reference, provides:

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of-

(1) Subsurface or latent physical conditions at the site which differ materially from those indicated in this contract; or

(2) Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

---

may receive and act upon a proposal submitted before final payment of the contract.

FAR 52.243-3 Changes-Time-and-Materials or Labor-Hours (SEPT 2000). (emphasis in original).

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; <u>provided</u>, that the time prescribed in paragraph (a) of this clause for giving written notice may be extended by the Contracting Officer.

(d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.

FAR 52.236-2 Differing Site Conditions (APR 1984) (emphasis in original).

The PWS provides nine specific tasks which "shall be performed in accordance with the applicable requirements of Section 3.0 'GENERAL REQUIREMENTS.'" (capitalization in original). The specified tasks are: (1) Work Plan, (2) Mobilization/Demobilization, (3) Site Remediation, (4) Site Sampling, (5) Packaging/Staging, (6) Transport Contaminated Soil, Mixed Waste, and LLRW to the Appropriate Treatment/Disposal Facility, (7) Treatment/Disposal, (8) Final Status Survey Report, and (9) Human Health Baseline Risk Assessment. The PWS instructs that "[a]ll submittals for the above 'Specific Tasks' will be reviewed for accuracy and compliance with the DP [Decommissioning Plan], PWS and regulations." (alterations added). Pertinent to this case, the PWS provides that:

The contractor shall conduct the work efforts under a formally approved NRC decommissioning plan. The USDA has submitted a draft decommissioning plan to NRC Region I which the contractor shall update, as required after award, to comply with the Multi-Agency Radiation Survey and Site Investigation Manual (MARSSIM, NUREG- 1575) and the NRC dose-based release criteria of 25 mrem/yr Total Effective Dose Equivalent (TEDE). The contractor shall conduct their decommissioning activities in accordance with this performance work statement and the final NRC-approved decommissioning plans. Any deviation from those plans must be coordinated with JMC/USDA [Joint Munitions Command/United States Department of Agriculture] to be approved by the NRC prior to action being taken by the contractor.

The Contractor should be prepared to attend and participate in at least 4 public meetings regarding this project. These meetings will be to inform the public of proposed operations, objectives, and methods of operation.

The Contractor is advised to conduct the work in a manner that insures [sic] compliance with the schedule, as it is essential to the successful completion of this project. Any failure to meet milestones will be addressed in the Quality Assurance Survelliance [sic] Plan.

(alterations added).

Critical to the case at bar, the PWS describes the measurement method of Task 1 as:

The Government will review the WP [work plan] for its ability to meet project objectives, specific requirements, and for proper and safe application of procedures and equipment utilized. The Government will review the WP and provide comments to the Contractor, which will require a written response from the Contractor and/or possible changes to the WP. The comments will focus primarily on compliance with the draft DP and all references contained within. These comments are to be addressed in detail by the Contractor. Additional comments may be provided for the Contractor's review and consideration that relate to economy and efficiency, which the Contractor may choose to incorporate; however, the Contractor is responsible for any impact this may have, positive or negative.

(alteration added). The PWS also relates the objective for Task 5 as:

Package, containerize, stage and prepare to transport contaminated soil, liquids, mixed waste, etc. to the appropriate disposal site in accordance with the approved DP and WP. Any material that is found to be hazardous waste, during the excavation, will be radiologically free released and prepared for packaging, storage and treatment/disposal at an approved facility. All waste will be segregated, packaged and staged based on sample analysis results.

The Solicitation was amended seven times, and each of the amendments, except for Amendment 0007, included offeror questions and government responses. Pertinent to the case at bar, contractor question and government response "o" of Solicitation Amendment 0001 states:

Contractor Question (o)
In order to demonstrate cost efficiencies and innovative approaches, changes from the procedures outlined in the decommissioning plan may be necessary.\~ [sic] Are changes to the DP permissible?

Government Response (o)
Offerors are instructed to develop their proposals based on the information contained in the draft DP. Changes to the draft DP are not permissible.

(alteration added). The section of Solicitation Amendment 0002 titled "SECTION A - SUPPLEMENTAL INFORMATION" states that "[t]he first burial pit was dug in the 1950s and there are no clear records as to exactly what materials are present or how they were packaged up th[r]ough pits dug in the 1970s." (alterations added). Amendment 0002 also provides government responses to contractor questions "g" and "i" as follows:

Contractor Question (g)
What task orders will be time-and-material or labor-hour contract types?

Government Response (g)
Fixed unit rate (time-and-material/labor-hour) task orders are called out in section L of the solicitation.[19]

Contractor Question (i)
Is the soil immediately above (backfill material) [overburden[20]] considered as radioactive waste or is it part of the Class 3 excavations?

Government Response (i)
The back fill material is probably not contaminated; however, offerors should consider it as part of the total volume for disposal.

(alteration and footnote added). Government responses to contractor questions (e), (o), (ae), (al), and (ar), provided in Amendment 0003, state:

Contractor Question (e)
The answer to question 6i in Amendment 2 states that the back fill material [overburden] should be considered as part of the total volume for disposal. Please clarify that if characterization indicates the backfill material is not contaminated, can it be used to back fill the hole instead of being managed as waste.

Government Response (e)
For additional clarification to question 6i of Amendment 0002, the backfill material will be identified as either clean or waste. If the offeror chooses to sample the back fill material and analysis determines the material to be clean, then yes, it can be used to backfill the hole instead of being managed as waste; however the clean backfill material may not be blended with the wastes to lower the concentration on [sic] contamination. If the offeror

---

[19] Section L of the Original Solicitation states that Tasks 1, 2, 8, and 9 "will be incorporated into the contract on a Firm-Fixed-Price basis," and, for Tasks 3, 4, 5, 6, and 7, "[t]he offeror shall be held to all of the proposed fully-burdened fixed unit rates for contract pricing." Also, the Acquisition Strategy Checklist, signed by Chief, Installation Contracting Division, indicates the contract type is both "Firm Fixed Price" and "T&M/LH [time and materials/labor-hour]" and states that "[t]ask orders may be awarded as firm fixed-price or time-and-materials, such as a fixed unit rate (see time-and-materials determination and findings)." (alterations added). However, each of the Solicitation's amendments does display a "Contract ID Code" (Block 1 of Standard Form 30) of "Firm-Fixed-Price."

[20] The overburden is considered the first five feet of material below ground surface.

decides to assume the back fill material is contaminated/waste, then the material shall be handled as such.

Contractor Question (o)
Regarding contractor question h of Amendment 0001, please confirm that the radioactive only [sic] contaminated materials can be stored up to 18 months at the site, and that hazardous/mixed wastes need to comply with the RCRA [Resource Conservation and Recovery Act] 90-day storage requirements.

Government Response (o)
It is a CERCLA site. Yes, the intent is to have the hazardous and mixed waste off site within the 90[-day] requirement.

Contractor Question (ae)
Section L-6 classifies the type of contracts being, firm fixed price, time and materials [T&M], and labor hour contract. The price sheets however do not support this classification. For example, we do not see any price sheet that is based on T&M. Price sheets that are not firm fixed price are often based on firm fixed unit rate (volume, drum, sample, etc). In other words, we do not see any price sheet representing T&M. Please clarify.

Government Response (ae)
Fixed unit rate is a form of T&M and Labor Hour; therefore, T&M effort will not specifically be addressed on any pricing sheets.

Contractor Question (al)
Draft Decommissioning Plan–Section 1.0, Facility Operations History, Subparagraph 1.1, License Status and Authorized Activities, fifth paragraph, page 2, and Section 4.1.1., Potential Application of Screening Levels, third paragraph, page 30, refers to the pit depth being 10 feet thick and separated approximately 6 feet horizontally from one another. However, Section 5.0, Planned Decommissioning Activities, second paragraph, page 36, refers to the 5 feet thick layer of waste, which is separated horizontally by 5 feet of sidewalls. Are the waste pits 5 or 10 feet thick? Do 5 or 6 feet of sidewall materials separate the pits horizontally?

Government Response (al)
All dimensions are estimates; however, assume the pits to be 12 x 10 x 10 with 5 of cover and 6 of side wall material.

Contractor Question (ar)
Item L-2 is a regulatory cite incorporating clause 52.216-29 TIME-AND-MATERIALS/LABOR-HOUR PROPOSAL REQUIREMENTS – NON COMMERCIAL ITEM ACQUISITION WITH ADEQUATE PRICE COMPETITION. This clause calls for fully burdened, fixed hourly rates by

labor category. There is no place in the Attachment 0003 to enter fully burdened prices for the various labor categories. Shall we add a sheet on which to enter these rates? Or, perhaps, was the clause included inadvertently?

Government Response ar)
The clause is applicable. The contact [sic] line items that are considered Time-and-Material/Labor-Hour are in the form of fixed unit rates based on a unit of issue. Therefore, fully burdened fixed unit rates are to be provided in Attachment 0003 where identified in the respective task worksheets.

(alterations added). Additionally, the government response to contractor question (ab) of Amendment 0003 states that "[t]he successful offeror may place a barrier in the pit and backfill if they want to while waiting on the EPA to confirm the area, or they may leave it open." (alteration added). Finally, Amendment 0004 provides the contractor question and government response to question (i), stating:

Contractor Question (i)
Based on JMC's response to Question i (Amendment 0002) on September 8, 2009, are bidders to assume that this volume increase (i.e., which now includes backfill material) has no impact to the total volume percent ages (i.e., 81% of Contaminated Soil/Debris/Water; 10% of Mixed Waste, 8% of LLRW, 1% of Hazardous Waste) we are required to bid to [sic] on the Price/Estimate and Technical Estimate worksheets for Tasks 5, 6, and 7?

Government Response (i)
As stated in the response to Question i of Amendment 0002, the backfill material is probably not contaminated; therefore, it should be assumed that it has no impact to the total volume percentages of the waste material.

(alteration added).

Regarding the first five feet of dirt below ground level, or overburden, the July 2009 Revised Final Decommissioning Plan, attached to the Solicitation, is more definitive, stating that "[b]ased on historical records provided by the BARC and the 2006 Characterization survey, the top five feet of overburden associated with each burial pit is considered uncontaminated soil. There is no known surface contamination." One of the historical records provided by the BARC was "a draft summary of the LLRBS produced by Mr. Horner of USDA in the early 1990s."[21] Plaintiff's exhibit 1003, a memorandum from Mr. Horner to an EPA employee, is dated February 4, 1993, and appears to have been a source for the Decommissioning Plan because much of the language is the same. For example, Mr. Horner's 1993 memorandum states in part:

---

[21] According to the Beltsville Agricultural Research Center, W.G. Horner was the Deputy Area Director, Facilities Management and Operations Division, at the BARC.

. . . The site is permitted under USDA's Nuclear Regulatory Commission (NRC) license, No. 19-00915-03, held by the Agency's [USDA] Radiological Safety staff (RSS). . . .

. . .

Through September 17, 1984, waste buried at the site consisted of a variety of BARC research laboratory wastes contaminated with radioactivity. This included dry solid materials such as gloves, paper, and syringes; other solid materials in the form of sealed sources and electron capture detectors; glass and plastic liquid scintillation vials containing liquid scintillant; aqueous and organic bulk liquids; animal carcasses, bedding, and excreta; and all other radioactive contaminated laboratory wastes. . . . The enclosed inventory of radioactive material includes only those materials which have not decayed to background levels. Inventory records of burials from 1949 through 1960 could not be located, thus are not included in the enclosure.

The USDA's license required only the maintenance of radionuclide and activity records for wastes disposed of at the site. As a result, no record of waste container type, waste type, chemical form, or physical form was maintained. Through interviews with employees present during the active life of the site it was determined that the majority of wastes placed in the pits were contained in cardboard boxes. Bulk liquid wastes were contained in plastic or glass carboys and packaged in cardboard boxes with some cushioning and absorbent material. Liquid scintillation vials were either returned to the vial trays and packaged in cardboard boxes, or placed loose in large plastic bags which were packaged in cardboard boxes (often the case for mini-vials used in later years). Depending on the volume of wastes generated, disposal pits were left uncovered until a sufficient volume of waste was contained. No animal carcasses or excreta were placed in the pits until immediately before closure. After September 17, 1984 no liquids were disposed of at the site. After September 24, 1985 only dry solid wastes and animal carcasses, packaged in 55-gallon steel drums, were disposed at the site. Radioactive waste shipment and disposal manifests prepared and maintained for disposals after September 1985, thus providing supplementary waste information for these disposals.

Twenty-three disposal pits were dug from April 6, 1951 to September 7, 1973, and twenty-seven pits from 1974 to 1987. The pits were dug with approximate dimensions of 10 feet wide by 12 feet long by 10 feet deep, with 6 feet of separation between pits and 5 feet of fill on top of each disposal pit. It is estimated that 33,000 cubic feet of waste is buried at the site. Four of the pits contain only dry solid or animal wastes, disposed after 1985, packaged in steel drums.

(omissions added).

23

Mr. Jensen was listed as receiving a carbon copy of Mr. Horner's 1993 memorandum. At trial, Mr. Jensen was asked whether the 1993 memorandum's statement that "[l]iquid scintillation vials were either returned to the vial trays and packaged in cardboard boxes or placed loose in large plastic bags which were packaged in cardboard boxes" reflects how "LSVs were buried, to your knowledge." Mr. Jensen response was:

> Ah, it reads – I guess it reflects maybe the USDA's thinking about how those materials were buried if that's what this all refers to. I assume that's what it all refers to, and certainly I didn't witness any of those burials, so I don't know for sure how they were buried. So it may be an interpretation of our records or something like that.

Mr. Jensen's testimony also included the following exchange regarding the dimensions:

> Q: "The pits were dug with approximate dimensions 10 feet wide by 12 feet long by 10 feet deep, with 6 feet of separation and five feet of fill on top of each disposal pit." Do you see that, Mr. Jensen?
>
> A. Yes, sir.
>
> Q. Again, would you agree that that reflects the understanding of the USDA at this time on how the LRRBS was situated, the condition of it?
>
> A. Configuration, yes.
>
> Q. Okay. Was there anything magical about the five feet of fill on top of each disposal pit? Does that have any meaning – special meaning according to your understanding?
>
> A. All of those dimensions are in – to my understanding would be in accordance with the regulatory requirement for the burial.
>
> Q. Okay. So that's how it was required to be done?
>
> A. Correct.

Conversely, defendant called Dr. Steve Brauner, an environmental engineer, to testify as an expert witness. When asked his "expert opinion to a reasonable degree of engineering certainty about the overburden at the LLRBS," Dr. Brauner stated that "it would have been more reasonable to have expected to encounter waste material within five feet of the ground surface and that there was not going to be a clean five feet of material over the waste at all at the LLRBS" because, in part, Cabrera's Daily Report for June 6, 2006, "stat[es] that the top of the waste pit was less than five feet below the existing grade surface." (alteration added). In response to Dr. Brauner's deposition testimony, plaintiff's

expert, John Fulton and a senior executive and program consultant, stated at trial that he did not agree with Dr. Brauner because "I didn't find any data that to me would counteract what was put in the solicitation and its attachments."[22] Mr. Fulton also stated that, "[i]n the narrative of the WCS [Waste Characterization Survey]," he did not "find anything that stated there would be waste in the overburden." (alterations added).

Carl Young, a former Cabrera employee who prepared the Draft Decommissioning Plan, portions of the Waste Characterization Survey, and the Final Decommissioning Plan, stated at trial that the Decommissioning Plan's statement regarding the overburden being uncontaminated and that there was no known surface contamination were accurate.[23] Regarding the Decommissioning Plan's statement that LSVs were "either placed on vial trays and packaged in cardboard boxes for disposal, or place loose in large plastic bags, then in cardboard boxes," Mr. Young explained that, according to his understanding, when Cabrera removed the cardboard boxes containing LSVs from Pit #26, "they were saturated with water and had to be carefully removed because they would fall apart . . . but all of the LSCs [LSVs] were either – as I recall, most of them – I mean, they were largely intact, but they had to be carefully removed and segregated so that they wouldn't break. (alteration added).

Defendant issued Amendment 0005 to the Solicitation on October 15, 2009, announcing that "Cabrera Services is hereby prohibited from participating in this solicitation as a prime contractor, subcontractor, team member or partner with any other offeror" to avoid an "organizational conflict of interest." The conflict existed because "this solicitation includes a Decommissioning Plan, Final Site Survey Plan, and Site Characterization Survey which were prepared by Cabrera."

Mr. Young also testified that, prior to Amendment 0005's removal of Cabrera from competition for award of the procurement at issue, Mr. Young "work[ed] on a proposal for Cabrera for the LLRBS remediation." (alteration added). When working on Cabrera's proposal in response to the Solicitation, an effort that only lasted "perhaps two weeks," Mr. Young relied upon Cabrera's first-hand experience gained during the waste characterization effort at the LLRBS, the Decommissioning Plan, and "the references that were in the DP, the Apex reports, EnTech report, and the WCS itself." Among the assumptions relied upon by Cabrera when preparing a proposal for the Solicitation, Mr. Young recalled at trial that "assum[ing] five feet of overburden" and that the LSVs "would be grouped to some extent in the soil," basing this later assumption "on the single pit that we [Cabrera] encountered with a large volume of in situ water and a large volume of vials." (alterations added). Regarding the Decommissioning Plan's statement that "the nature

---

[22] Plaintiff's expert, John Fulton, testified at trial that his opinion was informed by the deposition transcripts of the contracting officer, Mr. Jackson, the USDA Project Manager, and Mr. Young, Cabrera's employee, as well as Dr. Brauner's written, expert opinion. Mr. Fulton testified, at trial, prior to Dr. Brauner.

[23] Mr. Young added that "'[s]urface' to the NRC means the upper six inches or – what is it? – X number of centimeters, of the surface soil to the NRC in most states."

and extent of the waste in the pits will be highly variable," Mr. Young testified that "'nature' means the type of contaminants" and "'[e]xtent' means how far those contaminants – where are they located in the subsurface," meaning the Decommissioning Plan could fairly be interpretated to mean "the types and distribution of the waste would vary across the site." (alteration added).

On September 21, 2009, defendant provided prospective offerors an opportunity to visit the LLRBS, and the site visit began with a PowerPoint presentation provided by the contracting officer and was followed by an opportunity to ask questions; plaintiff participated in the site visit. One slide of the presentation provided to prospective offerors states that "[p]roposals should be based on the PWS and the Draft Decommission [sic] Plan." (alterations added). Offerors were not authorized to conduct subsurface investigations of the LLRBS, and the single site visit was the offeror's only opportunity to visit the LLRBS prior to performance. At trial, the contracting officer testified that she could not recall whether offerors were authorized to walk upon the North Field of the LLRBS during the site visit or whether the North Field was fenced. When the contracting officer was asked, however, "did you look at either the north or the south field," the contracting officer stated: "I viewed it from the outside." When asked "whether offerors were permitted the opportunity to walk in the south field," the contracting officer replied: "I believe they were." The contracting officer did not observe any LSVs visible on the surface of the North Field during the site visit.

Plaintiff submitted a timely proposal, dated December 11, 2009, employing a technical approach designed to "perform all work and final radiological release survey within the guidelines of the site Decommissioning Plan (DP) (July 2009), Final Status Survey (FSS) Plan (October 2008), and Waste Characterization Survey (July 2008)." TPMC's proposal included the following figure, which, according to plaintiff, "showed the conditions at the LLRBS that TPMC anticipated based on the Solicitation, amendments, and attachments" below:



Based on these anticipated conditions, plaintiff proposed a 9-Phase Remediation Approach: (1) Removal of Overburden, (2) Remediate Waste Pits, (3) Remediate and Remove Sidewall Soils, (4) Characterize Underlying Soils, (5) Remediate Underlying Soils, (6) Remove Underlying Soils, (7) Conduct Final Status Surveys, (8) Backfill, and (9) Site Restoration. Generally, plaintiff intended to "bulk excavate the soils for either direct loading into waste packaging or processing for potential reuse for backfill" when removing the "overburden, pit sidewalls, and underlying materials." The proposal "acknowledge[s] that actual site conditions may vary from" the conditions anticipated by plaintiff. (alteration added).

Plaintiff's proposed bulk excavation strategy was to remove the overburden one foot of soil at a time, conducting a beta-gamma walkover survey following the removal of each layer, down to five feet below ground surface, as required by the decommissioning plan.[24] Plaintiff's proposal clarifies that "[a]lthough the overburden is presumed clean, the

---

[24] The July 2009 Revised Final Decommissioning Plan directs:

Soil will then be excavated from the top five feet of clean cover fill material in one foot lifts. As each one-foot-lift is excavated, the newly-exposed ground surface will be surveyed via beta and gamma walkover survey. Beta

DP requires a MARSSIM [Multi-Agency Radiation Survey and Site Investigation Manual] FSS [Final Site Survey] to confirm this understanding." (alterations added). But the proposal does state that "[u]nconsolidated surface soils (i.e., overburden) will be removed using a bulldozer and front-end loader for transport to the clean soils staging area." (alteration added). Plaintiff proposed "to sequence the excavation consistent with the burial pit numbering sequence provided in the pit locations figure in the DP (i.e., Pit 1, 2, 3…46)." (emphasis and omission in original). The proposed "west to east and north to south" excavation would "ensure rainwater does not accumulate in low-lying areas by minimizing natural surface water flow disruption along the natural land contours" and "prevent[] contamination during excavation operations."[25] (alterations added). Dr. Daniel Caputo, plaintiff's Vice President responsible for radiation remediation projects, testified that the proposed excavation strategy encompassed "the whole LLRBS



North Field." Included in the proposal was the picture copied below, which appears to depict the North Field of the LLRBS following the proposed excavation of the first row, Pits 1-7, of overburden:[26]

---

and gamma walkover surveys will be performed at the undisturbed, original ground surface, then at one foot below original surface grade, then at two feet below original surface grade, all the way down to five feet below original surface grade.

Beta and gamma walkover surveys were "used to identify areas of elevated radioactivity."

[25] Plaintiff's proposal included a "Water Management and Erosion Control" Plan that included "cover[ing] any exposed face of the contaminated areas every night and/or such times that rain may be predicted," "install[ing] engineered barriers to minimize the migration of surface water runoff onto the areas where waste material has been exposed," and a water collection system, including sump pumps and storage tanks to address "the potential impact of rainwater collecting in the excavation pits above the waste material." (alterations added).

[26] The acronym BGS, as used in the image, represents Below Ground Surface.



Plaintiff's proposal acknowledges that "the pit contents are of a highly hetero-geneous nature with the potential for a wide variety of waste types (i.e., containerized waste, liquids, sealed radioactive sources, laboratory glassware, animal carcasses, etc.)." Plaintiff understood, and acknowledged in its proposal, that this "complex waste mix presents a unique challenge in preventing cross-contamination of hazardous and radioactive waste to minimize the generation of mixed waste."

According to Dr. Caputo, "one of our driving requirements or conditions in our proposal was to minimize breakage [of LSVs]." Dr. Caputo testified that, if glass LSVs containing "toluene or xylene as a matrix, which were both RCRA hazardous materials," were to break and spill their contents onto radioactive soil, the result would be radioactive soil mixed with RCRA soil. Dr. Caputo stated that "the cost of disposing of radioactive soil versus radioactive soil mixed with RCRA soil, the difference is about somewhere between ten to twenty times as expensive," adding that "[t]he mixed waste is much more expensive." (alteration added). Seemingly as a precaution against this scenario, plaintiff proposed to have an Army-approved Certified Waste Broker[27] onsite during remediation

---

[27] According to the Decommissioning Plan, the Certified Waste Broker was to report directly to Mr. Jensen, the USDA project manager, and was responsible for:

- Developing the waste profiles for the disposal site(s) of choice, based on sample data generated at the site;
- Ensuring all generated waste materials are inspected and properly prepared for shipment as per applicable regulations;
- Manifesting the wastes;

activities to "direct precision excavation whenever any containerized wastes or potentially hazardous materials are encountered."

Applying this excavation approach, plaintiff intended to remove the overburden to a "clean soils staging area" and to "load and transport waste soils, debris, containers, and liquids from the excavation to the appropriate on-site processing area for screening and packaging." "The two primary options for on-site waste loading and transport are 1) loading bulk soils into articulated dump trucks for transport to the power shaker screen and conveyor for direct waste or 2) loading waste materials and debris into a containment bin or overpacked for transport."

After on-site loading and transport, plaintiff's proposal describes "a highly innovative and robust waste scanning, sorting, and segregating process" designed "[t]o minimize project cost and risk." (alteration added). The proposed segregating process utilized "two distinct approaches to scanning, sorting, and segregating waste removed from the LLRBS." The first approach was to use the Waste Sorting and Segregation Facility, a building located at the LLRBs, "for the hand sorting and segregation of all containerized waste and liquids, LSVs, radioactive sources, and other heterogeneous materials." The second approach was to use the power shaker screen and conveyor for direct waste, known as the Conveyor Scan System, "for in-process debris separation, soil scanning, and waste minimization sorting during excavation activities."

The Conveyor Scan System was described by plaintiff as "an innovative approach to segregate debris from soil, then to segregate the soil based on the gross beta/gamma radiation levels," and was depicted in plaintiff's proposal as:

---

- Obtaining generator certification from proper BARC/ARS personnel;
- Procuring all necessary permits;
- Ensuring that the waste hauler is properly certified;
- Witnessing all waste shipments from the site; and
- Acting as support oversight for waste disposal activities.



Plaintiff proposed that bulk soils could be fed into the Conveyor Scan System, which would shake the soils over a screen in the trommel to sift the soil, diverting and containerizing oversized material. Continuing through the system, the remaining soil would be shaped by a scraper before passing through a detector array. The detector array, in conjunction with the system's Control Center, would command a reversing conveyor belt to direct the soil on a certain path based on the soil's radiation level. Thus, according to plaintiff, the Conveyor Scan System would "segregate soil into two disposition pathways: direct load of soil material that exceeds the DP/FSS DCGLs [Decommissioning Plan/Final Status Survey Design Plan Derived Concentration Guideline Limit] into transport containers for off-site disposal and stockpiles of soil for potential reuse on-site." (alteration added). According to plaintiff's proposal, "[t]his technical approach, coupled with directed precision excavation, allows for near real-time assessment of excavated soils, which assists in minimizing overexcavation [sic] and reducing the volume of soil material below the DP/FSS [Decommissioning Plan/Final Status Survey Design Plan] criteria to be shipped off-site for waste disposal." (alterations added).

Plaintiff's Volume I – Technical – of its proposal also states that:

The scanning, sorting, and segregation subtask will address the following waste types; each processing approach is discussed in the following phased remediation approach:

♦ bulk clean soils (Zone 1 overburden, 0-5' bgs [below ground surface], nominally);

♦ waste pit contents (Zone 2 soils, debris, liquids, DAW [Dry Active Waste], LSVs, bulk water);

- ♦ interstitial sidewall Soils (Zone 2 soils);

- ♦ underlying contaminated soils (Zone 3 radioactive or hazardous soils); and

- ♦ underlying clean soils (Zone 3 non-contaminated soils).

(formatting in original; alterations added). Plaintiff's "Phase 2–Remediate Waste Pits (Zone 2)" proposed approach states in part:

> Following removal of the overburden, excavation will continue as directed by the CWB [Certified Waste Broker] and/or HP [Health Physicist] staffing to identify the perimeter of each burial pit. A visual inspection will be performed using process knowledge to direct the excavation of the waste, thereby minimizing the potential for breaking the LSVs or other containers with liquids.

> Containerized wastes will be segregated and staged for further hand-sorting in the WSSF [Waste Sorting and Segregation Facility]. TES will utilize a power-actuated box screen and a variable speed-sorting conveyor to separate loose soil from debris, including DAW [Dry Active Waste], and LSC vials.

(alterations added). Plaintiff's "Phase 3–Remediate and Remove Sidewall Soils (Zone 2)" proposed, after having remediated a pit, to remediate the pit's sidewalls "through direct radiation measurements and biased sampling [targeted sampling]," after which "the excavation operator will remove impacted soils. (alteration added). These contaminated soils will be screened using the Conveyor Scan System and directly loaded into the waste packaging for off-site disposal." "Once all of the pit waste has been removed and the sidewalls remediated, all remaining sidewall soils will be bulk excavated. This soil will be power screened and 100% scanned using the CSS [Conveyor Scan System]."[28] (alteration added). Finally, plaintiff's "Phase 6–Remove Underlying Soils to 15 Feet BGS (Zone 3)" proposed approach states that, having remediated the overburden, pits, and interstitial soils,

> "TES will then remediate all remaining soils to a depth of 15 feet bgs [below ground surface]. These soils will be bulk-excavated as described in Phase 3, with all soils processed through the CSS [Conveyor Scan System] and sampled in compliance with MARSSIM [Multi-Agency Radiation Survey and Site Investigation Manual] Class 1 survey requirements."

---

[28] Plaintiff's Phases 4 and 5 of its proposed approach also characterize and remediate the pits' underlying soils in a targeted manner, similar to how plaintiff proposed to characterize and remediate the sidewalls.

(alterations added).

Plaintiff's initial price proposal included a Fully Burdened Price Roll-up for Evaluation Purposes, totaling $4,167,853 and replicated below:[29]

| WBS | Task # | Fully Burdened Price Roll-up for Evaluation Purposes | |
| --- | --- | --- | --- |
| | | Description | Total |
| BARC.01 | 1 | Work Plan | $ 73,263 |
| BARC.02 | 2 | Mobilization + Demobilization | $ 246,102 |
| BARC.03 | 3 | Site Remediation | $ 1,615,996 |
| BARC.04 | 4 | Site Sampling | $ 395,712 |
| BARC.05 | 5 | Packaging + Staging | $ 326,369 |
| BARC.06 | 6 | Transportation | $ 619,022 |
| BARC.07 | 7 | Treatment + Disposal | $ 804,069 |
| BARC.08 | 8 | Final Status Survey Report | $ 43,194 |
| BARC.09 | 9 | Baseline Risk Assessment | $ 44,126 |
| | | Total Evaluated Price: | $ 4,167,853 |

To calculate an evaluated price for Task 3 – Site Remediation, plaintiff states that "[a]ll material in the designated North Field LLRBS area (150' x 200') will be excavated down to 15 feet below ground surface. This results in a 16,667 cy [cubic yards] insitu volume being excavated." (emphasis in original). The price proposal also states that "[a]ll overburden material down to 5 feet below ground surface will be surveyed clean and available for reuse." (alteration added). Underneath the overburden, the proposal assumes that "1040 cy of waste material in the burial pits," containing "81% Contaminated soil/debris/water, 10% Mixed waste, 8% LLRW, and 1% Hazardous Waste," and an additional 924 cy would be excavated to "meet NRC and EPA release criteria" and to account for "contaminated soil containing only hazardous wastes." (alteration added). Therefore, the proposal states that "[t]he total exsitu volume of material shipped offsite is 1964 cy based on the above information provided." (emphasis in original). Finally, the proposal assumes "[n]ormal weather conditions will exist during field efforts. TES has included normal weather delays in planning." (alteration added).

Initially, plaintiff's proposal was found to be not technically acceptable. Plaintiff received a letter from the Army, dated March 12, 2010. The March 12, 2010, letter identified three "deficiencies, weaknesses and comments" related to plaintiff's proposal. The first identified deficiency was that plaintiff's "proposal did not provide a Technical Estimate Spreadsheet using the waste stream percentage estimates as stated in Attachment 0002 of the RFP." Instead, plaintiff appears to have included internally derived waste streams in its Technical Estimate Spreadsheet, as opposed to those specified in the Solicitation, making defendant's comparison of the different technical approaches proposed by the offerors difficult. The second deficiency identified was that "[t]he proposal

---

[29] As defined above, BARC stands for "Henry A. Wallace Beltsville Agricultural Research Center."

did not clearly state that TES will not engage directly with the NRC or EPA without USDA knowledge and approval."[30] (alteration added).

Plaintiff provided a "second submittal while in the 'discussions phase' related to TES' [sic] Technical/Cost Proposal." (alteration added). To correct the first identified deficiency, plaintiff provided new Technical Estimate Worksheets for Tasks 5-7, utilizing the required waste stream percentages, and "further acknowledge[d] that these estimated percentages are for proposal evaluation purposes and may not relate directly to our technical approach or total cost estimates." (alteration added). Plaintiff corrected the second identified deficiency, stating in part:

> It is TES' intent to work closely with and take direction from our client (JMC/USDA) regarding any and all communications with the NRC and/or the EPA. Any communications will be documented in writing and at no time during the project lifecycle will any TES representative initiative [sic] communications with the NRC and/or the EPA unless authorized by JMC/USDA.

(alteration added).

"After discussions closed," according to the contracting officer's testimony at trial, "all the offerors were given the opportunity to update their pricing proposal to reflect – to incorporate anything that may have changed through the open discussion session." The contracting officer also stated that "[b]ecause the percentages [plaintiff used in its original proposal were incorrect] – they needed to include their fixed unit rates based on the waste characterization percentages on the pricing sheets," i.e., plaintiff's update to the technical estimate spreadsheet necessitated plaintiff submitting updated pricing spreadsheets. (alterations added). Instead of simply updating the pricing spreadsheets, however, plaintiff submitted two new pricing proposals, both dated April 7, 2010. Plaintiff's two pricing proposals are referred to as the Revised Price Proposal and the Alternate Price Proposal. Plaintiff's Revised Price Proposal reflected its original price proposal, except for revised prices for Tasks 5-7 using the waste streams specified in the Solicitation, and plaintiff's Alternate Price Proposal reflected its original price proposal.[31] A comparison of the fully burdened, fixed unit rates listed in the Revised and Alternate Price Proposals, for Tasks 5-7, is reflected here:

---

[30] The third deficiency identified related to the Conveyor Scan System's documented effectiveness but is not pertinent to this case.

[31] Plaintiff's Alternate Price Proposal, Joint Ex. 029, displays plaintiff's price proposal by task on Bates 001529 of the trial record. Bates page 001529 is not displayed in its entirety because the top of the page has been cutoff. Nevertheless, the prices proposed for each task and the sum of the proposed prices can be discerned.

| Proposed Fully Burdened Fixed Unit Rates | | | |
|---|---|---|---|
| | Unit | Revised | Alternate |
| Task 5 | | | |
| Contaminated Soils (81%) | cu yd | $ 150.77 | $ 212.84 |
| Mixed Waste (10%) | 55-gal | $ 110.07 | $ 123.57 |
| LLRW (8%) | cu ft | $ 9.27 | $ 5.41 |
| Hazardous Waste (1%) | 55-gal | $ 173.77 | $ 147.79 |
| Task 6 | | | |
| Contaminated Soils (81%) | cu yd | $ 292.72 | $ 497.12 |
| Mixed Waste (10%) | 55-gal | $ 131.36 | $ 132.51 |
| LLRW (8%) | cu ft | $ 28.41 | $ 10.33 |
| Hazardous Waste (1%) | 55-gal | $ 39.38 | $ 36.84 |
| Task 7 | | | |
| Contaminated Soils (81%) | cu yd | $ 118.90 | $ 118.90 |
| Mixed Waste (10%) | 55-gal | $ 486.91 | $ 487.18 |
| LLRW (8%) | cu ft | $ 23.10 | $ 12.83 |
| Hazardous Waste (1%) | 55-gal | $ 27.30 | $ 27.31 |

Defendant evaluated the proposals from all offerors, determining that, according to the contracting officer, that "all three offerors were technically equal" but that, with "TPMC, their approach with using the surveyor – conveyor system and the lower price, they were determined to be the best value to the government." Following the evaluation phase of the procurement, defendant awarded Contract W52P1J-11-D-0001 to plaintiff, with an effective date of November 9, 2010, to plaintiff. The contract language described it as a "3-year Indefinite Delivery Indefinite Quantity (IDIQ) contract"[32] awarded to plaintiff "for remediation services for the free release/decommissioning, and license termination of the Beltsville Agricultural Research Center (BARC) burial site located in Beltsville, MD." The Contract identified the following CLINs:

| CLIN | Description | Contract Type |
|---|---|---|
| 0001 | Work Plan | Firm Fixed Price |
| 0002 | Mobilization/Demobilization | Firm Fixed Price |
| 0003 | Site Remediation | Fixed Unit Rate |
| 0004 | Site Sampling | Fixed Unit Rate |
| 0005 | Packaging/Staging | Fixed Unit Rate |
| 0006 | Transportation | Fixed Unit Rate |
| 0007 | Treatment/Disposal | Fixed Unit Rate |
| 0008 | Final Status Survey Report | Firm Fixed Price |
| 0009 | Human Health Baseline Risk Assessment | Firm Fixed Price |

---

[32] Without explanation, the Contract states: "Contract Expiration Date: 2015 OCT30." The underlying IDIQ contract is a three-year contract, with an effective date of November 9, 2010.

The Contract states "CONTRACT TYPE: Firm-Fixed-Price" and the "KIND OF CONTRACT: Service Contracts." (capitalization in original). The Contract specifies that "Task Orders will be awarded for remaining tasks in the PWS utilizing rates agreed to in the Pricing Sheet found at Attachment 0002 (not electronically posted)." The contracting officer testified that "[o]ur contract writing system only allows us to select firm fixed price or cost type for the type of contract." Because the contracting officer believed "firm fixed rates are similiter to what's used with a firm fixed price line item or contract CLIN" and "[b]ecause within each of the line items, we indicate whether it is firm fixed price or fixed unit rate, and I consider fixed unit rate to be a form of firm fixed price," the contracting officer testified that she does not believe that "having a base IDIQ contract listed as firm fixed price but including some fixed unit rate CLINs . . . presents an inconsistency within the document." (alteration and omission added).

Attached to the Contract are the PWS (Attachment 0001), Price Spreadsheet (Attachment 0002), Quality Assurance Surveillance Plan (Attachment 0003), Draft Decommissioning Plan (2009)[33] (Attachment 0004), plaintiff's Proposal (Attachment 0005), and Open Discussion Questions and Answers (Attachment 0006).[34] In addition to including FAR 52.216-18 Ordering (OCT 1995), the Contract states that "[a]ll task orders and modifications executed under this contract shall refer to this contract and shall be subject to the applicable terms and conditions incorporated in this contract." (alteration added). Finally, defendant issued the Contract and its four modifications, Task Order 0001 and its four modifications, Task Order 0002 and its sole modification, and Task Order 0003 and its thirteen modifications.[35]

Defendant awarded Task Order 0001, dated the same day as the Contract, satisfying "the guaranteed minimum requirement for the basic IDIQ contract." Task Order 0001 required plaintiff to create a work plan and obligated $73,263.00 under CLIN 0001AA, as well as identified the contract type as "Firm-Fixed-Price." The task order states, "[t]his task order is firm-fixed price." (alteration added). Task Order 0001 facilitates the PWS and Draft Decommissioning Plan's requirement to create a work plan prior to

---

[33] The Contract states that "[t]he final Decommission [sic] Plan will be incorporated upon approval from the Nuclear Regulatory Commission (NRC)." (alterations added). The parties agree that the Final Decommissioning Plan (2012) is not materially different from the Draft Decommissioning Plan (2009), as the plans pertain to this case.

[34] When asked to specify which of the two price proposals, Revised or Alternate, was accepted by the Government, the contracting officer stated "[t]he Alternate." (alteration added). Plaintiff claims it cannot confirm which proposal was in Attachment 0002 and that "a March 28, 2012, internal TPMC email identified that the Contracting Officer never sent the Attachments to the Contract."

[35] Task Order 0003 has been modified a total of twenty-five times, but, according to the parties, only the thirteen modifications identified in the trial record are relevant to the case currently under review.

initiating work at the LLRBS. The work plan created by plaintiff under Task Order 0001 became known as Work Plan Revision 0.

On November 23, 2010, defendant held a post-award meeting with plaintiff, at which the parties "reviewed the CLIN structure" of the contract and plaintiff was allowed "to ask questions regarding the project." At the meeting, the parties established that "there is not much that TES can get started on besides portions of the Work Plan" while the parties were "waiting on the Decommissioning Plan (DP) to be finalized by the NRC." Also at the meeting, the following was part of the question-and-answer exchange:

Q: What will happen if the waste streams change or the amounts of material changes from what is anticipated via the DP and TES proposal?

A: We will use the unit rates in the contract but would adjust for price for the amount/type of waste.

. . .

Q: Does the DP or Final Status Survey (FSS) take precedence?

A: The DP would be the better document to use as the FSS is more of a guide.

. . .

Q: Who approves the work plan?

A: The NRC does not approve it. Derek, Dana, John and Matt will review and approve it.

(omissions added).[36]

On September 1, 2011, defendant issued Task Order 0001, Modification 01, to extend the period of performance to May 31, 2012. On January 5, 2012, defendant unilaterally issued Contract Modification P00001, amending the underlying IDIQ Contract; Contract Modification P00001 provided administrative instructions to Army contractor holders regarding invoicing and is not at issue in this case.[37]

---

[36] Defendant's reference to Derek, Dana, and John appears to refer to Derek Cornette, the contracting officer representative, Department of the Army, Dana Jackson, project manager, USDA, and John Jensen, Chief of Radiation Safety Division, USDA. The court is not aware of to whom "Matt" refers.

[37] Contract Modification P0001, in Block 14 and without explanation, states: "Contract Expiration Date: 2015OCT30."

On February 28, 2012, about fifteen months after award of the Contract, defendant emailed to plaintiff a technical memorandum that revised calculations used to determine the Derived Concentrations Guideline Levels, a metric "utilized during the final status survey in support of site decommissioning activities at the LLRBS." The technical memorandum was created by Cabrera and appended to the Draft Decommissioning Plan. The resulting document became the "REVISED FINAL DECOMMISSIONING PLAN," dated "January 2012," and appears to have been submitted by the USDA to the NRC in March 2011. (capitalization in original).

While the NRC reviewed the proposed Decommissioning Plan, plaintiff continued to develop Work Plan Revision 0. On May 1, 2012, defendant issued bilateral Modification 02 to Task Order 0001. Task Order 0001, Modification 02, served, in part, as "an official notice to begin work to initiate the work plan for the excavation and other remediation activities at the LLRPS [sic] to ensure timely mobilization after Nuclear Regulatory Commission (NRC) approval of the LLRBS Decommissioning Plan (DP)" and to "extend[] the period of performance to 30 November 2012." (alterations added).

On October 18, 2012, defendant awarded Task Order 0002, which states "[t]his task order is firm fixed price." Nevertheless, while "CLIN 0001AA, Project Cost," was "established as a Firm Fixed Price CLIN," "CLIN 0002AA, Travel Cost," was "established as a Cost Reimbursable CLIN." Task Order 0002 appears to establish reimbursement to plaintiff for its participation and support of a presentation provided by the USDA to stakeholders, including members of the public, that occurred in October 2012 because Task Order 0002 states "[t]he on-site period of performance is 16 October 2012 thru 17 October 2012." The USDA presentation utilized information that appears to have been provided by plaintiff, including the figure provided above that depicted plaintiff's anticipated conditions at the LLRBS.[38]

On October 24, 2012, defendant emailed plaintiff to determine whether plaintiff "wish[ed] to update the fully burdened rates for Task 2 through Task 9 of the awarded contract, W52P1J-11-D-0001." (alteration added). According to the contracting officer at trial, "we sent or we may have discussed, but there was an email that was sent to TPMC asking them if they would like to update their pricing because it had been almost two years since the proposal or the contract was awarded." Plaintiff's response, a letter dated November 1, 2012, requested an increase of $506,286.51 to "TES' original proposed price of $4,216,365,"[39] appearing to result in an escalation rate of 12.22 percent.

---

[38] The Title Slide is dated October 16, 2012, and contains the logos of plaintiff, the USDA, and the USDA's Agricultural Research Service, whereas the remaining slides contain only plaintiff's logo.

[39] Plaintiff's original proposal, also known as the Alternate Proposal, was priced at $4,167,853 and was not technically acceptable. Plaintiff's Revised Price Proposal totaled $4,216,365, but plaintiff's Alternate Price Proposal, totaling $4,167,853, was the proposal accepted by defendant.

The "Lead Contract Price/Cost Analyst" of the "Contract Pricing Division," reviewed plaintiff's escalation request and created a memorandum dated November 9, 2012. The memorandum limits the scope of the review, appearing to characterize the escalation proposal as a fixed price proposal:

> Field Pricing Assistance was not required for this effort. Defense Federal Acquisition Regulation Supplement (DFARS) Procedures, Guidance, and Information (PGI) 215.404-2(c)(i)(A) states, "The contracting officer should consider requesting audit assistance from DCAA for fixed price proposals exceeding $10 million." The proposal does not exceed the threshold for obtaining audit assistance. DFARS PGI 215.404-2(a)(i)(A) states, "The contracting officer should consider requesting field pricing assistance for fixed price proposals exceeding the cost or pricing data threshold." The proposal does not exceed the threshold for obtaining field pricing assistance.

The analyst summarized his review as follows:

> Based on the preceding review, the methodology utilized by TES in determining an escalation factor appear [sic] reasonable and the calculated weighted average escalation of 12.22% appears mathematically accurate.

> However, the analysis questions the reasonableness of simply applying an escalation factor to a contract price that is 2½-3 years old without any recognition or review of the underlying costs and factors (such as labor rates, indirect rates, etc.). As such, this analysis makes no assessment of the escalated contract price.

> This analysis recommends that the contracting officer consider obtaining an updated proposal from TES to ensure that the proposed escalation factor is reflective of all of the changes that have occurred in the 2½-3 years since the proposal was originally priced.

(alteration added).

Despite plaintiff stating its escalation request was based upon the "original proposed price," which totaled $4,167,853, had been found not technically acceptable, and which became known as the Alternate Price Proposal, plaintiff's escalation request appears to be based upon plaintiff's Revised Price Proposal. Plaintiff's escalation request, dated November 1, 2012, includes "Table 2: Escalation Presented by Task," which is replicated, in relevant part, here:

| Task # | Task Description | [Revised Price] | Escalated Price | Weighted Escalation | Escalation Rate |
|---|---|---|---|---|---|
| 1 | Work Plans | $73,263 | $73,263 | $0 | |
| 2 | Mobilization & Demobilization | $246,102 | $276,176 | $30,074 | 12.22% |
| 3 | Site Remediation | $1,615,996 | $1,813,470 | $197,474 | 12.22% |
| 4 | Site Sampling | $395,712 | $444,068 | $48,356 | 12.22% |
| 5 | Packaging & Staging | $370,520 | $415,797 | $45,277 | 12.22% |
| 6 | Transportation | $743,831 | $834,727 | $90,896 | 12.22% |
| 7 | Treatment & Disposal | $683,621 | $767,159 | $83,538 | 12.22% |
| 8 | Final Status Survey Report | $43,194 | $48,472 | $5,278 | 12.22% |
| 9 | Baseline Risk Assessment | $44,126 | $49,518 | $5,392 | 12.22% |
| | | | | | |
| | **Total** | **$4,216,365** | **$4,722,652** | **$506,287** | 12.01% |

(alteration and column six, "**Escalation Rate**," added).[40] The prices listed in column three, "[Revised Price]," match those listed in the Revised Price Proposal.

The parties subsequently signed Contract Modification P00002, effective November 26, 2012. Contract Modification P00002's "Contract ID Code" is "Firm-Fixed-Price." The Contract Modification states, in Section A: "Kind of Modification: Change Order/Funding Action/Administrative Change." Narrative Section A0003 of the contract modification states:

> 1. The purpose of this contract modification is to update the fully burdened rates for Task 2 through Task 9 of contract W52P1J-11-D-0001, Beltsville. This pricing revision request is the result of a 2 year delay in finalization of the Decommission [sic] Plan.

> 2. Task Orders will be awarded for remaining tasks in the PWS utilizing the new rates agreed to in the Pricing Sheet found in Attachment 0007 – TES BARC Escalation Request Letter_1NOV12. All task orders and modifications executed under this contract shall refer to this contract and shall be subject to the applicable terms and conditions incorporated in this contract.

> 3. All other terms and conditions of W52P1J-11-D-0001 remain unchanged.

(alterations added).

---

[40] To determine the value of column six, "Escalation Rate," the court divided column five, "Weighted Escalation," by column three, "[Revised Price]." The court renamed column three, which is "Initial Price" in the original, to clarify that the by-task prices listed in the Table come from plaintiff's Revised Price Proposal, not the Alternate Price Proposal.

In December 2012, the NRC approved the Revised Final Decommissioning Plan, dated January 2012. Additionally, the NRC issued a Safety Evaluation Report Related to Approval of the Decommissioning Plan License No. 19-00915-03, Docket No. 03004530, dated December 2012. According to Mark Roberts, the NRC's lead inspector assigned to the LLRBS, the information in the safety evaluation report was "accurate to the best of our knowledge at the time it was prepared." The report states in part:

> The BARC LLRBS is made up of a total of 50 designated waste burial pits, of which, only 46 were reportedly used. The pits are approximately 10 feet wide by 12 feet long by 10 feet deep and are separated approximately five feet horizontally from one another. Each pit was reportedly backfilled to surface grade with at least 5 feet of clean soil.

> . . .

> Inventory records of burials from 1949 through 1960 could not be located and thus the estimated radionuclide activities in the BARC LLRBS may to be greater than the tabulated values listed in Section 4.4.1. The characterization study of the pits initiated in 2005 included one of the pits where the disposal records could not be located. The radioactive isotopes identified and the types of waste were not different than the contents of the pits for which records were available.

> . . .

> Based on historical records provided by the USDA and data from the 2005 waste characterization study, the top five feet of soil overburden associated with each burial pit and the soil between the pits is considered uncontaminated soil. There is no known surface contamination. Upward migration of radiological contamination or undocumented spills into the clean overburden will be evaluated through testing of these soils. The overburden is to be removed in one-foot lifts and segregated from the waste removed from the LLRBS. The over burden may be suitable for use as clean backfill pending analytical results.

> . . .

> The USDA estimates that it will cost approximately $7M to complete the decommissioning project at the LLRBS. This estimate is largely dependent on the amount of mixed waste in the burials [sic] pits and the associated costs of disposal or treatment. Based on this cost estimate, the decommissioning will be executed within approximately 12 months following approval of the DP by the NRC.

(alteration and omissions added).

Plaintiff's LLRBS project manager, Brian Clayman, submitted a draft of Work Plan Revision 0 to defendant for review on September 10, 2012. Defendant provided comments regarding Work Plan Revision 0, and plaintiff submitted Work Plan Revision 0, dated January 2013.[41] Work Plan Revision 0 was accepted by defendant on March 7, 2013.

Work Plan Revision 0, according to defendant, "was mostly consistent with the technical approach it proposed in response to the solicitation, with one glaring exception: TPMC was no longer using the innovative CSS [Conveyor Scan System] to sort debris and scan soil." (alteration added). According to the minutes of a meeting attended by employees of plaintiff and its venture partner, Energy*Solutions* (ES), "ES determined to bid work using [the Conveyor Scan System]," which was "[o]riginally envisioned to operate on three jobs and split costs among the three jobs." (alterations added). Energy*Solutions* "won BARC [the contract to remediate the LLRBS] but did not win the other two jobs," and then "made [the decision] not to buy the soil sorter [Conveyor Scan System]." (alterations added).

Plaintiff's Work Plan Revision 0 states: "There is a possibility that waste pits were buried at more shallow depths than the approximate five foot depth that is anticipated through review of historical data. Should TES discover this condition, removal of overburden soil will be halted and the waste pit will be immediately remediated." To replace the function of the Conveyor Scan System, Work Plan Revision 0 apparently contemplated a significant amount of hand sorting; the plan states that "[w]hen the debris contents become visible, the remainder of the pit will be performed by hand until the item has been uncovered" and "[b]agged and containerized wastes will be removed from the burial locations by hand, and lifted out with the assistance of heavy equipment, to minimize the potential for rupture." (alterations added). Defendant argues that "Work Plan Revision 0 also contemplated that TPMC would find non-containerized waste and broken LSVs." The work plan, however, characterizes "container punctures, items found outside of container, broken Liquid Scintillation Vials (LSV), etc [sic]" as "abnormalities." (alteration added). Finally, the work plan appears to propose processing bulk soils with an unfavorable waste determination, as made by the Certified Waste Broker, by using a "shaker screen" to separate potential waste material from the soil.

Effective February 1, 2013, defendant issued Task Order 0001, Modification 03, a bilateral modification, "to extend the period of performance to 31 March 2013 to allow for completion of the workplan." Six days later, defendant issued Contract Modification

---

[41] Asked if she read Work Plan Revision 0 at all, the contracting officer responded, "No."

P00003,[42] "to incorporate [FAR] clause 52.232-37 and [DFARS clause] 252.204-0001 for multiple payment arrangements."[43] (alterations added).

On April 4, 2013, the contracting officer awarded Task Order 0003 to plaintiff "for tasks 2-9 for the Beltsville Agricultural Research Center, [Project Number] AG 2005-002 described in the PWS dated 17 August 2009, Attachment 00001 [sic] of the base contract W52P1J-11-D-0001."[44] (alterations added). Task Order 0003 incorporates a change to plaintiff's proposal, necessitated by the EPA changing the LLRBS's sampling requirements, and establishes CLINs 0002AA – 0009AA, listing their respective values. The following table compares the price of the tasks, as escalated by Contract Modification P00002, with the price of the CLINs, as listed in Task Order 0003.

---

[42] Contract Modification P00003 appears to be a unilateral modification because the copy of the document in the record before the court is not signed by plaintiff. Nevertheless, the Narrative Section of the modification includes the following statements:

> The contractor hereby waives any and all rights and claims for equitable adjustment attributable to such facts and circumstances giving rise to the incorporation of the above stated change [Contract Modification P00003]. The contractor specifically waives any and all claims which it has or may have against the Government related to any delay resulting from the incorporation of the stated changes into the contract.

(alteration added).

[43] The clause at FAR 52.232-37 Multiple Payment Arrangements provides that: "[t]his contract or agreement provides for payments to the Contractor through several alternative methods. The applicability of specific methods of payment and the designation of the payment office(s) are either stated-

> (a) Elsewhere in this contract or agreement; or

> (b) In individual orders placed under this contract or agreement."

FAR 52.232-37 Multiple Payment Arrangements (MAY 1999) (alteration added).

[44] DD Form 1155, DEC 2001 is titled "ORDER FOR SUPPLIES OR SERVICES" and Block 2 is labeled "DELIVERY ORDER/CALL NO." (capitalization in original). In this case, the terms Delivery Order and Task Order have been used interchangeably. Because the contract procured services, not supplies, the court uses the term Task Order.

| Task/CLIN | Modification P00002 | Task Order 0003 |
|---|---|---|
| 2/0002AA | $276,176 | $276,175 |
| 3/0003AA | $1,813,470 | $1,813,471 |
| 4/0004AA | $444,068 | $486,059 |
| 5/0005AA | $415,797 | $415,798 |
| 6/0006AA | $834,727 | $834,727 |
| 7/0007AA | $767,159 | $767,160 |
| 8/0008AA | $48,472 | $48,472 |
| 9/0009AA | $49,518 | $49,518 |
| **Total** | **$4,649,387** | **$4,691,380** |

(alterations added). Task Order 0003 also specifies that "[a]ll terms and conditions of contract W52P1J-11-D-0001 remain unchanged." While Task Order 0003 states in the Narrative Section that "[t]he total task order amount is $4,764,643.00," the sum of the CLINs is $4,691,380.00. The disparity of $73,263.00 does not identify a readily apparent explanation, in the exhibits or after the trial.

The Supplemental Information Section of Task Order 0003 identifies the contract type as "Firm Fixed Price," and each of the CLINs' contract type is individually identified as "Firm Fixed Price." At trial, the contracting officer explained that CLINs 0003AA-0007AA contract types are each listed as firm-fixed price because of a software limitation, explaining that:

> When we're adding funding to the contract, we're required to add a CLIN contract type, and our options are firm fixed price or cost type. So since this was a firm – a fixed unit rate, we decided and made the determination that it was closer to a firm fixed price than what it was a cost type.

In addition to identifying CLINs 0003AA-0007AA as firm fixed price, each of the CLINs orders a quantity of "1" and does not specify a unit price, but according to the contracting officer, unit prices for CLINs 0003AA-0007AA were "not specified because the basic contract states that the offerors' [sic] agreed-to proposal would reflect the unit prices." Additionally, the Federal Procurement Data System[45] states that Task Order 0003 is a "Firm Fixed Price" contract.

Plaintiff's personnel internally questioned the language of Task Order 0003. The following portions of four emails were exchanged between Dr. Caputo and another of plaintiff's employees, Eileen Hegarty, each of which was sent on May 3, 2013:

> Hegarty: I left you a voice message, can you confirm that the awarded Tasks 2 thru 9 are are [sic] all FFP [firm fixed price]. If so, Sara can then

---

[45] The Federal Procurement Data System (FPDS) "is a U.S. General Services Administration Federal Government computer system that is "FOR OFFICIAL USE ONLY." Contracts whose estimated value is $10,000 or more" are "reported to FPDS. Every modification to that contract, regardless of dollar value, must be reported to FPDS."

just set up one line for each with the award amount. Our original proposal shows Fixed unit rates for many tasks but I do not see any mention of that in the DO#3 [Task Order] award.

Just want to reconfirm.

Caputo: Tasks 2, 8, and 9 are fixed price.

Tasks 3-7 are fixed unit rate, with each defined in the attached pricing spreadsheet (not escalated or with the additional sampling cost).

Hegarty: Why isn't the client showing the unit rates in the Task order similar to HPS? They are only showing the CLINS, dollar amounts and FFP.

Caputo: I saw that and we are trying to reconcile this difference with the client. They do incorporate our proposal by reference, so I'm assuming they will want us to invoice by units (per the proposal).

As you recall, this is the issue I brought up earlier regarding setting up the contract by CLIN or SubCLINs.

I would consider the contract fixed price with fixed unit rate invoicing to provide basis for progress payments. Not sure how the system handles this, but that's likely how it will be managed.

(alterations added).

Prior to performance of Task Order 0003, Michael Kurth, the contracting officer's representative, sent an undated teleconference invitation, with the subject line "Beltsville Project Status – Questions and Answer Session Regarding Schedule," scheduling the teleconference for April 16, 2013. (capitalization in original). The email invitation states that "Dan[iel Caputo] and Brian [Clayman], I ask that you invite other key TES staff that will be involved with the Beltsville project."[46] The email invitation from Mr. Kurth, addressed to "[e]veryone," also states that:

So everyone is aware, I have received feedback that the mobilization schedule seems a little aggressive and that more days might need to be added. Dana Jackson will be leading that discussion. Also from May 28-June 3 the "Removal of Overburden" is proposed. The team needs to consider that some of the waste pit debris could have migrated up towards the surface and that careful consideration is needed when removing the overburden. This might impact the approach to removing the overburden. Something to consider.

---

[46] The email invitation does not include a list of recipients.

(alteration and omission added). At trial, the contracting officer's representative testified that, prior to plaintiff's mobilizing to the LLRBS, he told plaintiff that there might be "debris or material" in the overburden. The contracting officer's representative also testified that he stated in the email invitation that pit debris could have migrated to the surface because "[t]here was concern based on materials that we found on the surface of the north field, also from the waste characterization survey report. There was some information in there about materials that may be on the surface of the excavated or dig area." (alteration added). Finally, the contracting officer's representative testified that the discovery of materials on the surface occurred after the Contract was awarded to plaintiff but before April 2013.[47]

Following award of Task Order 0003 and on May 9, 2013, defendant issued Task Order 0001, Modification 04, a bilateral modification, revising the PWS. The modification incorporated a revised PWS, dated May 9, 2013, into the contract and "add[ed] a separate soil and erosion plan to Task 1: Work Plan for the Beltsville remediation project." (alteration added). The revised PWS also specifies that "[t]he Beltsville staff must approve the [soil and erosion] plan prior to the contractor starting soil excavation work." (alterations added).[48] Plaintiff began Task 2 – Mobilization on May 29, 2013.

According to defendant, "[a]s of the June 2013 approval date of the soil and erosion plan, TPMC was authorized to begin excavation work under CLIN 0003[AA] because it had a fully approved work plan – Work Plan Revision 0 – and contractual authorization, including obligated funds." (alterations added). According to Dr. Caputo, although, plaintiff needed approval of a revised work plan, which became known as Work Plan Revision 1, because of the concern for contamination in the overburden, as relayed to plaintiff by the contracting officer's representative during the teleconference. Plaintiff submitted a "Notification of Intent to Revise Work Plans at the Low-Level Radioactive Burial Site Remediation Project at the Beltsville Agricultural Research Center – Contract No. W52P1J-11-D-0001, Delivery Order 0003," dated July 18, 2013, "in response to a change in anticipated soil cover depth due to the recently communicated potential for impacted debris to be present in the cover due to frost heave or previous characterization activities." Plaintiff's notification of intent to revise also stated that:

> The presumption that the overburden material is free of contaminated material has been challenged, however, by the fact that the initial gamma

---

[47] Mr. Jackson's discovery of "broken and intact lab glassware on the surface" of the LLRBS was reported to Mr. Jovanovich on December 2, 2008, which was prior to the September 8, 2009, issuance of the Solicitation.

[48] After the Soil and Erosion Plan was approved, Mr. Jackson of the USDA testified that "I requested a change from the fabric silt fence, which has a three-month survival rate under UVs, to the super silt fence, which is a -- a chain-link fence type of product that has fabric woven onto it, which is a lot more durable and lasts for years." On May 20, 2013, defendant issued Task Order 0003, Modification 01, to add CLIN 0002AB, "in the amount of $44,456.67," to upgrade the silt fencing.

scan over the surface of the north field indicates the presence of radioactive material in the overburden. The primary risk in following this original strategy [Work Plan Revision 0] is that it results in the removal of protective cover over all the waste pits prior to remediating any of the waste; therefore the majority of the pits will be exposed during waste pit remediation. This results in a greater potential, when compared to the alternative strategy [Work Plan Revision 1], for the migration of contamination due to erosion and particularly during precipitation events due to the high mobility of the primary contaminants of concern; Hydrogen-3 and Carbon-14.

The alternative excavation strategy only diverges from the original strategy in that it does not dictate removal of the six feet of cover over the entire north field prior to excavating waste pits. Instead, cover material is removed in smaller areas and exposed pits are remediated as they are located and exposed. Once all waste pits are removed in this manner, the two strategies merge again as soil beneath the remediated pits is removed to a depth of fifteen feet below grade. When compared to the original strategy, the alternative strategy has a relatively elevated risk of contaminating overburden material with waste pit material because the operation will cycle from cover removal to waste pit remediation until waste pit remediation is complete. TES' alternative strategy mitigates this risk by segregating excavation equipment (track hoe for soil and back hoe for waste pits) as much as is practicable and increasing the survey and sampling rigor applied to the cover material. The alternative strategy offers the benefit of preserving the six feet of protective cover, including a vegetative layer, until the project is ready to remediate the waste beneath the cover. The cover protects the waste from erosion, unnecessary migration of contamination with water, and shifting of the pit due to the proximity of heavy equipment. Regardless of which excavation strategy is employed for the LLRBS, the expected amount of material requiring excavation remains the same; therefore TES' level of effort and proposed cost also remains the same.

(alterations added). Of importance in this case, the notification of intent to revise further states that "[w]hen compared to the original strategy, the alternative strategy has a relatively elevated risk of contaminating overburden material with waste pit material because the operation will cycle from cover removal to waste pit remediation until waste pit remediation is complete." (alteration added).

Previously, on June 26, 2013, Mr. Clayman, plaintiff's project manager, had emailed the contracting officer's representative a draft memorandum that identified the weaknesses of Work Plan Revision 0 and proposed Work Plan Revision 1's implementation strategy. According to Mr. Clayman, the identified weaknesses of Work Plan Revision 0 were:

• There is a potential for impacted material/contaminated material to be present in the overburden strata due to frost heave or disturbance during

previous excavation work onsite. This is contrary to the assumption that all overburden material is non-impacted. When performing a walkover survey of a 1-foot thick lift, the instruments deployed for soil surveys on this project can not [sic] reliably detect even Cs-137 contamination at the Derived Concentration Guidance Level (DCGL) calculated for this project. Reliable depth is 6-inches.

• The sampling frequency for excavated soils purposed for reuse/backfill is lowest (1 sample for every 398 CY) for soils to be excavated that have the highest potential for contamination.

• Removing the entire overburden and transition soils as initial excavation activities will result in uncovering contaminated material weeks prior to excavation of contaminated material –scheduled duration of waste excavation and remediation is approximately 8-10 weeks.

• Removing the entire overburden and transition soils as initial excavation activities will result in a larger disturbance of soil at the onset of the excavation phase, and lead to more risk and effort to mitigate risk with respect to erosion/sediment control as well as water management.

(alteration added). The draft memorandum proposed to address the identified weaknesses by changing from "removing the entire overburden, followed by the entire transition lift,[49] and then pit-by-pit remediation" and, instead, plaintiff would "excavate overburden, transition, interstitial, and contaminated material pit-by-pit from the onset." The forwarded draft memorandum concludes:

If all stakeholders agree that the alternative strategy would offer benefit without requiring revision to the DP, TES will include this memorandum in the project record and revise project specific plans to reflect the new strategy. If concurrence with all stakeholders is not achieved, TES will implement the technically sound original technical approach successfully.

(alteration added).

In an email dated July 8, 2013, from Mr. Clayman to Dr. Caputo, Mr. Clayman stated that, "[a]s of now the only radioactive material identified in the overburden is documented by the walkover survey – as you know similar data was available to us from the characterization survey report, therefore I don't feel that a change condition exists." (alterations added). When asked about the July 8, 2013, email at trial, Mr. Clayman explained his reason for requesting the work plan change, stating:

---

[49] The transition layer is the one-foot layer of soil from five feet below ground surface to six feet below ground surface.

I believe what I'm referring to there, and I'm not sure, was our original technical approach was to come and clear the entire overburden of soil, and I changed that early in the project when I arrived because I felt that removing five feet of soil from the entire field would have created a – it would remove all the vegetation and topsoil and it would create a wet sloppy mess, versus excavating the overburden and kind of make the pit as we go and we had a safer work surface.

Because I didn't want to – if you can imagine the way – the way the waste is supposed to look is it's five feet of cover with this overburden and then all these pits, you know, and I didn't want to shave all the way to the top of the pits, and then as I dug the rest I would have the other pits exposed to the environment. I did not want that situation, so I did change the technical approach for the excavation of the overburden. Instead of sweeping the entire overburden, I took it off piece by piece, pit by pit.

Plaintiff prepared Work Plan Revision 1, which was dated July 2013 and accepted by defendant on July 30, 2013. On August 7, 2013, defendant issued Task Order 0003, Modification 02 – a bilateral modification – to incorporate plaintiff's "Alternative Excavation Approach," to note the changes in plaintiff's revised sampling distribution, and to state that "this modification will be completed at no additional cost to the Government." Defendant argues that the modification results in no additional cost to the government because Mr. Clayman represented to the government that "[r]egardless of which excavation strategy is employed for the LLRBS, the expected amount of material requiring excavation remains the same; therefore TES' level of effort and proposed cost also remains the same." (alteration added). Plaintiff began excavation work the day prior, on August 6, 2013.

Plaintiff's excavation of the LLRBS occurred during two distinct periods, with a work hiatus encompassing February and March of 2014. During its excavation work, plaintiff maintained a handwritten Excavation Log and produced Daily Activity Reports. Defendant argues, however, that there are "some gaps in its [plaintiff's] record-keeping." (alteration added). A review of plaintiff's Excavation Log and Daily Activity Reports demonstrates that plaintiff engaged in work at the LLRBS on 109 days during the first excavation period, from August 6, 2013, to January 31, 2014, but produced only forty-nine Daily Activity Reports.[50]

During the first excavation period, defendant issued Modifications 3-5 to Task Order 0003. Task Order 0003, Modification 03, added CLIN 0010AA "in the amount of $10,759.62" for the purpose of "relocate[ing] an existing cable that is buried in the work

---

[50] Pertinent to the case at bar, the record reflects that after plaintiff produced a Daily Activity Report on the first day of excavation, August 7, 2013, plaintiff's next Daily Activity Report was not until September 17, 2013.

zone."[51] (alteration added). Task Order 0003, Modification 04, effective November 20, 2013, "[e]xtend[ed] the period of performance completion date on CLIN 0010AA to November 30, 2013." (alterations added).

Plaintiff argues that plaintiff encountered waste in the overburden within a week of beginning its excavation activities. The Excavation Log for August 12, 2013, states that plaintiff encountered "broken glass, caps, metal punch outs, ceramic piping, LSVs, bottles" at "3 feet (ft) below ground surface (bgs)." (capitalization in original). Plaintiff's log entry for August 21, 2013, states that plaintiff also "[e]ncountered [waste] at 3.5ft bgs," and the log entry for August 28, 2013, states that plaintiff encountered waste "at 3ft bgs." (alterations added).

Plaintiff also argues that its excavation of the LLRBS uncovered LSVs "dispersed in the soil," "in the interstitial soil," i.e., between pits, and "in numerous pits." Asked whether he personally observed LSVs dispersed in the soil and in which parts of the soil, Dr. Caputo testified at trial that "I mean, we excavated pit contents, pit sidewalls, with various liquid scintillation vials spread throughout. And in some cases, the cover material overburden." Plaintiff's second Daily Activity Report after beginning excavation operations, dated September 17, 2013, states that "Pit #12 has more vials [LSVs] per unit volume than any previous pit." (alteration added). Furthermore, plaintiff's Daily Activity Report for October 21, 2013, states that "Volatile Organic Compounds (VOCs) and Liquid Scintillation Vials (LSVs) have been identified in the majority (10 of 12) pits excavated to date."[52] Furthermore, the Daily Activity Report for December 31, 2013, also states that "Volatile Organic Compounds (VOCs) and Liquid Scintillation Vials (LSVs) have been identified in the majority (17 of 21) pits excavated to date."

On December 31, 2013, Dr. Caputo submitted to the contracting officer's representative, with a carbon copy to the contracting officer, a memorandum notifying defendant "of a change condition which is likely to lead to schedule and cost increases."[53] Dr. Caputo's memorandum states that "[t]he quantity and concentration of liquid scintillation vials (LSVs) have been significantly greater than the quantity and concentrations that were described in historical documentation resulting in greater mixed

---

[51] Task Order 0003, Modification 03, was signed by plaintiff on September 9, 2013, but the copy in the record before the court does not appear to have been signed by the contracting officer. Task Order 0003, Modification 03, appears to be the last Task Order issued during the three-year ordering period of the underlying contract.

[52] Apparently, elevated VOC levels may have negatively impacted efficiency because the Excavation Log for August 21, 2013, states that "[i]dentified elevated Volitile [sic] Organic Compound (VOC) readings that required stopping excavation activities." (alterations added). Plaintiff states that "[f]or instance, TPMC discovered LSVs in Pits #2-3, 6-7, 9-11, 11A, 12-13, 15-18, and 21-25." (alteration added).

[53] Discussed below, the contracting officer treated TPMC's notice of a "Change Condition" as a notification of a differing site condition.

waste volume and delays in remediation schedule." (alteration added). The memorandum also states that:

> Sorting and segregation of the LSVs is the most time intensive activity in the pit remediation; since the LSVs are small, usually made of fragile glass, contain mixed waste, and were essentially dumped into the waste pits versus being containerized prior to disposal. LSVs must be delicately extricated from the waste matrix in such a manner to prevent breakage and needlessly exposing personnel to hazards as well as spreading the chemical and radioactive material inside the vials and creating larger mixed waste volumes. The waste matrix consists of soil/mud and several other types of debris so extraction of individual vials with the required diligence to safety and health concerns is extremely time consuming. Once a LSV is sorted, project staff determines whether or not the vial contains residual cocktail and then segregates the vial into the appropriate waste stream according to its contents. This technical approach was included in our proposal and plans, however we have encounters [sic] a much greater volume of LSVs is [sic] many more waste pits than initial [sic] anticipated based on available historical documentation.

> TES expected to encounter LSV containing waste pits during remediation of the BARC LLRBS, and we planned for extended durations for remediation of this pit type. We based the LSV pit density on the historical documentation (Draft Decommissioning Plan, Table 1, July 2009) provided during the proposal phase. This [sic] documentation, attached to this letter, identified LSVs in 3 of the 46 waste pits. Currently, 24 pits have been remediated for the presence of LSVs (based on TES and prior contractor efforts) and 19 of the pits contain significant quantities of LSVs. At this point in the project, TES does not anticipate the ratio of pits containing LSVs to total pits will change significantly during the remainder of the project, thus we expect a significant schedule and cost overrun due to this change in anticipated conditions. TES developed its original operating schedule based on available information; overburden, waste pit, interstitial and underlying soil excavation had a total planned duration of 20 weeks for 42 pits, or ~2.4 days per pit on average. The week ending January 3, 2014 will mark the conclusion of the 20th week of excavation on the project. TES' actual average rate of pit remediation is ~3.8 days per pit. This difference in average time to process a waste pit, if held constant through the remainder of the remediation, would result in an overall schedule slip of (3.8 days/pit - 2.4 days/pit) x 42 pits = 59 days. TES' daily operating cost is $17,670 per day; therefore TES' estimated additional cost due to the high concentration of LSVs is just over one million dollars.

> A second cost impact associated with LSVs relates to waste treatment and disposal. The LSV waste stream requires thermal treatment (i.e. incineration) to remove its characteristic hazard per the Resource

Conservation and Recovery Act and subsequent disposal of the residual ash in a facility permitted to accept treated radioactive material. The described treatment and disposal regimen for mixed waste LSV drums is priced at $2,900 per drum by the competitively chosen vendor for this material. This is well above TES' per drum disposal pricing for mixed waste ($548.41). The $548.41, as required by the proposal, is a blended price based on different mixed waste streams. TES estimates generating a total of ~90 LSV drums for the BARC remediation project. TES anticipates requesting to be able to cover the cost of disposal for LSV drums. This will result in an estimated adjustment of ($2,900- $548.41) x 90 = $211,643.10.

(alterations added).

On January 23, 2014, plaintiff's project manager emailed the contracting officer and contracting officer's representative,

proposing an operational hiatus during the months of February and March to allow time for weather conditions to become more amenable to safe and efficient sorting and segregation. Since the onset of winter, TES has had challenges maintaining its exemplary safety performance (no recordable injuries during the entire duration of field work) due to the combination of precipitation and cold weather. Weather conditions have made it increasingly difficult to reliably plan and execute work. TES production has been significantly impacted as well[.]

(alteration added). Subsequently, defendant issued Task Order 0003, Modification 05, a bilateral modification effective January 30, 2014, that,

allow[ed] TES to temporarily shut down operations at Beltsville during the months of February 2014 and March 2014, as requested in [sic] email dated 23 January 2014 from Mr. Brian Clayman, TES. The purpose of the shut down [sic] request is to allow time for weather conditions to become more amenable for safe and efficient sorting and segregation."

(alterations added). Modification 05 also states that the "shutdown will be at no additional cost to the government" and "the Period of Performance is being extended from 26 March 2014 to 30 June 2014."[54] (capitalization in original).

On January 29, 2014, the contracting officer responded to plaintiff's notification of a differing site condition, stating "the Government's position is that there is no valid basis

---

[54] Task Order 0003, Modification 05, also states that "[a]ll other terms and conditions of contract W52P1J-11-D-0001-0003 remain unchanged" and continues to identify CLINs 0003AA, 0004AA, 0005AA, 0006AA, and 0007AA as "Firm Fixed Price." (alteration added).

for TES's allegation of FAR 52.236-2, Differing Site Conditions at the BARC Project." The basis of the contracting officer's determination was, in part:

> FAR 52.236-2, Differing Site Conditions, paragraph (a) states "The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer…". Even though TES has not properly submitted their notification to the Contracting Officer in accordance with the FAR requirements, the Government is providing a response to your notification.
>
> The Government believes that the Decommissioning Plan and the solicitation provided adequate documentation to support the quantity of the liquid scintillation concentration (LSC) vials that is currently being generated at the LLRBS Waste Pits.
>
> TES stated in the notification letter that it is anticipated that TES will generate a total of approximately 90 LSV drums. The July 2009 Decommissioning Plan on page 36, Section 5.0, Planned Decommissioning Activities, stated "The ex-situ volume of waste is estimated to be approximately 1040 CY [cubic yards], comprised of approximately 600-660 CY of waste soil, 200-240 CY of contaminated debris, **80-100 CY of LSC vials,** 80-100 CY of dry active waste, and 10-12 CY of bulk liquids." In addition, the solicitation proposal price evaluation sheet estimated 90 CY of Mixed Waste due to the liquid scintillation vials (LSVs), which equates to approximately 324 55-gal drums.

(emphasis in original; alteration added).

Plaintiff acknowledged receipt of the contracting officer's January 29, 2014 response and replied with a memorandum, dated February 14, 2014. In its reply, plaintiff states that:

> TES assumes your assertion of impropriety relates to the timeliness and disruption of condition clauses of this paragraph, since we provided written notice of the differing site condition to the Contracting Officer and Representative in our 31 December 2013 memorandum. As such, TES takes the position that in order to determine whether or not a differing site condition has occurred, by the nature of soil excavation, it is necessary to disturb the soil in order to properly characterize the underlying waste types. Thus, it was not until late Dec 13 and after our initial planned excavation period had expired, that TES was convinced of a change in liquid scintillation vial (LSV) concentrations and distribution that exceeded our expectations and those outlined in the request for proposal documentation. In addition, TES has produced daily reports, held weekly project conference calls, and produced monthly status summaries that all referenced the high concentrations of LSV in over 80% of the waste pits excavated. To state

that TES did not promptly notify the Contracting Officer of this differing site condition or that we disturbed the condition prior to written notification is done so without considering the numerous written statements regarding the LSV issues in project status report [sic] and without regard for the nature of soil excavation and waste site remediation. Thus, we feel we provided significant written documentation on the potential for differing site condition, and once we were convinced of a continuing trend materially affecting project execution, we formally provided our 31 December 2013 written notification.

(alteration added). Plaintiff's reply also highlights that defendant's determination that plaintiff had not identified a valid basis for a differing site condition was "center[ed] around the volume of LSVs present at the BARC site and disregards our [plaintiff's] assertion regarding the concentration and distribution of the LSVs that are [sic] basis for our notification." (alterations added). Plaintiff's reply further explains that,

The DP clearly states that LSVs were packaged in trays or placed in plastic bags and cardboard boxes (ref DP page 2 statement, "Liquid scintillation vials were either placed on vial trays and packaged in cardboard boxes for disposal, or placed loose in large plastic bags, then in cardboard boxes."). Both methods of LSV disposal in isolated waste pits would result in easily removable waste over isolated areas. However, we have encountered large concentrations of mostly loose LSVs in over 80% of the waste pits which requires a much different excavation approach that [sic] previously anticipated. The Characterization Survey Report shows photos of well isolated LSVs in both trays and in a 5 gal metal container (ref App C). Thus there was no reason to believe large scale LSV distribution would exceed over 10% of the pits or be mixed with bulk soils as we have encountered.

Plaintiff's reply memorandum, dated February 14, 2014, also served to notify the contracting officer of three other differing site conditions, two of which, "'Clean' Backfill Soil Exceeding EPA Screening Limits" and "Adverse Weather Conditions" as Differing Site Conditions 3 and 4, are not at issue. The second differing site condition identified in the reply was "Lack of Five Foot Thick Clean Cover resulting in Increase[d] Waste Zone." (capitalization in original; alteration added; emphasis omitted). Plaintiff explained the basis of its claimed differing site condition, the lack of five feet of clean overburden, stating that:

The RFP and DP (FSSP [Final Status Survey Design Plan] Sec 3.11) clearly defined a five foot thick "clean" cover over the waste pits that will be removed, tested, and subsequently re-used for backfill. TES incorporated this information into our technical approach and assumed the "clean" cover could be quickly removed, tested, and stockpiled for re-use. Now that we are approximately 45% complete with the excavation, we can clearly state that we do not have a five foot thick clean cover over the waste pits, and the lack of this cover results in a differing site condition. During initial surveys,

we encountered a radioactive "hot spot" in the cover, and since then, we have encountered waste pits within 1-2' below ground surface. Thus the DP defined assumption that there will be 5,555 cubic yards of clean soil that can be quickly removed in 1' lifts and tested with limited effort (four samples per lift) is not valid. The impact of this differing site condition is that our excavation rates through the first five feet of the site is much slower than planned/proposed, and the level of effort to test the cover soil for re-use if [sic] much greater than expected. There is also a high potential that much of this top five foot cover is impacted by the waste pit contaminants, thus unavailable for re-use. In addition, we are still encountering a total waste site depth of 15 feet, so instead of having to manage a highly impacted zone 10 feet in depth, we have to manage a zone of 13-14 feet in depth (due to the lack of a clean five foot cover). This increased waste zone results in increased schedule and cost.

(alterations added).

On March 7, 2014, the contracting officer's representative emailed the contracting officer "a document that highlights information from [sic] Cabrera Characterization Report and site Decommissioning Report to address TES' concerns about site differing conditions." (alteration added). The twenty-page document includes the following paragraph from the Waste Characterization Survey:

Based on the work completed thus far, it is anticipated that the nature and extent of the waste in the remaining pits will be highly variable. Waste materials encountered during excavation include laboratory trash (gloves, paper, metals, plastics, laboratory glassware, and other wastes generated during the process of performing laboratory analyses), liquid scintillation vials, radioactive sources, bulk soils containing small amounts of waste or debris not readily separable from soil, animal remains, and bulk liquids in their original containers.

On March 14, 2014, the contracting officer responded to plaintiff's February 14, 2014 reply memorandum, again stating that "the Government's position is that there is no valid basis for TES's allegation of FAR 52.236-2, Differing Site Conditions at the BARC Project." At trial, the contracting officer clarified that plaintiff's Notification of Differing Site Condition, dated December 31, 2013 and which was Joint Exhibit 70 of the trial record, was not timely, but "[t]he other notices [of differing site conditions] would have been timely." (alterations added). When plaintiff's counsel examined the contracting officer at trial, the following exchange occurred:

Q: Do you believe the Government was prejudiced by what you believe to be a late notice of differing site conditions?

A: No.

About one week before the end of the work hiatus, plaintiff's project manager sent a memorandum dated March 25, 2014, to the contracting officer's representative, requesting approval of what would become known as Work Plan Revision 2. During the hiatus, plaintiff had,

> identified a process improvement that will result in realization of cost efficiency for completing waste remediation of the LLRBS. TES proposes to shift the performance of sorting and segregation of Liquid Scintillation Vials (LSVs) from the north field to the Treatment, Storage, and Disposal Facility (TSDF). Implementation of the improvement does not constitute a change in technical approach however TES is proposing a revision to its Work Plans in order to accurately document the plan for performance of work.

Plaintiff's memorandum asserts that "[o]nsite sorting and segregation of LSVs has been the overwhelmingly substantial cause of TES' inability to complete scope according to the proposed schedule and shifting this task to the TSDF [Treatment, Storage, and Disposal Facility] allows TES to shorten the expected remaining duration;" the Treatment, Storage, and Disposal Facility referred to by the work plan revision request appears to be located in Clive, Utah.[55] (alterations added). Plaintiff's request further asserts that "TES has completed a review of the Decommissioning Plan (DP) in conjunction with the revision to the Work Plans and determined that there is no required revision to the DP in association with this minor change" because "[t]he process improvement effects the location of sorting and segregation of LSVs and does not constitute a change in technical approach." (alteration added). Plaintiff's specific request was "that Joint Munitions Command and United States Department of Agriculture technical staff review the proposed revisions for acceptability and review TES' assertion that the proposed revision does not constitute a change in technical approach."

Asked whether all the sorting and segregating under Work Plan Revision 2 was done at the LLRBS, Dr. Caputo testified that,

> I mean, unless we encountered something very large, you know, if there was a drum of unknown contents, we would have gone through that. If there were other hazardous items, high-activity radioactive sources or cylinders that we encountered, those could not be shipped safely, but the bulk of the LSV waste and other types of debris were not sorted and segregated on site.

Instead, the bulk of the LSV waste and other types of debris were, according to Dr. Caputo, put into intermodal containers, "packaged, manifested, and shipped to the Clive disposal site in Utah."

---

[55] According to the testimony of Dr. Caputo, the Treatment, Storage, and Disposal Facility referred to by the work plan revision request was "the Energy Solutions Clive[, Utah] disposal site." (alteration added).

The contracting officer acknowledged receipt of plaintiff's revised work plan submission the following day, March 26, 2014, and requested plaintiff "provide a cost impact showing cost saving as a result of the revised work plan submission." The contracting officer also instructed that plaintiff "is required to continue operations under the current approved work plan until such time the government has had adequate time to review the revised plan submission." On March 28, 2014, Dr. Caputo emailed the contracting officer, confirming that "TES understands that the current revision of the work plans are [sic] applicable during performance of work until new revisions are reviewed by the government." (alteration added). Dr. Caputo's email also clarified that Work Plan Revision 2 would not result in cost savings but would create a cost efficiency benefit of $492,318 to plaintiff, providing a comparison of plaintiff's estimated cost at completion of the project under Work Plan Revision 1 to plaintiff's estimated cost at completion of the project under Work Plan Revision 2.

On March 31, 2014, the contracting officer requested Dr. Caputo provide "a cost breakdown" of plaintiff's two estimated cost at completion calculations and "the cost impact to packaging, transportation and disposal cost, if the proposed work plan were to be approved." The contracting officer's March 31, 2014, inquiry does not appear to have been answered until Dr. Caputo provided an interim response on April 23, 2014, pending completion of the cost estimate.

Also on March 31, 2014, defendant issued Task Order 0003, Modification 06, "to add additional funding to new CLINs 0005AB, 0006AB, and 0007AB as a result of the characterization of the waste being categorized as LLRW versus Contaminated Soil/Debris/Water." Modification 06 states that "[t]he period of performance for the new CLINs is 30 June 2014" and that the added CLINs "increases the contract total from $4,746,596.62 to $7,019,227.62."[56] Each of the new CLINs were characterized as a "Firm Fixed Price" contract type, and each of the CLINs ordered a quantity of 1. None of the CLINs provides a unit price. Additionally, the Federal Procurement Data System identifies Task Order 0003, Modification 06, as a multiyear, firm fixed price contract.

Following the hiatus, plaintiff began a second excavation period at the LLRBS on April 9, 2014.[57] The last entry in plaintiff's Excavation Log is dated July 23, 2014, and the Excavation Log reflects that plaintiff's work during the second excavation period occurred over seventy-three days, from April 9, 2014, through July 23, 2014. During this same time period, plaintiff produced seventy-one Daily Activity Reports, for seventy-three days of work.

---

[56] The added CLINs for Tasks 5, 6, and 7 of the PWS were in the amount of $239,998, $994,865, and $1,037,768, respectively.

[57] As indicated above, the first excavation period took place from August 6, 2013, through January 31, 2014.

During the second excavation period, plaintiff continued to discover LSVs dispersed in the soil. On April 17, 2014, Mr. Clayman emailed the contracting officer two memoranda signed by Dr. Caputo. The two memoranda notified the contracting officer of differing site conditions for Pits 28 and 29, and the notification language for both pits appears to be nearly identical.[58] The memorandum regarding Pit 28 states, in part:

> In accordance with Federal Acquisition Regulation (FAR) 52.236-2, Differing Site Conditions, TPMC-EnergySolutions Environmental Services 2008, LLC (TES) is providing prompt written notice of a Differing Site Condition associated with Waste Cell # 28 at the Beltsville Agricultural Research Center (BARC) Low-Level Radioactive Burial Site (LLRBS) Remediation Project. TES removed overburden and uncovered Waste Cell # 28 at approximately 10:30 AM on April 17, 2014. Upon initial observation of the contents of the cell, TES arrested remediation of Waste Cell # 28 without disturbing the as-found conditions. The differing site condition identified in Waste Cell # 28 is identical to the condition that has been addressed in ongoing correspondence: Waste Cell # 28 contains a significant quantity of Liquid Scintillation Vials (LSVs) that appear to be distributed ubiquitously throughout the waste cell volume instead of being concentrated in discrete locations. Waste remediation of Waste Cell # 28 will require a higher level of effort to remediate than TES' planned level of effort due to the widespread distribution of LSVs. Below is an as-found photograph of Waste Cell # 28:

---

[58] While the memoranda provide notice of a changed condition for Pits #28 and #29, plaintiff's Excavation Log for April 17, 2014, indicates that plaintiff was excavating Pits #29 and 37 on April 17, 2014, but each usage of "29" has been corrected, apparently with Mr. Clayman's initials, to "36". Furthermore, plaintiff's Daily Activity Reports indicate that excavation for Pit #28 did not begin until April 21, 2014, stating "[f]inished excavation of pit 29 and started pit 28." (alteration added). Apparent differences between the memoranda include the pit identification number, the time of day the pit was uncovered, and the photograph of the pit.



*Proprietary and Confidential*

At this time, TES requests acknowledgment of receipt of this prompt written notice and direction from the government to proceed with remediation of Waste Cell # 28 or to place Waste Cell # 28 in a safe condition (return overburden to the cell) pending further direction from the Contracting Officer.

(emphasis in original). The contracting officer responded by email, also on April 17, 2014, stating:

> Even though your company has submitted to the Government two 17 April 2014 letters regarding "Notification of Differing Site Condition, Beltsville", the contract's "Disputes" clause requires your company to proceed with the contract in accordance with its stated specifications. Specifically, subparagraph (i) of FAR 52.233-1 "Disputes", states, "The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer." Therefore, the purpose of this letter is to notify you that your company must continue to make reasonable, significant progress on this contract, despite your two 17 April 2014 letters. Thus, your two 17 April 2014 letters' request for Government authorization for you to proceed should be unnecessary given that the terms and conditions of the contract are still in effect.

In addition, you are reminded that the Government is still reviewing your Revised Work Plan submission. Until such time a determination has been made to accept the Revised Work Plan, TES is required [sic] continue working under the Approved Work Plan.

The Government has not authorized a Stop Work on this contract. If you proceed with a Stop Work on this contract, then this Stop Work at is [sic] your own risk and at your own cost.

(alterations added). Plaintiff continued its excavation activities at the LLRBS.

On April 23, 2014, plaintiff and defendant exchanged four emails, beginning with the contracting officer's request for "a firm date as to when I will receive the cost impact information," relating to Work Plan Revision 2 that she had requested six days prior. The contracting officer concluded her email, stating:

You are again reminded that the revised work plan has not been approved and will not be approved until all of our questions and concerns have been responded to. TES is required to continue working under the approved work plan until such time [sic] a determination has been made on the revised work plan.

(alteration added). Dr. Caputo responded on April 23, 2014, committing plaintiff to submitting the information within the next two working days and stating that "[w]e continue to work under existing plans and procedures." (alteration added). The contracting officer's reply email states that "you are continuing to work under existing plans and procedures, however, in the weekly status calls indications are that you are working as if the revised work plans will be approved. Please explain." Mr. Clayman concluded the email exchange, explaining to the contracting officer that:

TES is currently processing, packaging, and storing waste without removing the LSVs. As the current work revision requires sorting and segregation of LSVs, TES has assumed the risk that stored waste may have to be re-processed for LSVs at no additional cost to the government if the proposed revision is not approved. TES has not shipped any material off-site that has not been fully processed under the current revision to the work plans. This process of partial sorting and segregation followed by eventual sorting and segregation of LSVs following a storage interval is consistent with the requirements of the current revision to the work plans. Again, TES understands that TES will have to remove LSVs from stored waste prior to shipment if the work plan revision to implement its proposed process improvement is not approved.

At trial, Dr. Caputo testified that plaintiff had been employing the Work Plan Revision 2 methodology since resuming excavation activities in April 2014. Dr. Caputo

also testified that, because plaintiff had packaged and stored waste without removing the LSVs,

> [w]e had containerized RCRA [Resource Conservation and Recovery Act] hazardous material, which in accordance with RCRA regulations, we have a 90-day window to dispose of those materials, so we had a RCRA compliance issue as well as we had containers with waste and all of our equipment and personnel awaiting disposition of those waste containers hinging on the approval of this revised work plan.

(alterations added).[59]

While defendant was analyzing the cost impact of Work Plan Revision 2, defendant argues, its "technical team identified three concerns with the proposed revisions." One concern identified by the contracting officer's representative, which he emailed to the contracting officer on April 29, 2014, was related to the potential for increased costs to the government. The contracting officer's representative's email states, in part:

> I shared[, with Mr. Clayman,] the concern that if the revised approach were followed there is a chance that the 5% LSV vial volume (maximum) could break during transit and cause the entire intermodal contents to become mixed waste rather than a 95% LLRW/5% Mixed Waste split. Disposal for mixed waste is $1972 per cubic yard versus $702 per cubic yard for LLRW, this could be a potential cost increase.

> We discussed the idea of TES providing the government a letter that would be part of the contract that if the revised technical approach was implemented, TES would invoice for each intermodal as at least 95% or more LLRW disposal cost and 5% or less for mixed waste. This would limit the government's liability for paying for large amounts of mixed waste disposal. Do you have any thoughts or insights into taking this approach?

> Regarding the packing and staging, Brian understands that if he is allowed to follow the revised tech approach, he should invoice it as mixed waste packing and staging. Also for the transportation invoicing, if he is allowed to transport following the revised tech approach, he should invoice for what it will be shipped as and that is a mixed waste. The packing and staging costs for mixed waste is $445 per yard versus $281 per yard LLRW and the transportation for mixed waste is $530 per yard versus $860 per yard LLRW. Adding the two costs together there is less cost with packing and transport as a mixed waste ($975 per yard) versus LLRW ($1141 per yard).

---

[59] The applicable regulation at 40 C.F.R. § 262.34 stated that "a generator [of hazardous waste] may accumulate hazardous waste on-site for 90 days or less without a permit or without having interim status." 40 C.F.R. § 262.3(a) (2014) (alteration added).

(alteration added). In a separate email, dated June 26, 2014, to the contracting officer and Messrs. Jensen and Jackson, of the USDA, the contracting officer's representative stated in part:

> If you do the math and have a 95% LLRW and 5% mixed waste ratio, the difference is still at around $500 per cubic yard. That would equate to $500 per cubic yard times 16 cubic yards per intermodal times roughly 100 intermodals = $800,000. Although I do not have the final say, I wouldn't believe that the government would be willing to spend an additional $800,000 for packaging and transportation.
>
> Regarding the site, I was informed yesterday that the rail yard has moved the rail cars needed for transporting the intermodals. TES says they need to provide the rail yard a 5 day prior notice to have the rail cars in the proper location for loading the intermodals if and when they arrive. So the TES site team will need to know on or before July 3 to start shipping the intermodals to the rail yard to meet the current July 8 hazardous waste movement expiration date.
>
> The July 8 expiration date is based on an EPA 90 day limit for packaging EPA regulated hazardous waste. The EPA permit being used is the USDA EPA permit. The site can request an extension (30 days I believe). TES would need to coordinate this with USDA site representatives. USDA would need to request the extension from EPA. I'm not sure how easy or difficult it would be to request an extension. Dana – any input on how challenging this might be?

(alteration added).

Another concern of the government regarded the increased volume of material that would be packaged and transported from the LLRBS. The contracting officer testified as to her understanding of Work Plan Revision 2, stating that:

> Based on how Mike Kurth [the contracting officer's representative] explained it to me, instead of sorting the waste at the site and segregating it, TPMC would be removing everything from each one of the pits, placing it into a railcar, and shipping it to an Energy Solutions facility where it would be sorted and segregated at that site.

(alteration added). Thus, the contracting officer was concerned that plaintiff was "going to be transporting soil and – as well as the waste." Because the contracting officer believed the result of transporting clean soil would mean the volume of shipments would increase, the contracting officer was concerned "that the Government would be charged more because we were paying a fixed unit rate based on the actual amount of material that was packaged and transported."

Defendant also raised a third concern, that "the Government realized that TPMC had been invoicing using incorrect rates." According to an email from the contracting officer's representative to plaintiff, dated May 13, 2014, "there are differences for a number of the sub-clins" between the rates that plaintiff was applying on invoices and the rates defendant believed were established by Contract Modification P00002. (capitalization in original). The contracting officer's representative's May 13, 2014, email also requested "any additional information to support the current invoiced rates." The email also stated: "We need to resolve this quickly." Dr. Caputo replied to the contracting officer's representative by sending an email, dated May 29, 2014, to the contracting officer that primarily discuss plaintiff's Work Plan Revision 2 proposal, but also states that plaintiff would respond to the invoicing question the following day. Dr. Caputo's email to the contracting officer also states:

> Per our discussion today, TES commits to the following conditions regarding the revised BARC work plan.
>
> 1. Invoice CLINS 5 and 6 for packaging and shipment of revised work plan waste as Mixed Waste (MW) with disposal invoiced at actual waste stream once segregated at Clive.
>
> 2. Invoicing for MW will be limited to up to 5% of individual containers with the remaining waste, per container, being invoiced as LLRW.
>
> 3. TES will obtain authorization for government officials working the BARC project to observe waste sorting and segregation activities at the Energy Solutions Clive Disposal site.
>
> We will provide a response to Mike Kurth's invoicing question by tomorrow, 30 May 14.

Plaintiff's Contracts Manager emailed the contracting officer's representative on June 4, 2014, stating, in part:

> I have been working with Linda Fleming, Brian Clayman and Dan Caputo to respond to your request to provide support on our current billing rates. Kylah Rasche [sic] email of 5/8/13 shows approval of the attached unit rate table, submitted by Brian Clayman, which is the basis for our billing as well any future pricing or projected losses.
>
> TES has also been using these approved rates as the basis for all analysis and projected losses for the completion of the BARC project.

(alteration added).[60] The contracting officer responded on June 6, 2014, stating that

> it is the Government's position that all requirements should have been invoiced at individual rates which were escalated by 12.2% versus rates that appear to have been randomly established and submitted by TES for approval. It is also the Governments [sic] position that TES should adjust all previous invoices to reflect the 12.2% escalated rates.
>
> The rates that are currently being used by TES have not been incorporated into the contract and therefore should not be used for invoicing purposes.
>
> Please note that if TES does not agree to use the escalated 12.2% rates, that decision may have an adverse affect [sic] on any possibility that the Revised Work Plan would be approved by the Government.

(alterations added). Dr. Caputo also replied to the contracting officer on June 9, 2014, the next business day, stating in part:

> For clarification, the rates under discussion were not randomly established, but rather were based on our initial proposal, approved by JMC, and have been consistently used for invoices since the beginning of project beginning in the summer of 2013. TES understands the government's position on this issue and regrets the position was not communicated and the issue resolved approximately a year ago when instead the rates were approved by JMC or during subsequent review cycles on monthly invoices. The purpose of this email is not to resolve the current invoicing issue. TES is currently evaluating the magnitude of the negative impact in potentially implementing invoicing according to the government's position. Such a proposed change at this stage of the project requires a complete reassessment of the project financials prior to engaging in further discussion. As a note, we interpret this contract as a firm fixed price contract under the FAR and see the unit rates as used for proposal evaluation

---

[60] Kylah Rasche's email signature block indicates she was a civilian employee of the Army employed as a contract specialist. Additionally, the approval email, to which plaintiff refers, provides the following exchange between plaintiff and defendant, which had occurred more than one year prior:

> Plaintiff's Contracts Manager: "Has a decision been made to accept Brian's [Mr. Clayman] rates and how are you handling the billing of the escalation?"
>
> Defendant's Contract Specialist: "Yes [sic] the unit rates are fine. When you submit the invoices [sic] please make sure to indicate how many samples were performed of which type and the unit rate."

(alterations added).

purposes and to facilitate billing up to the FFP amounts. If the basis of the contract is unit rates, possibly another type of contract could have been used (Cost reimbursable or fixed unit rate).

The purpose of this email is to clearly highlight the fact that this invoicing issue does not relate to the Work Plan Revision that was submitted on 3/25/14. All technical and invoicing questions related to the Work Plan Revision have been resolved. The current invoicing issue stretches beyond the scope of the Work Plan revision and includes material that was shipped under the previous revision(s) to the Work Plan. To that end, TES strongly recommends the government expedite approval of the Work Plan revision so that TES may ship waste stored on site and minimize costs associated with the current delay. The project is currently at risk of incurring rental charges on containers and may lose access to rail conveyances that have been standing by to transport intermodal containers of waste. TES will not assume responsibility for these delay costs and therefore suggests that the Work Plan revision be approved and shipments from the project resume in order to minimize these unnecessary costs that are not related to the Work Plan revision. The current invoicing issue already impacts shipments that have been made, invoiced, and paid; therefore there is no reason not to continue shipping while the issue is resolved. The avoidance of delay costs is a significant reason to expedite the continuation of shipments.

On June 12, 2014, the contracting officer sent an email to Dr. Caputo, carbon copying other employees of plaintiff and the contracting officer's representative, that began by quoting the portion Solicitation W52P1J-09-R-0118 that explained contract pricing. Specifically, the contracting officer explained "based on the above subparagraph g., only Tasks 1, 2, 8, and 9 are Firm-Fixed-Price." The contracting officer also stated that, "based on the above subparagraph h-j, fully burdened Fixed Unit Rates were being used for CLINs for Tasks 5, 6, and 7 because of the offeror's proposed technical approach and any unknowns that may have been discovered during remediation." The contracting officer supported the Government's position by recalling that "[t]he Government initially added funding to the contract based on the estimated quantities for each CLIN for Tasks 3, 4, 5, 6, and 7" and reasoning that if "these CLINs had been Firm-Fixed-Price as you allege, the Government would not have added funding on modification 06 of Task Order 0003 due to difference in waste streams based on characterizations." (alteration added). The contracting officer's email concluded by explaining which fully burdened fixed unit rates should be applied to plaintiff's invoices and reiterating the Government's threat not to approve Work Plan Revision 2, if plaintiff did not adopt the Government's position regarding contract pricing. The contracting officer stated:

With regards to the Fully Burdened Fixed Unit Rates (on the pages labeled "Page 13 – 04/17/10" through "Page 35 – 04/17/10" in the attached "Volume

Ill-Price Proposal- Alternate" dated 7 April 2010),[61] these rates that were incorporated into the contract were highlighted in green in the proposal submission. Modification P00002 to the basic contract incorporated the Government's acceptance of TES' proposed 12.2% increase to these rates. Therefore, each of the rates highlighted in green (except Task 1 which had been completed) from "Volume Ill-Price Proposal- Alternate" dated 7 April 2010 should have been increased by 12.2%.

On 6 May 2013, Brian Clayman submitted an email to the Government that requested that the TES fixed unit rates be re-established so funding would not have to be shifted once actual quantities were established. The same day, I replied in the attached email, "We are not able to change the CLIN structure established in the contract. Since this was a competitive action, we would have to re-compete the contract in order to change the CLIN structure, as a different CLIN structure could result possibly a change to who received the award. Therefore, you will be required to invoice based on the unit prices and CLINs established in the contract."

Therefore, due to my prompt written denial of this requested change, I am not sure why Brian Clayman submitted to the Government the TES fixed unit rates for invoicing that were different than the fixed unit rates that were established in your proposal and the subsequent contract.

Based on the information outlined above, it is still the Government's position that all requirements should have been invoiced at individual fully burdened fixed rates which were escalated by 12.2% versus rates that appear to have been randomly established and submitted by TES for approval. It is also the Government's position that TES should adjust all previous invoices to reflect the 12.2% escalated rates.

The rates that are currently being used by TES have not been incorporated into the contract and therefore should not be used for invoicing purposes.

The Government still maintains our position that if TES does not agree to use the escalated 12.2% rates, that decision may have an adverse affect [sic] on any possibility that the Revised Work Plan would be approved by the Government.

---

[61] The record before the court does not include the attachment referenced by the contracting officer. Joint Ex. 029 is a Portable Document File (PDF) titled "Volume III – Price Proposal – Alternate" and dated April 7, 2010. The PDF in the record does not include page numbers. The PDF does provide, however, plaintiff's proposed fixed unit rates (Alternate) for Tasks 3-7 on PDF pages fifteen through thirty-seven.

(alteration and footnote added).[62]

On June 25, 2014, the contracting officer indicated that the Government would approve Work Plan Revision 2, contingent upon four conditions. The first three conditions appear to be substantively the same as the three conditions stated in Dr. Caputo's May 29, 2014, email. According to the contracting officer's email, the fourth condition was that "TES will adjust all previously paid invoices to reflect the rates as attached incorporating the 12.22%." Both Dr. Caputo and Ken Fillman, plaintiff's President and TerranearPMC's Chief Executive Officer, responded to the contracting officer's June 25, 2014, email. Dr. Caputo's June 25, 2014 response provides a clarification that was accepted by the contracting officer and a request,

> that this invoicing issue does not hold up approval of our work plan change that all parties have agreed is the better solution to expediting remediation of the BARC site. We need to start shipping of the waste containers to avoid adding additional costs to the project and possibly putting the USDA at risk for EPA RCRA violations.

Mr. Fillman's June 26, 2014 response states that:

> This was not what was intended in our discussions as evidenced by Dan's [Caputo] email of May 29. Rather than writing long emails on the issues associated with this project, I recommend that we meet in your office on Monday to see if we can clarify our position and see if there is a reasonable path forward to completion of this project.
>
> More importantly, and as we have made you aware, several of the intermodals will go past their 90 day RCRA storage limit on 7/8/14 and will result in a NOV[63] for the USDA. This can only be avoided if JMC [Joint Munitions Command] decouples the invoicing and contract questions from the technical aspects of this job. There is no inherent connection between resolution of this invoicing issue and the approval of the work plan. The work plan does not address anything about invoicing.
>
> We have resolved all of the technical issues with our revised work plan weeks ago, and withholding approval of this plan will result in a regulatory noncompliance in which we will be held harmless. We must have permission to ship by July 1 to avoid this situation so that we can start the notifications process.

---

[62] The contracting officer's representative forwarded the contracting officer's email to Mr. Jackson, the USDA's senior remedial project manager, who later forwarded it to other USDA personnel, commenting: "RI [Rock Island – the Army] is holding TES over the fire to make sure that the Government is getting the best value." (alteration added).

[63] "NOV" appears to refer to "Notice of Violation" for a 90-day RCRA storage limit.

Please provide approval so that we can ship the waste.

(alterations and footnote added).

While Mr. Fillman's June 25, 2014, email reiterates plaintiff's concern regarding the potential violation of the EPA's ninety-day storage limit, testimony at trial suggest that the government had reached an understanding to relax the 90-day requirement. At trial, the contracting officer's representative and defendant's counsel had the following exchange:

Q. Okay. And did TPMC raise any regulatory concerns with you relating to storing the intermodals onsite?

A. Yeah, there was a concern, and this was an EPA rule or regulation that talks about the storage of EPA-regulated waste onsite. They have a certain time-period to be able to store things like that onsite. If you exceed that time-period, you could have a violation or an issue with EPA on that.

Q. And do you recall how long these intermodals could be stored onsite under the EPA rules?

A. I believe it was approximately 90 days. There's a 90-day rule to be able to store and ship and get materials like that processed and disposed of.

Q. So the concern was if the intermodals were at the LLRBS for more than 90 days, that could be a violation of EPA rules?

A. Correct. And that violation would be issued to USDA.

Q. And how was this potential regulatory concern addressed?

A. USDA representatives worked with EPA and they [the USDA and the EPA] came to some agreement where EPA was not planning to cite any type of violation.

Q. So TPMC raised the potential issue and the USDA worked with the EPA. Is that right?

A. That is correct.

Q. And the EPA said, okay, you [the USDA] can store them onsite, we will not fine you?

A. Right. Based on the information provided to EPA, they [the EPA] kind of agreed to the work approach that was being done, so there was no type of violation issued for it.

(alterations added). Assuming defendant obtained a waiver or extension from the EPA regarding the ninety-day rule, plaintiff, however, alleges that defendant "failed to reveal that information to keep 'TPMC over the fire." Plaintiff also asserts that "the Government never produced any record of the Government's alleged conversation with the EPA" regarding a waiver or extension from the EPA.[64] (alteration added).

The contracting officer replied by email to Mr. Fillman the next day, June 26, 2014, stating: "The Government will not accept the revised work plan if it results in an increase in cost to the Government." Her email continued:

When we discussed the conditions before, our position was based on rates that were based on the invoiced rates not the contractually agreed to rates of 12.22%. Once we realized the cost difference, I sent an email to everyone stating that we had 1 more issue to resolve with regards to the rates being invoiced. Now that we have agreed to use the 12.22% in accordance with the contract, by TES invoicing as Mixed Waste versus the way TES responded originally to the [sic] our question, the Government would end up paying approximately $800,000 more than under the current work plan.

Since the current work plan, with the sorting and seg[regating] at Beltsville, is technically acceptable and there have been no safety issues, the Government cannot justify paying more for TES [to] complete the contractually [required] efforts as approved.

---

[64] On December 12, 2014, well after plaintiff eventually signed Task Order 0003, Modification 07, Marc Conrad, employed by Energy*Solutions*, emailed Mr. Fillman, stating in part:

The CO [contracting officer] also made errors: 1) awarded a price sheet that we clearly did not agree to in our proposal, 2) accepted escalated CLINs estimates which we based on our original price sheet, 3) accepted and paid the wrong unit rates for about 9 months, confirming our belief/misunderstanding on what rates we were working to, 4) issued mods as FFP, 5) confirmed that our original rates were accepted, 6) changed our agreement on the third work plan after we had agreed and negotiated it, and 7) used the expiration of the RCRA storage permit as leverage to force us to accept government terms on the third work plan, the rate sheet, and other issues.

(alterations added).

> With this being said, TES traveling to Rock Island will not change the Governments [sic] position. If you would like to have a teleconference to discuss this on Monday, please let me know and I will schedule one.

(alterations added).

The contracting officer's representative and Mr. Jensen accepted Work Plan Revision 2 on July 9, 2014. Four days earlier, on July 11, 2014, Dr. Caputo emailed the contracting officer, expressing a desire to hold a teleconference "to discuss the contract conditions." The contracting officer replied by email, stating:

> I received your voicemail. I believe your concern is with the following statement.
>
> "The contractor hereby waives any and all rights [sic] claims for equitable adjustment attributable to such facts and circumstances giving rise to the incorporation of the above stated change. The contractor specifically waives any and all claims which it has or may have against the Government related to any delay resulting from the incorporation of the stated changes into the contract."
>
> This statement means that TES waives their rights for an equitable adjustment related to additional cost associated with incorporation of the Revised Work Plan, which is the "above stated change." The government has stated several times that we would not accept the Revised Work Plan if there would be additional cost to the Government. TES has assured the Government that the revised workplan [sic] was at no additional cost to the government and when we questioned the "cost savings", TES submitted the attached document to show that there would be no additional cost to the government, therefore, I am not sure why this statement would be an issue.
>
> Since the Packaging, Transportation and Disposal CLINs are considered by the Government to be based on Firm Fixed Rates, if the actual quantities exceed the estimated quantities awarded on the contract, you must notify the Government and the quantities will be increased by a modification.
>
> Therefore, I do not believe a teleconference will be necessary.

(alterations added). Dr. Caputo responded:

> As you are aware, we have a differing opinion on how the contract is structured. We believe it is based on a firm fixed price, and you believe it is a fixed unit rate contract. We have agreed to continue working towards completion of the project, while resolving our differences through the normal channels. We have further agreed to invoice progress payments based on the fixed unit rates you believe are correct. Our issue with the language is

that it appears to force us to revoke our right for dispute on how we view the contract. We don't believe it is in alignment with our earlier agreement, and we simply ask that it be removed or modified such that the spirit of our agreement is still intact.

The contracting officer's response restates the waiver clause and defendant's interpretation of the clause, as applied, but added:

In the past, TES has repeatedly assured the Government that the Revised Work Plan was at no additional cost to the government. In addition, when the Government questioned TES' "cost savings," TES submitted documentation to the Government to show that there would be no additional cost to the Government. Therefore, TES' request for the removal of the above statement is directly contradictory to TES' prior reassurances to the Government.

In conclusion, the Government will not agree to this modification unless this statement is kept in it.

On July 14, 2014, Dr. Caputo emailed the contracting officer, stating that "[a]fter further review of this [waiver of rights and claims] clause, we are in concurrence, however, we have a potential concern that there may be changes in waste volume or discovery of any unexpected waste forms." (alterations added). Dr. Caputo then stated that "[i]f you can clarify that this clause does not impact those conditions, if they arise, we will accept this clause." (alteration added).

The contracting officer answered on July 15, 2014, restating portions of the Solicitation and concluding that:

Thus, fully burdened Fixed Unit Rates were being used for CLINs for Tasks 5, 6, and 7 because of the offeror's proposed technical approach and any unknowns that may have been discovered during remediation.

The Government initially added funding to the contract based on the estimated quantities for each CLIN for Tasks 3, 4, 5, 6, and 7.

If the actual quantities exceed the estimated quantities for CLINs for Tasks 5, 6, and 7, the Government will issue a modification to increase quantities and the associated funding. An example of where funding has been increased due to changes in quantities is Mod 06 to task order 0003 where the Government increased quantities due to the characterization of waste being LLRW versus the estimated characterization of Contaminated Soil/Debris/Water.

(capitalization in original).

On July 15, 2014, defendant issued Task Order 0003, bilateral Modification 07, for the purpose of incorporating Work Plan Revision 2. Task Order 0003, Modification 07, states that "[t]he revised work plan will allow TES to maximize cost efficiency, while maintaining safety and compliance, during the second half of waste remediation." (alteration added). The modification further states that:

2. As a result of the revised work plan being incorporated TES has agreed to the following conditions:

3. TES will collect waste weight and volume data from Treatment Storage and Disposal Facility (TSDF) and will invoice for Packaging and Storage, and Transportation cost based on the waste characterization after completion of the sorting, and segregation process, utilizing the contractual rates for the "Alternate Approach" escalated by 12.22% as incorporated into the basic contract.

4. Invoicing for Mixed Waste will be limited to not more than up to 5% of the volume of individual intermodal containers with the remaining waste, per container, being invoiced as Low level Radioactive Waste (LLRW).

5. TES will obtain authorization for Government officials working the Beltsville Agricultural Research Center (BARC) project to observe waste working and segregation activities at the Energy Solutions Clive Disposal site.

6. The revised work plan will be at no addition [sic] cost to the Government.

7. In addition to incorporating the Revised Work Plan, dtd July 2014 as Attachment 0005, we are incorporating the Technical Management Plan (Section 1 of the Work Plan) Rev 2 as Attachment 0006 and the Waste Management and Transportation Plan (Section 3 of the Work Plan) as Attachment 0007.

8. The contractor hereby waives any and all rights [sic] claims for equitable adjustment attributable to such facts and circumstances giving rise to the incorporation of the above stated change. The contractor specifically waives any and all claims which it has or may have against the Government related to any delay resulting from the incorporation of the stated changes into the contract.

9. All other terms and conditions of contract W52P1J-11-D-0001-0003 remain unchanged.

(alterations added). Modification 07 is identified as "Firm Fixed Price" in Block 1 and in Section A – Supplemental Information.[65]

While the parties were navigating the work plan change proposal and invoicing discrepancy, plaintiff continued its excavation activities at the LLRBS. On June 27, 2014, plaintiff was excavating Pit #52, a pit not identified in the Solicitation, amendments, or attachments. While excavating Pit #52, plaintiff discovered what appeared to be "metal cylinders containing unknown gases." Because "at least a few of the visible cylinders appear to be intact and thus assumed under pressure," plaintiff "placed the excavation in a safe condition and initiated a stop work so that the condition would not be disturbed" and "provided initial notification to the government of this condition via email on 27 June 2014 with follow-up communications on 30 June 2014." Plaintiff submitted a notification of a differing site condition, based on the cylinders discovered in Pit #52, on July 1, 2014. The contracting officer responded to plaintiff by email on July 2, 2014, stating in part that "[t]he Government agrees that these Cylinders are outside the Scope of the Contract," offered a two-phased approach for remediating the cylinders, and requested plaintiff provide a "technical approach and price proposal for Phase I." (capitalization in original; alteration added). According to the contracting officer's trial testimony, the government believed the presence of the cylinders in Pit #52 constituted a differing site condition "[b]ecause we were not aware that there were any gas cylinders buried at the site." (alteration added).

On July 9 and July 11, 2014, plaintiff and defendant corresponded via email regarding the technical approach and price proposal for Phase I of the cylinder remediation. The first correspondence, from defendant to plaintiff, is dated July 9, 2014, and states "[p]lease see the attached comments regarding BARC Cylinder #52 proposal." (alteration added). The second correspondence, from plaintiff to defendant, is dated July 11, 2014, and appears to have replicated defendant's previous email and then added comments to address two issues identified by defendant. The second correspondence states in part:

The Government has completed its review of TES's proposal, dated 08 July 2014. At this time the Government has authorized a Notice to Proceed with the proposed worked plan however, prior to issuing a formal modification we wish to address the following areas:

CYLINDER DELAY COST ESTIMATE
b.    For the estimated days of delay, TES proposed 5.5 days.

The Government request [sic] TES to provide support as to how it was determined to be 5.5 days of delay.

TES Response: TES notified JMC [ACC-RI] about the differing site condition at 1:15PM on June 27, 2014 and received notification to proceed

---

[65] Section A – Supplemental Information is identified as "Narrative A0000."

(NTP) with work on July 9, 2014 at 2:01 PM. The interval between these two occurrences was 7 workdays. TES assumed the delay would be 5.5 days in preparation of the pricing, when the time of NTP was unknown. TES is willing to hold with that reduced duration of delay or resubmit pricing with the actual 7 days of delay calculated.

2. For the equipment unit of measure (UOM), TES proposed per (day) UOM in determining the billable rate. The Government request TES to provide support for determining the UOM and if this method was used throughout the contract.

TES Response: TES used actual cost for determining the unit of measure. Actual cost is invoiced to TES on a 4-week cycle from our equipment vendors so the daily cost was calculated based on a 4-day work week. Please find back-up cost documentation attached that exhibits invoices and/or quotation for affected equipment. Please note that the daily rate for equipment used in TES' build-up is much lower than the vendors' daily or weekly rate for the equipment because TES has a negotiated 4-week rate from its vendors. During the course of this contract, TES has consistently based proposed pricing on estimated/actual costs that are accompanied by back-up documentation. While the method of building up pricing has remained stable, the specific rates and chosen equipment have varied because the various proposals on the contract have spanned several years.

(alterations added).

On July 25, 2014, the contracting officer provided plaintiff with a "time line of events, regarding the Differing Site Condition due to the discovery of the cylinders in Waste Pit 52," which states in part:

   --July 8, 2014: the Government received the TES plan (job hazard analysis and work instructions) and estimate. (Since there was a July 4th holiday, it took TES two days (July 3 and July 7) to create the job hazard analysis, work instruction, and cost estimate.)

   --July 9, 2014: PCO Cindy Wagoner gave TES the authorization to proceed with the proposed work plan for Phase I of the cylinder remediation.

The Government accepts TES' cost estimate of $8,720.67 for executing Phase I scope of work for the differing site condition resulting from cylinders which were discovered while remediating Waste Pit #52.

The Government takes exception to TES' pricing proposal of $50,125.63 for TES' alleged 5.5 day delay in excavation activities caused by the discovery of the cylinders. Based [sic] TES' Daily Activity Reports from June 27 – July 9, 2014 for the Beltsville project, it appears TES was utilizing the personnel

and the equipment to perform other requirements under the Performance Work Statement. Specifically, according to the "Work Performed" section for each day of the relevant daily reports, the Health Physist [sic] (HP's), laborer and operators kept busy with miscellaneous activities those days. Therefore, there are no facts supporting TES' claim that these workers were not working for 5.5 days. In addition, the daily reports from June 27 - July 9, 2014 indicated that the heavy equipment was in use at times on other activities. Therefore, there are no facts supporting TES' claim that this heavy equipment was not being used for 5.5 days.

(alteration added; formatting in original).

At trial, the contracting officer's representative's testimony indicated that the Pit 52 cylinders could pose safety hazards, if they were pressurized, stating that,

the concern was if they were pressurized, and then buried for a period of years, so what was the condition of those, and then also what were the contents inside the cylinders. What type of materials, what type of gas was in there, you know, is it harmful to individuals.

Asked whether the cylinders discovered in Pit 52 were pressurized, the contracting officer's representative stated that, "Initially, there was – it was unknown, but after they were removed and under further visual examination by TPMC people, they found that they were punctured, so they were – they were not pressurized."

The contracting officer testified at trial that plaintiffs request for additional money "was related to additional labor associated with developing the plan on how they were going to remove it or determining whether the gas cylinders were filled or not or whether they could – were empty, and for the removal of those cylinders." However, "[w]hen they removed the cylinders, they found that they could be disposed of under the waste characterizations that were currently on the contract, so they were able to invoice using the existing waste characterizations at the agreed-to fixed unit rates." (alteration added). The contracting officer also appears to have stated that plaintiff was compensated for disposing of the cylinders under the contract's waste stream pricing but not for plaintiff's effort resulting from the differing site condition.[66]

---

[66] At trial, defendant's counsel and the contracting officer had the following exchange:

Q. Has the Government paid TPMC for any portion of the cylinders?

A. They were paid for the disposal; however, they were not paid for the efforts for executing the Phase I plan.

Q. And that's the 50,000 -- the approximately $50,000?

On July 22, 2014, defendant sent plaintiff a draft contract modification for plaintiff's review and signature. In response, Dr. Caputo asked the contracting officer:

> Since, we already accepted the alternate unit rate billing under Mod 07 to Delivery Order 0003, can you explain why the base contract also needs to [sic] modified to include these rates? As you're aware, we accepted the alternate unit rate billing under Mod 07 to DO [Task Order] 00003 to keep the project moving forward, but we're reluctant to incorporate these rates as part of the master contract since there is clearly some discrepancies in prior base contract communications regarding billing. At this point, we'd prefer to just execute the change to the final status survey to keep the project moving forward.

(alterations added). The contracting officer replied that she was "not clear on TES' concerns with signing contract modification P00004 which incorporates the 12.22% rate to the individual unit rates associated with the Beltsville contract." The contracting officer further explained that:

> Modification P00002, which you signed on 19 Nov 2012, already incorporated TES' proposed revised pricing rates, due to the delay in the finalization of the Decommissioning Plan, at this rate of 12.22%. Modification P00004 merely clarifies the individual unit rates as a result of escalating the original contract unit rates by the previously agreed upon 12.22% rate, as previously incorporated in bilateral modification P00002.
>
> Your email set forth below referenced "Billing rates" several times. I am not clear as to why you keep mentioning that TES agreed to "alternate unit rate billing to keep the project moving forward." Billing rates are established in Cost Type Contracts to allow the contractor to invoice at a rate throughout the life of the contract. Those billing rates are finalized after a final incurred cost audit has been completed by DCAA. As I have stated several times in the past, this contract was awarded as a firm-fixed-price and firm-fixed unit rate contract – NOT a Cost Type Contract – which was clearly shown in Section L of the solicitation and Section B of the contract award.

---

A. The $8,700 that I agreed to.

Q. And that's what they were paid? I'm sorry.

A. They have not been paid that yet.

Q. They have not been paid that, okay. And is that because there's still disagreement between the parties?

A. Yes.

Since the purpose of modification P00004 is to incorporate TES' proposed Technical Memo – Final Status Survey Improvements, and to clarify the previously agreed upon escalated rates from modification P00002, this modification P00004 could be signed solely by me as unilateral modification. However, I normally prefer to issue modifications as bilateral to allow the contractor to review the information and concur with the information in the modification. Nevertheless, if TES chooses to not sign this modification P00004, I will issue it as a unilateral modification as it is merely incorporating information submitted by TES and information previously agreed upon by both parties in modification P00002.

Please reply to indicate whether TES will be signing modification P00004.

Dr. Caputo informed the contracting officer on August 7, 2014, that plaintiff still opposed incorporating the revised contractual unit rates. Dr. Caputo stated that plaintiff felt that "there were discrepancies on both TES's and the government's side with regards to contract language, and we would like to discuss these discrepancies once the project is at a natural break point." Dr. Caputo concluded his email by stating that "I have been instructed by our TES [sic] board to hold off on signing the modification until we're able to present our position with regards to billing rates and contract structure." (alteration added).

On August 8, 2014, defendant issued Contract Modification P00004 to incorporate "the revised contractual unit rates escalated by 12.22%, as specified in the Attachment 0008, dated June 24, 2014"[67] and "the BARC Technical Memo – Final Status Survey Improvements, BTM-02, Rev.2, Attachment 0009, dated May 12, 2014" into Contract W52P1J-11-D-0001. Contract Modification P00004 identifies the Contract as "Firm Fixed Price" in Block 1 and in Section A – Supplemental Information, a narrative section. Contract Modification P00004, in the record before the court, does not bear plaintiff's signature.

Plaintiff completed its remediation activities at the LLRBS in August 2014, and, according to defendant, "TPMC requested that it be permitted to demobilize," pending NRC and EPA approval of the Final Status Survey "[b]ecause this regulatory process could take a significant amount of time." (alteration added). The contracting officer sent plaintiff a memorandum that states in part:

The Government concurs that it is in the best interest of the Government for TES to demobilize while waiting for the Nuclear Regulator [sic] Commission (NRC) and Environmental Protection Agency (EPA) to approve the Final Status Survey (FSS). Once the FSS has been approved, TES will be required to return to the site to backfill the remediated area with clean back fill as required in the Performance Work Statement (PWS).

---

[67] Attachment 0008 is not included in the record before the court.

TES has indicated that 11 drums of remediated waste remain at the site. While the government understands that TES may incur additional cost for compliance inspections and also cost associated with mobilization/demobilization for the shipment of these 11 drums, it is the Government's position that TES should have taken the necessary actions to ship the remediated waste prior to the demobilization. Therefore, the compliance inspections and any mobilization/demobilization cost associated with the shipment of the drums of waste will be completed at no additional cost to the Government.

USDA requests TES to perform monthly site inspections until such time the NRC and EPA have approved the FSS. We request TES submit a proposal with a monthly unit rate to perform these monthly site inspections. A new CLIN will be established as a Firm Fixed Rate CLIN. Funds will be added to the contract based on an estimated number of months that NRC and EPA will take to approve the FSS. If the FSS is approved in fewer months than estimated, the remaining funds will be deobligated. If it takes longer for the FSS approval than estimated, additional funds will be added at the negotiated monthly unit rate.

The Government also understands that TES will be required to return to the BARC site to complete the GEO Probe sampling once the EPA and NRC has made a determination as to how many samples will be required. It is the Government's position that this sampling can be completed during the monthly site inspection. The cost to perform the GEO probe sampling will be at the rate of the already established in CLIN 0004 for that type of sampling requirement.

(alteration and omission added). Plaintiff demobilized from the LLRBS on August 15, 2014.

From September 12, 2014, through January 25, 2016, defendant issued Modifications 08-13 to Task Order 0003, each of which were bilateral modifications. Each of these modifications identifies Task Order 0003's "Contract ID Code" as "Firm Fixed Price" in Block 1. Task Order 0003, Modification 08, added "CLIN 0003AB, Site Remediation," and obligated additional funding because plaintiff had remediated 704 cubic yards more than estimated. CLIN 0003AB's "CLIN CONTRACT TYPE" is characterized as "Firm Fixed Price." (capitalization in original). Task Order 0003, Modifications 08-13, ordered plaintiff to perform duties such as site sampling and site inspections through June 30, 2016, while waiting on the NRC and EPA to authorize the free release of the LLRBS.

According to Mr. Jackson's, the USDA's senior remedial project manager, testimony, the post-remediation closure process entails,

> two phases to this removal action, and two guiding regulatory agencies. The NRC is the primary until it [sic] removed and released through the free release of the site and removed it from the ARS [Agricultural Research Service], USDA's radiological permit, and then it became the purview of U.S. EPA Region 3's Superfund Program and they regulate the final closure of that after action.

(alterations added). The contracting officer testified at trail that "I believe the final status survey approval has been received from the NRC; however, I believe we are – we were still waiting for information from the EPA for that approval." As a result, the LLRBS, as of the date of the trial, had not yet been backfilled, i.e., restored to pre-remediation conditions.

On August 11, 2015, plaintiff submitted a Request for Equitable Adjustment, seeking $7,341,358.39, and attempted to schedule a meeting with the Government to discuss the request. Greater than sixty days later, on October 21, 2015, plaintiff requested a final decision from the contracting officer, which was never issued. Plaintiff, therefore, filed a Complaint with the United States Court of Federal Claims on December 23, 2015, and the Government answered on March 23, 2016. On June 17, 2018, following "several years" of discovery, including numerous depositions, defendant filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction. According to plaintiff, there "was enough of a jurisdictional question that it was better to request dismissal of the First Lawsuit without prejudice, re-certify a new claim to the CO, obtain a final decision by the CO, and file a new Complaint in the Court of Federal Claims." (alteration added). Thereafter, plaintiff filed, and this court granted, a Motion for Dismissal Without Prejudice on July 2, 2018.

On July 19, 2018, plaintiff submitted a certified claim to the contracting officer, seeking $7,177,045.68. On November 20, 2018, the contracting officer issued a Final Decision, denying plaintiff's fourteen claims for compensation. Thereafter, plaintiff filed a Complaint with this court on January 18, 2019. Defendant filed an Answer on April 9, 2019, and an Amended Answer on October 8, 2021. On March 11, 2022, plaintiff filed an Amended Complaint. Following a twelve-day trial, the court heard closing arguments.

According to plaintiff's Amended Complaint, in the case currently under review, after receiving the contracting officer's final decision, plaintiff filed its claim in this court. Plaintiff's Amended Complaint alleges four claims for relief: (1) equitable adjustment based upon Type I Differing Site Conditions, (2) breach of contract based upon Superior Knowledge, (3) breach of contract based upon breach of the Covenant of Good Faith and Fair Dealing, and (4) equitable adjustment based upon Changes. Plaintiff's post-trial brief, however, states that "based on the relief already provided by the differing site, superior knowledge, and breach of implied duty good faith and fair dealing claims outlined above, TPMC withdraws its changes claim."

Plaintiff argues the facts in this case give rise to six bases for a claim of Type I Differing Site Conditions. The first four bases are (1) the lack of five feet of clean overburden, (2) the increased concentrations and distribution of LSVs, (3) LSVs in more

than two pits, and (4) less than six feet of interstitial soil. For each of these four claimed differing site conditions, plaintiff argues that the Solicitation, amendments, and attachments affirmatively indicated a subsurface condition, upon which plaintiff reasonably relied when interpreting the contract and contract-related documents. Considering the 2009 Draft Decommissioning Plan in conjunction with Cabrera's Waste Characterization Survey, plaintiff claims the Solicitation, Performance Work Statement, and the Government's response to question (o) in Amendment 0001 to the Solicitation directed offerors to develop their proposals in accordance with the 2009 Draft Decommissioning Plan. Based upon the information available to plaintiff at the time of bidding on the Solicitation, plaintiff claims the actual conditions encountered, regarding these four conditions, "was not reasonably foreseeable." The final two bases for plaintiff's claim of Type I Differing Site Conditions are (5) the discovery of "elevated Radioactive Material" and (6) the discovery "of metal cylinders containing unknown gases." Plaintiff's post-trial brief claims "the Government conceded the radiological sources and cylinders are differing site conditions."

Defendant challenges plaintiff's Type I Differing Site Condition Claim, for all bases except the discovery of the metal cylinders, on five independent grounds, the first four of which are: (1) "the contract documents made no affirmative representations about the specific site conditions that a decommissioning contractor was likely to encounter when decommissioning the burial site," (2) "TPMC failed to establish that the conditions that it actually encountered at the site were materially different than what the Government represented in the contract documents," (3) "TPMC failed to reasonably rely on the contract documents because it cherry-picked only limited information that was favorable to it," and (4) "the actual site conditions that TPMC encountered at the burial site were reasonably foreseeable based on the contract documents." (capitalization omitted).

Defendant also argues that "for each of the [five] claimed differing site conditions, Mr. Fulton [plaintiff's damages expert] had no way of apportioning TPMC's total claimed amount into its constituent parts."[68] (alterations added). Therefore, defendant states that plaintiff's "inability to apportion damages claimed for each of the various alleged differing site conditions dooms TPMC's damages claim." According to defendant, the fifth independent challenged ground by defendant arises because, according to defendant, "[a]t trial, TPMC failed to establish that its damages were due solely to the alleged actions of the Government, rather than TPMC's own choices, errors, delays, and equipment procurement problems." (alteration added).

Regarding plaintiff's sixth basis of its Type I Differing Site Conditions claim, the metal cylinders, defendant argues that "at trial TPMC failed to establish a standalone damages amount" but adds that "[t]o the extent that TPMC is entitled to any amount, an

---

[68] Defendant's argument addresses five of plaintiff's claimed differing site conditions, instead of all six of plaintiff's claimed conditions, because, according to defendant: "We do not dispute that the presence of gas cylinders in Pit 52, the last pit to be excavated, constituted a differing site condition."

appropriate recovery would be TPMC's own "'cost estimate of $8,720.67.'" (alteration added).

In its amended answer, defendant also pleads that the doctrines of waiver and release bar plaintiff's claims for equitable adjustment "for the alleged differing site condition of less than five feet of clean backfill/overburden over the pits," which corresponds to plaintiff's first basis for a differing site condition. Defendant's post-trial brief argues that "[t]he plain language of Modification 2 to Task Order 3 is unambiguous and bars TPMC's request for damages relating to the 44 days of alleged delay and associated drafting of Work Plan Revision 1." (alteration added). Defendant further argues that "[t]he plain language of Modification 7 to Task Order 3 is unambiguous and bars TPMC's request for damages relating to drafting Work Plan Revision 2. (alteration added).

Plaintiff's claim of superior knowledge alleges that defendant "knew there was a significant number of loose LSVs that would make excavation more difficult and expensive" and "had knowledge of surface debris at the LLRBS consisting of crushed LSVs." According to plaintiff, "[t]he Government was aware of TPMC's lack of knowledge after reviewing its Technical Proposal, which assumed five feet of clean overburden and grouped LSVs, and Cost Proposal, which also assumed five feet of clean overburden." (alteration added). Plaintiff argues that "[t]he Contract specifications affirmatively misled TPMC as to the actual conditions," and because the 2009 Draft Decommissioning was required "to be accurate and complete" upon submission to the NRC, plaintiff "was not on any notice to inquire." (alteration added). Because defendant failed to inform plaintiff of "(1) the LSVs dispersed in the soil and (2) the lack of five feet of clean overburden," plaintiff claims that defendant "breached the duty to disclose superior knowledge, which is a breach of the Contract."

Defendant argues that plaintiff's superior knowledge claim fails "because the Government provided to TPMC all the knowledge it had regarding both the contents of the pits, including LSVs, and the possibility of waste in the overburden." Alternatively, defendant claims that "even if the Government withheld information from TPMC on the overburden, its superior knowledge claim still fails because TPMC cannot show causation."

Finally, plaintiff claims defendant breached the implied duty of good faith and fair dealing, arguing two different bases. First, plaintiff states that "the Contractor [sic] Officer threatened TPMC that if it '[did] not agree to use the escalated 12.2% rates, that decision may have an adverse affect [sic] on any possibility that the Revised Work Plan would be approved by the Government.'" (second alteration in original). Plaintiff believes the contracting officer's threat was wrongful because, according to plaintiff, defendant's consideration of Work Plan Revision 2 "was separate and distinct from the invoicing dispute," while, "[a]t the same time, TPMC warned the Government that the refusal to approve WP Rev. 2 for the methodology used since April 2014 would cause non-compliance with the RCRA." (alteration added). Second, plaintiff contends that "[d]espite getting NRC's approval, the Government still has not obtained EPA approval [of the Final

Status Survey]," and that "[d]elaying TPMC's final work for years is a breach of the implied duty of good faith and fair dealing." (alterations added).

Regarding plaintiff's first basis for plaintiff's theory of breach of the implied covenant of good faith and fair dealing, defendant argues that "TPMC has not demonstrated that the Government interfered with TPMC's performance or reasonable expectations under the bargain struck." According to defendant, "the contracting officer needed to ensure that TPMC was billing the Government using the correct rates so that the Government would not be charged extra for a change in technical approach that was not necessary for technical or safety reasons." "Thus," defendant states, "the actions that TPMC alleges violated the Government's duty of good faith and fair dealing merely reflect the Government's exercise of its contractual rights." Regarding plaintiff's second basis, delaying TPMC's completion of work due to lack of EPA approval, defendant states initially that "TPMC has waived this claim because it was not raised prior to TPMC's post-trial brief." Defendant also argues that "the PWS [Performance Work Statement] merely provides that the contractor will backfill the site under Task 3 once the Government regulators – the NRC and the EPA – have released it" and that "[t]here is also no record evidence that the Government has purposely delayed obtaining EPA approval or otherwise hindered the process." (alterations added).

In addition to the three claims raised by plaintiff, the parties disagree about whether CLINS 0003 through 0007 were ordered as firm fixed price or as fixed unit rate. Plaintiff concedes that "[t]here is no dispute that the Contract identified CLINs 0003-07 as fixed unit rate," but adds that "there also is no dispute that the Contract did not order work." (alteration added). According to plaintiff, because Task Order 0003 identified CLINS 0003-07 as having a quantity of 1, no unit price, and a lump sum and Modifications 05, 06, and 08 to Task Order 0003 identified CLINs 0003-07 as firm fixed price, with a quantity of 1, no unit price, and a lump sum, then the plain language of the Task Order and its Modifications is that defendant ordered the CLINS as firm fixed price.

Plaintiff attempts to support its argument by referencing the Federal Procurement Data System, the Federal Acquisition Regulation, plaintiff's invoices, and the terms of the contract. Plaintiff states that the Federal Procurement Data System identified Task Order 0003's "contract type as 'Firm Fixed Price.'" Plaintiff argues that, based on the facts of this case, the only "contract form authorized by FAR Subpart 16.1 was a firm-fixed price contract, which was how the Contracting Officer ordered CLINs 0003-07 in DO [Task Order] 0003 and Mod. 6 to DO 0003 [as firm fixed price]." (alterations added). Further, plaintiff states that "TPMC invoiced CLINs 0003AA, 0004AA, 0005AA, 0005AB, 0006AA, 0006AB, 0007AA, and 0007AB as firm-fixed price," and defendant "then paid these CLINs that were invoiced as firm-fixed price." Plaintiff also argues that "[t]he specific terms of DO 0003 and Mod. 6 to DO 0003 would control over any general terms in the Contract." (alteration added).

Defendant argues that, while "the general proposition that the specific terms of a contract control over general terms . . . is correct," the issue here "is not general versus specific language, but whether task orders could change the terms of the base contract

in the face the base contract's explicit language to the contrary." (omission added). According to defendant, because the contract here includes FAR 52.216-18 Ordering (Oct 1995), "the terms of the base contract 'shall control' in the event of a conflict between the base contract and the task order."

Plaintiff's post-trial brief states: "As outlined in the Certified Claim, testified to at trial, and outlined in Sections VII(d) through (q) below, TPMC incurred the following damages:"[69]

| CLIN | Damages |
|---|---|
| CLIN 1 – Work Plan Revision 1 | $6,560.39 |
| CLIN 1 – Work Plan Revision 2 | $76,156.23 |
| CLIN 2 – Mobilization – NTP – 3/2013 | $214,558.04 |
| CLIN 2 – Demobilization – Ecavation Complete – 8/2014 | $8,051.47 |
| CLIN 2 – Remobilization – Geo-probe/Backfill – TBD | $30,648.78 |
| CLIN 2 – Demobilization – Geo-probe/Backfill – TBD | $13,668.30 |
| CLIN 3 – Site Remediation | $2,597,448.64 |
| CLIN 4 – Site Sampling | $343,445.61 |
| CLIN 5 – Packaging and Staging – Additional Waste | $315,891.62 |
| CLIN 6 – Transportation – Additional Waste | $1,382,747.17 |
| CLIN 7 – Treatment & Disposal – Additional Waste | $933,960.24 |
| CLIN NEW – Surveillance – Excavation Complete | $45,166.73 |
| CLIN NEW – REA Preperation | $128,398.70 |
| CLIN NEW – Escalation | $1,080,883.00 |
| | |
| **Total Damages** | **$7,177,584.92** |

Plaintiff states that "[t]he amount of TPMC's damages is put into perspective in light of the fact that the 2005 Draft DP noted '[c]urrent estimates indicate that it will cost approximately $24M to complete the decommissioning . . . .'" (third alteration and omission in original).[70]

---

[69] The Amended Complaint requests an equitable adjustment of $7,177,045.68, which is $539.24 less than the post-trial request.

[70] Plaintiff's Exhibit 1032, "Monthly Update of CERCLA [Comprehensive Environmental Response, Compensation, and Liability Act] Activities At the Beltsville Area," which is dated December 2, 2008, and was apparently authored by Mr. Jackson, states that "[t]he U.S. Army Field Support Command, Rock Island, Illinois has prepared a draft RFP for review for USDA. In the revised DP [Decommissioning Plan] the cost estimated is approximately $70 million." (alteration added).

Plaintiff claims compensation for:

- CLIN 1 – Work Plan Revision 1 – "based on costs incurred to draft Work Plan Rev. 1, which was required because of the waste in the overburden." Plaintiff claims compensation for CLIN 2 – Mobilization "based on costs incurred for mobilization activities that took longer than the accepted scheduled due to waste in the overburden."

- CLIN 1 – Work Plan Revision 2 "based on costs incurred to draft WP Rev. 2, which was required because of the LSVs dispersed in the soil." Plaintiff claims compensation for CLINs 3 and 4 "based on costs incurred due to the LSVs dispersed in the soil."

- CLIN 2 – Demobilization – Excavation Complete "based on costs incurred for demobilization activities that took longer than the accepted scheduled due to the delayed approval of WP Rev. 2."

- CLIN 2 – Remobilization and CLIN 2 Demobilization – Geo-probe/Backfill "based on costs it will incur to" remobilize and demobilize, respectively.

- CLINs 5-7 – Packaging and Staging, Transportation, and Treatment and Disposal of Additional Waste – "based on additional costs incurred to package and stage . . . transport . . . [and] treat and dispose of LLRW." (alteration added). Plaintiff's memorandum of March 13, 2015, that accompanied an invoice "for CLINs 5, 6, and 7," explains that

> TES considers the subject delivery order, issued by the Army Contracting Center, to be Firm-Fixed Price (FFP), and that prior interim progress billings were presented on a fixed unit rate basis. Since we have substantially completed the scope of work and units provided for under Tasks 5, 6, and 7, we are billing these tasks to completion less the remaining units awaiting final disposition.

- CLIN New – Surveillance – "based on costs incurred to conduct inspections after demobilization."

- CLIN New – Request for Equitable Adjustment (REA) Preparation – "based on costs incurred for REA preparation."

- CLIN New – Escalation – "based on increased costs incurred due to escalation."

## DISCUSSION

Plaintiff brings this suit pursuant to the Contract Disputes Act, 41 U.S.C. § 7104(b)(1). Congress has conferred jurisdiction upon the United States Court of Federal Claims "to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41." 28 U.S.C. § 1491(a)(2).

I.    Contract Interpretation

The question of breach of contract is one of contract interpretation. "Contract interpretation starts with the language of the contract." SUFI Network Servs., Inc. v. United States, 785 F.3d 585, 593 (Fed. Cir. 2015); see also NOAA Maryland, LLC v. Adm'r of GSA., 997 F.3d 1159, 1165 (Fed. Cir. 2021); Authentic Apparel Grp., LLC v. United States, 989 F.3d 1008, 1014 (Fed. Cir. 2021); Premier Off. Complex of Parma, LLC v. United States, 916 F.3d 1006, 1011 (Fed. Cir. 2019) (citing NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)); Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 824 (Fed. Cir. 2010), cert. denied, 562 U.S. 1178 (2011); Bell/Heery v. United States, 739 F.3d 1324, 1331 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); LAI Servs., Inc. v. Gates, 573 F.3d 1306, 1314 (Fed. Cir.), reh'g denied (Fed. Cir. 2009); Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004); Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993); ASG Sols. Corp. v. United States, 170 Fed. Cl. 485, 496 (2024); Schneider Elec. Bldgs. Ams., Inc. v. United States, 163 Fed. Cl. 708, 721 (2023); Ascendant Servs., LLC v. United States, 160 Fed. Cl. 275, 286 (2022); HCIC Enters., LLC v. United States, 147 Fed. Cl. 118, 124 (2020); Nw. Title Agency, Inc. v. United States, 126 Fed. Cl. 55, 57-58 (2016) (citing Foley Co. v. United States, 11 F.3d at 1034) ("The starting point for any contract interpretation is the plain language of the agreement."), aff'd, 855 F.3d 1344 (Fed. Cir. 2017); Beard v. United States, 125 Fed. Cl. 148, 158 (2016); Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. 372, 483-84 (2013).

"""In contract interpretation, the plain and unambiguous meaning of a written agreement controls.""" Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1379 (Fed. Cir. 2009) (quoting Hercules Inc. v. United States, 292 F.3d 1378, 1380-81 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002) (quoting Craft Mach. Works, Inc. v. United States, 926 F.2d 1110, 1113 (Fed. Cir. 1991))). "Terms must be given their plain meaning if the language of the contract is clear and unambiguous." SUFI Network Servs., Inc. v. United States, 785 F.3d at 593 (citing Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003)); see also Manitou Island Transit, LLC v. United States, 168 Fed. Cl. 218, 225 (2023); Gilead Scis., Inc. v. United States, 163 Fed. Cl. 104, 121 (2022); CanPro Invs. Ltd. v. United States, 130 Fed. Cl. 320, 347, recons. denied, 131 Fed. Cl. 528 (2017); Beard v. United States, 125 Fed. Cl. at 158 ("If the contract language is unambiguous, then it must be given its plain and ordinary meaning . . . ."). The United States Court of Appeals for the Federal Circuit stated in Massie v. United States:

In interpreting a contract, "[w]e begin with the plain language." "We give the words of the agreement their ordinary meaning unless the parties mutually

intended and agreed to an alternative meaning." In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense."

Massie v. United States, 166 F.3d 1184, 1189 (Fed. Cir. 1999) (quoting McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1996); and Harris v. Dep't of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998)); see also Lanclos v. United States, 40 F.4th 1352, 1355 (Fed. Cir. 2022); Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000) (quoting McAbee Constr., Inc. v. United States, 97 F.3d at 1435; and Harris v. Dep't of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998)) (internal citations omitted); Harris v. Dep't of Veterans Affairs, 142 F.3d at 1467; see also Coast Prof'l, Inc. v. United States, 828 F.3d 1349, 1354 (Fed. Cir. 2016); Shell Oil Co. v. United States, 751 F.3d 1282, 1305 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2014); McHugh v. DLT Sols., Inc., 618 F.3d 1375, 1380 (Fed. Cir. 2010); Giove v. DOT, 230 F.3d 1333, 1340-41 (Fed. Cir. 2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs." (citations omitted)); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (indicating that a preferable interpretation of a contract is one that gives meaning to all parts of the contract rather than one that leaves a portion of the contract "useless, inexplicable, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result" (quoting Arizona v. United States, 216 Ct. Cl. 221, 575 F.2d 855, 863 (1978))). A Judge of the United States Court of Federal Claims has explained:

> "The words of a contract are deemed to have their ordinary meaning appropriate to the subject matter, unless a special or unusual meaning of a particular term or usage was intended, and was so understood by the parties." Lockheed Martin IR Imaging Sys., Inc. v. West, 108 F.3d 319, 322 (Fed. Cir. 1997). "Under general rules of contract law we are to interpret provisions of a contract so as to make them consistent." Abraham v. Rockwell Int'l Corp., 326 F.3d 1242, 1251 (Fed. Cir. 2003). "[A]n agreement is not to be read in a way that places its provisions in conflict, when it is reasonable to read the provisions in harmony. . . . [T]he provisions must be read together in order to implement the substance and purpose of the entire agreement." Air-Sea Forwarders, Inc. v. United States, 166 F.3d 1170, 1172 (Fed. Cir. 1999). "A reasonable interpretation must assure that no contract provision is made inconsistent, superfluous, or redundant." Medlin Const. Grp., Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (internal quotation marks omitted).

Dynetics, Inc. v. United States, 121 Fed. Cl. 492, 512 (2015); see also Crowley Gov't Servs., Inc. v. United States, 171 Fed. Cl. 453, 464 (2024); ASG Sols. Corp. v. United States, 170 Fed. Cl. at 496; Gilead Scis., Inc. v. United States, 163 Fed. Cl. at 121; Elevated Techs., Inc. v. United States, 160 Fed. Cl. 257, 270 (2022); Marquardt Co. v. United States, 101 Fed. Cl. 265, 268 (2011) ("In interpreting contractual language, the

court must give reasonable meaning to all parts of the contract and avoid rendering portions of the contract meaningless." (citation omitted)).

If this court determines that a contract is ambiguous and the contractor's interpretation is reasonable, this court will normally apply the rule of *contra preferentem*, resolving the ambiguity against the drafter. See Wash. State Dep't of Licensing v. Cougar Den, Inc., 586 U.S. 347, 368, (2019) (Gorsuch, J., concurring) (Ginsburg, J., joining) (stating that "[a]fter all, the United States drew up this contract, and we normally construe any ambiguities against the drafter who enjoys the power of the pen" (alteration added)); see also United States v. Seckinger, 397 U.S. 203, 210 (1970) (stating that "the general maxim that a contract should be construed most strongly against the drafter, which in this case was the United States"); NOAA Md., LLC v. Adm'r of the GSA, 997 F.3d 1159, 1169 (Fed. Cir. 2021) (holding that,

> [w]hen a dispute arises as to the interpretation of a contract and the contractor's interpretation of the contract is reasonable, we apply the rule of *contra preferentem*, which requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document."

(citing Turner Constr. Co. v. United States, 367 F.3d 1319, 1321 (Fed. Cr. 2004) (alteration added))); Spectrum Scis. v. United States, 84 Fed. Cl. 716, 736 (2008); Cuyahoga Metro. Hous. Auth. v. United States, 57 Fed. Cl. 751, 760 (2003).

The parties in this case disagree over how the CLINS were ordered by Task Order 0003. The determination of contract type is a matter of law. See Hymas v. United States, 810 F.3d 1312, 1330 (Fed. Cir. 2016) (citing Maint. Eng'rs v. United States, 749 F.2d 724, 726 n.3 (Fed. Cir. 1984) (holding that "[d]etermination of the type of contract is a matter of law – not controlled by a label in the contract" (alteration added))), cert. denied, 581 U.S. 1010 (2017). In interpreting the contract, "[t]he court is not bound by the name given to a contract. Rather, it must look to the actual terms of the contract to determine its character." A-Transport Northwest Co. v. United States, 27 Fed. Cl. 206, 214 (1992) (citing Ralph Constr., Inc. v. United States, 4 Cl. Ct. 727, 731 (1984)), aff'd, 36 F.3d 1576 (Fed. Cir. 1994)

The Contract at issue is labeled – and is characterized by the parties as – a three-year IDIQ contract, with an effective date of November 9, 2010, and the originally awarded Contract unambiguously provides that contract line items 0003 – Site Remediation, 0004 – Site Sampling, 0005 – Packaging / Staging, 0006 – Transportation, and 0007 – Treatment / Disposal are fixed unit rate line items.

As stated above, plaintiff argues that Task Order 0003 identified CLINS 0003-07 as having a quantity of 1, no unit price, and a lump sum and Modifications 05, 06, and 08 to Task Order 0003 identified CLINs 0003-07 as firm fixed price, with a quantity of 1, no unit price, and a lump sum. Thus, according to plaintiff, the plain language of the Task Order and its Modifications is that defendant ordered these CLINS as firm fixed price.

Plaintiff also argues that the only "contract form authorized by FAR Subpart 16.1 was a firm-fixed price contract" and states that "TPMC invoiced CLINs 0003AA, 0004AA, 0005AA, 0005AB, 0006AA, 0006AB, 0007AA, and 0007AB as firm-fixed price" and defendant "then paid these CLINs that were invoiced as firm-fixed price." Plaintiff further argues that "[t]he specific terms of DO 0003 and Mod. 6 to DO 0003 would control over any general terms in the Contract."[71] (alteration added).

Defendant argues the court should "give the terms of the base contract their plain meaning," which, according to defendant, are "plain, clear, and unambiguous," such that the court should "reject[s] TPMC's attempt to transform CLINs 0003-0007 into firm-fixed-price." (alteration added). In support of its argument, defendant cites the Contract, the Ordering clause, and the language of Task Order 0003, Modification 06. Defendant explains that because "Task Order 3 and Modification 6 provided that '[a]ll terms and conditions of contract W52P1J-11-D-0001 remain unchanged,'" then "CLINs 0003-0007 remained fixed unit rate."[72] (alteration in original). Defendant adds that, should a conflict exist "between the terms of the base contract and the terms of Task Order 3 or Modification 6, the terms of the base contract establish an order of precedence," i.e., that the Ordering clause requires the terms of the Contract to control. The Ordering Clause, as written in the Contract, states in pertinent part:

(a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the individuals or activities designated in the Schedule. Such orders may be issued for a period of three (3) years from the date of contract award.

(b) All delivery orders or task orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order or task order and this contract, the contract shall control.

Incidental to the argument that CLINs 0003-0007 remained priced as a fixed unit rate, defendant states in a footnote that "[n]one of the four modifications to the base contract changed CLINs 0003-0007 from fixed-unit-rate to firm-fixed-price." (alteration added). Additionally, defendant argues "the Court should not consider extrinsic evidence when the contract language is plain and unambiguous," adding that, "in any event, TPMC's extrinsic evidence is either irrelevant or supports our position."

In addition to plaintiff's arguments stated above, in its response to defendant, plaintiff challenges that "[t]he Government ignores the language in DO [Task Order] 0003

---

[71] As stated above, Task Order 0003 ordered CLINs 0002AA-0009AA, and Task Order 0003, Modification 06, ordered CLINS 0005AB-0007AB.

[72] The Contract, as issued on November 9, 2010, identifies Tasks 3-7 as fixed unit rate line items. For example, the Contract describes CLIN 0003 – Site Remediation as: "Fixed Unit Rate line item for the performance of "Task 3 Site Remediation" of the Attachment 0001 Performance Work Statement."

and its modifications" and that defendant's "proposed contract interpretation of CLINs 0003-0007 also would create a conflict between the Contract, on one hand, and DO 0003 and Mod. 6 to the DO 0003, on the other hand." (alterations added). Plaintiff further contends, in response to defendant's reliance upon the Ordering clause's conflict resolution provision, that defendant's "issuance of DO 0002 prior to the issuance of DO 0003 is contrary to this very argument." Plaintiff explains that Task Order 0002 "ordered CLIN 0002AA as a cost reimbursable CLIN in DO 0002," despite the Contract "indentif[ying] CLIN 002 as firm-fixed price" and Task Order 0002's statement that "[t]his task order is subject to all applicable terms and conditions of the basic IDIQ contract W52P1J-11-D-0001." (first alteration added). Plaintiff also argues, having already stated "[t]here is no dispute that the Contract identified CLINs 0003-07 as fixed unit rate," that, "[e]ven if the terms of DO 0003 and its Modifications conflict with the terms of the Contract (which they do not), the specific terms of DO 0003 and its Modifications control." (alterations added). Thus, according to plaintiff, "[a]s the parties agree there is no conflict, FAR § 52.216-18 does not apply." (alteration added).

Plaintiff also argues, in a supplemental brief, that:

Whatever information may have been in Attachment 0002 - Price Spreadsheet became irrelevant once the Government issued Contract Modification P00002 with the new rates (here, lump sums per CLIN) that superseded any prior rate from Attachment 0002- Price Spreadsheet. The Contracting Officer then issued DO 0003, which further adopted the new rates from Contract Modification P0002 and ordered CLINs 0003AA, 0004AA, 0005AA, 0006AA, and 0007AA as firm-fixed prices.

As an initial matter, the court determines that the Contract at issue is a three-year IDIQ contract, with an ordering period that began on November 9, 2010, and ended on November 8, 2013, because the Contract states that "[s]uch [task] orders may be issued for a period of three (3) years from the date of contract award."[73] (alterations added). The court notes that Task Order 0003, Modification 06, was not signed by both parties until March 31, 2014, well after the end of the Contract's three-year ordering period. Neither party, however, challenges the enforceability of the Modification.

Because the Ordering Clause establishes that the Contract controls in the event of a conflict between a task order and the Contract, the court initially interprets the contract language. The original contract language, in Joint Exhibit 31, established that CLINs 0003-0007 would be awarded as fixed unit rate CLINs and CLINs 0001-0002 and 0008-0009 would be awarded as firm fixed price CLINs. Of the four Contract Modifications in the trial record currently before the court, only Contract Modification P00002 was signed

---

[73] While the Contract, and each of its Modifications, provides a contract expiration date of October 30, 2015, the court cannot discern what the Contract means by "expiration date" because the plain language interpretation of a "3-year Indefinite Delivery Indefinite Quantity (IDIQ) contract," awarded on November 9, 2010, indicates that the ordering period should expire on November 8, 2013.

by both parties. The court need not interpret the first, third, or fourth Contract Modifications because FAR 52.243-1 Changes-Fixed-Price – Alternate I limits the contracting officer's ability to unilaterally change the Contract to the description of services performed or the time or place of performance.[74] FAR 52.243-1 Changes-Fixed-Price (Aug 1987) – Alternate I (Apr 1984). Because the first, third, and fourth Contract Modifications were unilateral contract changes, the first, third, and fourth Contract Modifications cannot be interpreted to change the method of determining the amount owed under the contract.[75] See FAR 52.243-1 Changes-Fixed-Price (Aug 1987) – Alternate I (Apr 1984).

Contract Modification P00002, however, was a "Change Order/Funding Action/Administrative Change," and its express purpose "is to update the fully burdened rates for Task 2 through Task 9 of contract W52P1J-11-D-0001 , Beltsville. This pricing revision request is the result of a 2 year delay in finalization of the Decommission Plan." (omission added). Contract Modification P00002 states that

> Task Orders will be awarded for remaining tasks in the PWS utilizing the new rates agreed to in the Pricing Sheet found in Attachment 0007 - TES BARC Escalation Request Letter_1NOV12. All task orders and modifications executed under this contract shall refer to this contract and shall be subject to the applicable terms and conditions incorporated in this contract.

Finally, the Contract Modification states that "[a]ll other terms and conditions of W52P1J-11-D-0001 remain unchanged." Thus, the only change to the Contract was to change the

---

[74] The clause at FAR 52.243-1 – Alternate I provides, in pertinent part:

> (a) The Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this contract in any one or more of the following:
> (1) Description of services to be performed.
> (2) Time of performance (i.e., hours of the day, days of the week, etc.).
> (3) Place of performance of the services.

FAR 52.243-1 Changes-Fixed-Price (Aug 1987) – Alternate I (Apr 1984).

[75] Defendant's post-trial brief states: "Finally, the parties resolved the invoicing issue by agreeing to use the correct rates – from the "Alternate Approach" price proposal – escalated by 12.2%. JX102 at 004872; see Tr. 1612:21-1613:19 (Wagoner); JX107 at 004959 (Modification P00004)." The court has reviewed the record and has found no other claim or evidence to support that Contract Modification P00004 was a bilateral modification. To the contrary, Dr. Caputo contemporaneously informed the contracting officer that he was directed by his board to not sign Contract Modification P00004 until plaintiff could "present our position with regards to billing rates and contract structure."

rates of payment for CLINs 0002-0009 – a mix of firm fixed price and fixed unit rate CLINs – to the "rates" agreed to in Attachment 0007.

Attachment 0007, however, does not articulate a "rate" of payment for any CLIN. Attachment 0007 is not an updated version of the Price Estimate Spreadsheet that defendant required of offerors during contract formation, which listed the different CLINs as either firm fixed price or fixed unit rates and listed the specific price of the four different waste streams for packaging, transporting, and disposal of waste, under CLINs 0005-0007. Instead of the robust, thirty-nine-page Price Estimate Spreadsheet submitted with plaintiff's offer, Attachment 0007 is a four-page memorandum with two attachments of indexing data and substantively provides little more than an initial price, the amount of escalation due to delay, and the escalated price for each PWS task. The amounts listed in Attachment 0007 are listed as lump sums for each task. Attachment 0007 also lists the "New Contract Price" as "$4,722,651.51." Furthermore, the "initial price" for each task, as listed in Attachment 0007, matches the price per task reflected in plaintiff's Revised Price Proposal, not plaintiff's Alternate Price Proposal. Because Attachment 0007 identifies the price per task as a lump sum and because no part of Attachment 0007 can be interpreted to represent a rate of payment, the court concludes the pricing proposal articulated in Attachment 007 is for a firm fixed price of $4,722,651.51.

Contemporaneous interpretations of Attachment 0007 and the Contract support the court's conclusion. The internal email exchange of May 3, 2013, between plaintiff's employees clearly states that Dr. Caputo believed the Contract to be a firm fixed price contract and that the fixed unit rates "per the proposal" were "to provide [sic] basis for progress payments." Additionally, defendant's Lead Contract Price/Cost Analyst, in reviewing Attachment 0007, determined the contracting officer did not need to request audit assistance or field pricing assistance because the escalation request did not exceed the threshold for either process "for fixed price proposals." Defendant's analyst recommended "that the contracting officer consider obtaining an updated proposal from TES," but instead, the contracting officer wholly incorporated plaintiff's four-page memorandum into the Contract as Attachment 0007. Because the language of Modification P00002 indicates all CLINs would be firm fixed price and the Contract, as awarded, indicates that CLINs 0003-0007 would be fixed unit rate CLINs, the court determines that the Contract, as amended by Modification P00002, is ambiguous.

The court concludes that plaintiff's interpretation of the Contract is reasonable. The court further concludes that Contract Modification P00002 changed the CLIN type of CLINs 0003-0007 from fixed unit rate to firm fixed price. Dr. Caputo authored plaintiff's escalation request, which reads like a firm fixed price contract and became Attachment 0007. Seven months later and prior to commencing work under CLINs 0003-0007, Dr. Caputo explained that he interpreted the Contract to be firm fixed price with specific rates for determining progress payments. Defendant's Lead Contract Price/Cost Analyst, who contemporaneously reviewed plaintiff's escalation request, also interpreted plaintiff's escalation request to apply to a firm fixed price contract. Under these facts, the court can apply the theory of *contra preferentem* and adopts plaintiff's interpretation that the parties'

adoption of Modification P00002 incorporated pay rates of "lump sums per CLIN," superseding "any prior rate from Attachment 0002-Price Spreadsheet."

## II.    Differing Site Conditions

To prevail on a claim for a Type I differing site condition, a contractor must prove, by a preponderance of the evidence, that the conditions encountered at the project site materially differed from those represented in the contract documents, the conditions must have been reasonably unforeseeable to the contractor based on the information available to the contractor at the time it submitted its bid, the contractor must show that it reasonably relied upon its interpretation of the contract and contract-related documents, and the contractor must show that, as a consequence of the difference between the expected and the encountered conditions, the contractor suffered damages. See Int'l Tech. Corp. v. Winter, 523 F.3d 1341, 1348-49 (Fed. Cir. 2008); Renda Marine, Inc. v. United States, 509 F.3d 1372, 1376 (Fed. Cir. 2007), reh'g and reh'g en banc denied (Fed. Cir. 2008); Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002); H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1345 (Fed. Cir. 1998); Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1581 (Fed. Cir. 1987).

The threshold issue of whether the plaintiff is eligible for an equitable adjustment for Type I differing site conditions claim depends on the conditions indicated in the contract documents. See Int'l Tech. Corp. v. Winter, 523 F.3d at 1348 ("[T]he contractor must prove that a reasonable contractor reading the contract documents as a whole would interpret them as making a representation as to the site conditions." (citing Renda Marine, Inc. v. United States, 509 F.3d at 1376; H.B. Mac, Inc. v. United States, 153 F.3d at 1345)); Renda Marine, Inc. v. United States, 509 F.3d at 1376 (holding that:

> In order to be eligible to recover for a Type I differing site condition, a contractor must first prove, as a threshold matter, that the contract contained some identification of the conditions to be encountered at the site. The contractor must then prove by a preponderance of the evidence that the conditions encountered during the contract performance differed materially from the conditions indicated in the contract. To carry this burden, the contractor must demonstrate that the conditions encountered were not reasonably foreseeable in light of all information available to the contractor when bidding, that the contractor reasonably relied upon its original interpretation of the contract, and that the contractor suffered damages as a result of the material variation between the conditions expected and those encountered.

(citing H.B. Mac, Inc. v. United States, 153 F.3d at 1345)); Stuyvesant Dredging Co. v. United States, 834 F.2d at 1581; P.J. Maffei Bldg. Wrecking Corp. v. United States, 732 F.2d 913, 916 (Fed. Cir. 1984)) (internal citations omitted); Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264, 1274 (Fed. Cir. 2001) ("This court has previously explained that 'in order to establish entitlement to an equitable adjustment by reason of a Type I differing site condition[,] . . . the contractor must prove, by a preponderance of the

evidence, that the conditions indicated in the contract differ materially from those it encounters during performance.'" (quoting <u>H.B. Mac, Inc. v. United States</u>, 153 F.3d at 1345) (alterations in <u>Randa/Madison Joint Venture III</u>)); <u>P.J. Maffei Bldg., Wrecking Corp. v. United States</u>, 732 F.2d at 916 ("As a threshold matter, then, this kind [Type I] of Differing Site Conditions claim is dependent on what is 'indicated' in the contract."); <u>Round Place, Inc. v. United States</u>, 31 Fed. Cl. 749, 751 (1994) ("An express representation in a contract specification or drawing furnished by the government to the contractor depicting specific conditions on a site can result in Type I Differing Site Conditions, if other conditions are encountered during construction."). The United States Court of Appeals for the Federal Circuit has made it clear that "[a] contractor cannot be eligible for an equitable adjustment for changed conditions unless the contract indicated what those conditions would supposedly be." <u>P.J. Maffei Bldg. Wrecking Corp. v. United States</u>, 732 F.2d at 916; <u>see</u> <u>also</u> <u>H.B. Mac, Inc. v. United States</u>, 153 F.3d at 1345 ("Determining whether a contract contained indications of a particular site condition 'is a matter of contract interpretation and thus presents a question of law'. . . ." (quoting <u>P.J. Maffei Bldg. Wrecking Corp. v. United States</u>, 732 F.2d at 916)) (internal citation omitted). The United States Court of Appeals for the Federal Circuit has also "stated that a proper technique of contract interpretation is for the court to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents. <u>Int'l Tech. Corp. v. United States</u>, 523 F.3d at 1350 (quoting <u>H.B. Mac Inc. v United States</u>, 153 F.3d at 1345 (Fed. Cir. 1998) (quoting <u>P.J. Maffei Bldg. Wrecking Corp. v. United States</u>, 732 F.2d at 916)). Thus:

> To establish an equitable adjustment to contract price based on a Type I DSC, a contractor must prove by a preponderance of the evidence:
>
>> [1] the conditions indicated in the contract differ materially from those actually encountered during performance; [2] the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; [3] the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and [4] the contractor was damaged as a result of the material variation between expected and encountered conditions.

<u>United States Army Corps of Eng'rs v. John C. Grimberg Co.</u>, 817 F. App'x 960, 963 (Fed. Cir. 2020) (citing <u>Comtrol, Inc. v. United States</u>, 294 F.3d at 1362) (alterations in original).

Plaintiff has raised six bases for an equitable adjustment to contract price based on a Type I Differing Site Condition: (1) the lack of five feet of clean overburden, (2) the increased concentrations and distribution of LSVs, (3) LSVs in more than two pits, (4) less than six feet of interstitial soil, (5) the discovery of elevated Radioactive Material, and (6) the discovery of metal cylinders containing unknown gases. Plaintiff claims the first basis for a differing site condition, the lack of five feet of clean overburden, resulted in the following damages: CLIN 1 – Work Plan Revision 1 ($6,560.39) and CLIN 2 – Mobilization

($214,558.04). Plaintiff claims the second basis for a differing site condition, the increased concentrations and distribution of LSVs, resulted in the following damages: CLIN 1 – Work Plan Revision 2 ($76,156.23), CLIN 3 – Site Remediation ($2,597,448.64), and CLIN 4 – Site Sampling ($343,445.61). Plaintiff does not argue that any of its other claims for damages are the result of differing site conditions, bases (3)-(6), in its Type I Differing Site Conditions claim. Because none of plaintiff's claims for compensation are the result of discovering LSVs in more than two pits, less than six feet of interstitial soil, elevated Radioactive Material, or metal cylinders containing unknown gases, plaintiff fails to prove by a preponderance of evidence that it was damaged as a result of a material variation between expected and encountered conditions, as to bases (3)-(6) of its Type I Differing Site Conditions claim.

  a. Lack of Five Feet of Clean Overburden – Differing Site Condition (1)

  Regarding plaintiff's differing site condition (1), defendant raises an affirmative defense based on an assertion that the "Bilateral Modification 02 to Task Order 0003 bars plaintiff's claims for equitable adjustment for the alleged differing site condition of less than five feet of clean backfill/overburden over the pits on the doctrine of release and waiver." Defendant argues that Task Order 0003, Modification 02,

> incorporated TPMC's "Alternative Excavation Approach" [Work Plan Revision 1] and explained that the alternate excavation approach "will allow the undisturbed cover layer to protect the waste pits from erosion and unnecessary contamination migration until [TPMC] is ready for remediation." And the modification expressly provided that the changes to TPMC's excavation approach "will be completed at no additional cost to the Government." There is no ambiguity in these terms.

(first alteration added; citations and footnote omitted).[76] While defendant asserts that the language of Task Order 0003, Modification 02, is clear and unambiguous,[77] defendant also states that "extrinsic evidence further supports our position." Claiming that "[t]he contract documents made clear that contractors could not assume the overburden was clean" and "TPMC's technical approach acknowledged the possibility of waste in the overburden," defendant argues that "TPMC was aware of the potential for waste in the five feet of overburden when it drafted Work Plan Revision 0 in March 2013." Thus, according to defendant, plaintiff did not change its work plan from Revision 0 to Revision 1 because plaintiff learned of the potential for waste or debris in the overburden but

---

[76] The court has omitted defendant's citations, one of which cited to Mr. Clayman's testimony and included the following explanatory parenthetical: "(Mr. Clayman explaining that the change in approach was necessary to avoid creating a 'wet sloppy mess,' not because of any waste in the overburden)."

[77] Task Order 0003, Modification 02, states: "3. The changes incorporated into this modification will be completed at no additional cost to the Government."

"because it believed the new approach would be technically superior." Defendant offers to support its allegation – that plaintiff's impetus for the change in work plans was due to technical superiority – by citing to Mr. Clayman's testimony and Mr. Clayman's contemporaneous statement to the contracting officer's representative that "'the expected amount of material requiring excavation remains the same; therefore [TPMC's] level of effort and proposed cost also remains the same.'" (alteration in original).

Plaintiff challenges defendant's affirmative defense, stating "the Government misconstrues the plain and ordinary language of Mod 2 to DO 0003 and is directly contrary to the Contracting Officer's testimony" at trial. Plaintiff argues that "[t]he Government knew how to include release and waiver language in modifications," citing to another modification: Task Order 0001, Modification 03.[78] (alteration added). Plaintiff also argues that defendant neither "conceded there was a differing site condition associated with the overburden" nor "identified any disputed differing site condition in Mod. 2 to DO 0003." Thus, according to plaintiff, "TPMC could not have released or waived its rights given the purpose of Mod. 2 to DO [Task Order] 0003 and lack of any intent to waive rights associated with a differing site condition." (alteration added). Finally, plaintiff states "the Government's argument is directly contrary to the trial testimony," citing to the following exchange between plaintiff's counsel and the contracting officer and regarding item (3.) of Task Order 0003, Modification 02:

> Q:    Do you have a belief that that is somehow TPMC releasing any rights or relief associated with any alleged differing site conditions?
> A:    No.

As to the elements of a differing site conditions claim, plaintiff argues that the contract documents affirmatively indicate that the five feet below ground surface "would be five feet of clean overburden." Plaintiff cites to two of the 2009 Draft Decommissioning Plan's statements, which state that "the top five feet of overburden associated with each burial pit is considered uncontaminated soil" and "[b]ased on data collected during the Characterization Survey, the DP has been updated." (alteration added). Plaintiff further argues that defendant directed plaintiff to rely upon "the 2009 Draft DP versus the WCS," supporting its argument with the testimonies of the contracting officer and of Dr. Caputo. According to plaintiff, "the Contracting Officer was asked what information about site conditions at the LLRBS had been provided to offerors, to which she testified that '[t]he information would have been included in the decommissioning plan.'" (alteration in original). Also according to plaintiff, when "asked: If there was a conflict between the 2009

---

[78] Task Order 0001, Modification 03 states:

> 4. The contractor hereby waives any and all rights and claims for equitable adjustment attributable to such facts and circumstances giving rise to the incorporation of the above stated change. The contractor specifically waives any and all claims which it has or may have against the Government related to any delay resulting from the incorporation of the stated changes into the contract.

Draft DP and WCS, on what document would he rely, Dr. Caputo testified he would rely on the 2009 Draft DP because it incorporated the findings from the WCS and 'it was also the regulatory binding document.'" (citation omitted). Finally, plaintiff argues the Solicitation documents support plaintiff's reliance upon the Decommissioning Plan over the Waste Characterization Survey, stating that

> the Solicitation told offerors that "[p]roposals will be submitted based on the draft Decommission [sic] Plan." Section L of the Solicitation on Volume I, Technical, instructed "[o]fferors [to] submit their proposed approach for completing the work called out for each task in the Performance Work Statement (PWS) based on the guidelines in the draft Decommissioning Plan (DP)." The PWS (which was attached to the Solicitation) also instructed offerors to rely upon the 2009 Draft DP. The Government's response to question (o) in Amendment 0001 to the Solicitation instructed offerors "to develop their proposals based on the information contained in the [2009 Draft DP]."

(second alteration added; internal references omitted).

Plaintiff argues that the conditions encountered materially differ from expected conditions because the contract documents "affirmatively indicated that there would be five feet of clean overburden. As to actual conditions, it is undisputed that TPMC found waste in the overburden." (internal reference omitted).

Plaintiff argues that finding waste or debris in the overburden was a reasonably unforeseeable condition because the Decommissioning Plan "clearly stated that "[b]ased on historical records provided by the BARC and the 2006 Characterization survey, the top five feet of overburden associated with each burial pit is considered uncontaminated soil. Nothing in the 2009 Draft DP identified waste in the overburden." (alteration in original; internal reference omitted). Plaintiff argues that finding waste in the overburden was reasonably unforeseeable because (1) "the Contracting Officer believed the first five feet of overburden to be clean based on information from the technical team (which included Mr. Kurth [the contracting officer's representative]), who told her the first five feet of overburden was clean," (2) the "Contracting Officer also gave a public presentation in the fall of 2012 showing five feet of clean overburden," (3) Mr. Young, a Cabrera employee, in preparing Cabrera's proposal before being excluding from competition, "assumed there would be five feet of clean overburden," and (4) "Mr. Fulton[, plaintiff's expert,] testified as to his expert opinion that nothing in WCS indicated there was waste in the overburden." (alterations added; capitalization in original).

Plaintiff argues it reasonably relied upon its interpretation of the contract documents because the Decommissioning Plan specifically states that "the top five feet of overburden associated with each burial pit is considered uncontaminated soil," and "Mr. Young confirmed this statement to be accurate." Plaintiff adds that "Mr. Young also testified that the 2009 Draft DP accurately represented the conditions at the LLRBS" and "the 2012 Final DP continued to make the same specific statement." Referencing the

regulation at 10 C.F.R. § 30.9(a), plaintiff asserts that because "[t]he 2009 Draft DP and 2012 Final DP were submitted to the NRC," the plans were required "to be accurate and complete."[79] (alteration added). Plaintiff also argues that Mr. Fulton's expert opinion at the time of trial was "that TPMC reasonably relied on the aforementioned statement from the 2009 Draft DP." In sum, plaintiff claims it was damaged by the material variation between the expected and encountered conditions such that plaintiff incurred costs, citing CLINs 1 – Work Plan Revision 1 and 2 – Mobilization, totaling $221,118.43.

Defendant, however, argues not only that "the contract documents made no affirmative representations about the specific site conditions that a decommissioning contractor was likely to encounter when decommissioning the burial site" but also that the contract documents "indicated that there was significant uncertainty about the site." Defendant states that "the contract documents include not only the solicitation and its amendments, but also the PWS, the 2009 Draft DP, and the entire WCS," adding that "[t]he Army made each of these documents available to all offerors." (alteration added).

According to defendant:

The "affirmative indications" of conditions at the burial site that TPMC alleges were in the contract documents are explicitly contradicted by the repeated statements in the documents, expressing uncertainty about nearly every aspect of the burial site. See, e.g., JX02 at 000143 (noting "uncertainty in both the location and contents of the burial pits"); JX013 at 001068 ("All dimensions and quantities are estimates."). As a starting point, the documents indicated that burial records were incomplete or missing entirely. See, e.g., JX005 at 000753 ("Inventory records of burials from 1949 through 1960 could not be located."); id. at 000754 ("No known records exist listing the specific types of containers used for the early burials."). Indeed, the contract documents were emphatic that "there is no record of waste container type, waste type, chemical form, or physical form" for much of the burial site's lifespan. Id. at 000769. Subsequent amendments to the solicitation reiterated this absence of records. See, e.g., JX010 at 001050 ("The first burial pit was dug in the 1950s and there are no clear records as to exactly what materials are present or how they were packaged up th[r]ough pits dug in the 1970s.").

(last alteration in original). Defendant argues that, while "the USDA hired Cabrera to conduct a WCS to sample the nature of the waste in several pits to try to better understand the conditions at the burial site," the resulting 2009 Draft Decommissioning Plan still

---

[79] The regulation at 10 C.F.R. § 30.9(a), effective since February 1, 1988, states: "Information provided to the Commission by an applicant for a license or by a licensee or information required by statute or by the Commission's regulations, orders, or license conditions to be maintained by the applicant or the licensee shall be complete and accurate in all material respects." 10 C.F.R. § 30.9(a).

"'anticipated that the nature and extent of the waste in the remaining pits will be highly variable.'"

Defendant states that "TPMC's sole support for this contention [that its argument that the contract documents affirmatively indicated there would be five feet of clean overburden] is a single sentence from the 2009 Draft DP, which states that the "'top five feet of overburden associated with each burial pit is <u>considered</u> uncontaminated soil.'" (alteration added; emphasis in original). Defendant states that, "like the uncertainty expressed in the contract documents concerning the waste contents of the pits, the contract documents and attachments expressed uncertainty regarding the condition of the overburden." Defendant cites, as examples, Solicitation Amendments 0002 and 0003, which state that "the backfill material is probably not contaminated; however, offerors should consider it as part of the total volume for disposal" and "[i]f the offeror chooses to sample the backfill material and analysis determines the material to be clean, then yes, it can be used to backfill the hole instead of being managed as waste," respectively. (alteration added). Defendant also argues "the WCS expressly noted that contrary to the historical records, Cabrera found that in "'the middle of [Pit 26], waste was found to exist <u>within 1 foot of the surface</u>.'" (alteration and emphasis in original). Defendant further argues that "TPMC's own proposal and initial work plan similarly acknowledged the possibility of contamination in the backfill."

Defendant next states that plaintiff's encountered conditions were not materially different from what was represented in the contract documents, stressing the lack of certainty in the language used by the Solicitation, i.e., "that the overburden was '<u>probably not</u> contaminated.'" (emphasis in original). Thus, according to defendant, "the solicitation required contractors to 'sample the backfill material' to determine whether it was clean." Defendant also states that "it should have come as no surprise to TPMC to find waste in the overburden in several pits," given that the Waste Characterization Survey "expressly stated that for two of the five pits that Cabrera excavated, waste was found in the overburden." Finally, defendant argues that plaintiff's "own proposal recognized this possibility [that waste or debris might be discovered in the overburden] by repeatedly acknowledging that the overburden was merely 'presumed' clean and would require testing to confirm." (alteration added).

Regarding foreseeability, defendant argues that

it was reasonably foreseeable that TPMC would find waste in the overburden. Indeed, the Daily/Weekly Field Reports attached to the WCS expressly informed offerors of that fact. Because the WCS expressly reported finding waste in the overburden in two of the five pits that Cabrera excavated, it was reasonably foreseeable that TPMC would uncover waste in the overburden of some of the remaining pits.

Defendant also notes that the PowerPoint slide presented to the public by the contracting officer in the fall of 2012 was qualified by plaintiff, in its technical proposal, "as an 'idealized model' of subsurface conditions while acknowledging that 'actual site conditions

may vary from this model.'" Defendant further argues that both plaintiff's proposal and Work Plan Revision 0 "recognized" and "expressly noted," respectively, the possibility of finding waste in the overburden. Moreover, defendant argues that "TPMC and Mr. Fulton [plaintiff's expert] overlook the Daily/Weekly Field Reports attached to the WCS [Waste Characterization Survey], which explicitly informed offeror that waste had been found in the overburden." (alterations added). Defendant also states, citing to trial testimony, that "even TPMC's own expect [sic] agreed that a reasonable contractor would consider 'the entirety of the information' in the 2009 Draft DP, WCS, and other contract documents when drafting their proposal."

Defendant argues that plaintiff "failed to reasonably rely on the contract documents because it cherry-picked only limited information that was favorable to it." (capitalization altered). Defendant claims "TPMC's interpretation is unreasonable because it was based on this single sentence from the 2009 Draft DP," ignoring "the solicitation's guidance that '[t]he backfill material is <u>probably</u> not contaminated.'" (alteration and emphasis in original). Thus, according to defendant, "TPMC's contrary interpretation, that the overburden definitely would be clean in every pit, is therefore unreasonable." Defendant also argues that "[b]ecause the WCS expressly reported finding waste in the overburden for two of the five excavated pits, TPMC's contradictory interpretation – that it would not encounter any waste in the overburden of any pit – cannot be reasonable." (alteration and omission added).

Finally, defendant argues that "even if there was a difference in the condition of the overburden, it was not material because it had no impact on TPMC's approach to overburden removal." Relying on Mr. Clayman's testimony, plaintiff's project manager, defendant claims

> that the change in TPMC's approach to removing the overburden (from which its alleged damages from the overburden claim arise) was not driven by a difference between contract representations and actual conditions or by waste being found in the overburden. Rather, TPMC changed the "original technical approach, [which] was to come and clear the entire overburden of soil," to removing the overburden "piece by piece, pit by pit," in order to avoid creating a "wet sloppy mess."

(alteration in original).

The court finds that the language of Task Order 0003, Modification 02 does not bar plaintiff's claim for equitable adjustment for the alleged differing site condition of less than five feet of overburden. "A release is a contract whereby a party abandons a claim or relinquishes a right that could be asserted against another." <u>Holland v. United States</u>, 621 F.3d 1366, 1377 (Fed. Cir. 2010) (quoting <u>Koules v. Euro-American Arbitrage</u>, 689 N.E.2d 411, 414 (Ill. App. Ct. 1998)) (internal quotation marks omitted), <u>cert. denied</u>, 565 U.S. 928 (2011). "If the provisions of a release are 'clear and unambiguous, they must be given their plain an ordinary meaning.'" <u>Id.</u> at 1378 (quoting <u>Bell BCI Co. v. United States</u>, 570 F.3d 1337, 1341 (Fed. Cir.), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2009)).

The term at issue – term (3) of Task Order 0003, Modification 02 – is clear and unambiguous. Term (3) states that "[t]he changes incorporated into this modification will be completed at no additional cost to the Government." Task Order 0003, Modification 02, incorporated plaintiff's Work Plan Revision 1 into the Contract. In addition to changing plaintiff's approach to removing the overburden the modification required plaintiff to collect an additional 327 samples. The originally issued Task Order 0003 ordered CLINs 0002AA through 0009AA, stating the "total task order amount is $4,764,643.00." Task Order 0003, Modification 01, ordered plaintiff to upgrade the silt fencing and added CLIN 0002AB "in the amount of $44,456.67." While Task Order 0003, Modification 02, ordered additional work, the modification did not add "an amount" of money to be due to the contract. Therefore, the plain and ordinary meaning of the phrase, as used in Task Order 0003, Modification 02, is that, despite plaintiff being ordered to complete additional work, the cost to defendant would not increase. Thus, the clear and unambiguous meaning of term (3) of Task Order 0003, Modification 02, is that all the work ordered under Task Order 0003, including the additions of Modifications 01 and 02, would not cost defendant more than $4,764,643.00 plus $44,456.67.

The clear and unambiguous language stating that "changes incorporated into this modification will be completed at no additional cost to the Government" should not be construed as plaintiff relinquishing its right to claim an equitable adjustment under FAR 52.236-2 Differing Site Conditions. By the time Task Order 0003, Modification 02, was signed, the parties had used the following contract term in Task Order 0001, Modifications 01 and 03, and Contract Modification P00003:

> The contractor hereby waives any and all rights and claims for equitable adjustment attributable to such facts and circumstances giving rise to the incorporation of the above stated change. The contractor specifically waives any and all claims which it has or may have against the Government related to any delay resulting from the incorporation of the stated changes into the contract.

Although Contract Modification P00003 was a unilateral contract modification, meaning the contractor could not have waived a right or claim, defendant's use of waiver language indicates that defendant knew how to draft a waiver clause.

The parties also included "the contractor hereby waives" language in at least two contract documents after Task Order 0003, Modification 02. In Task Order 0003, Modification 05, terms (4) and (6) of state:

> 4. This shutdown will be at no additional cost to the government.
>
> . . .
>
> 6. The contractor hereby waives any [sic] all rights [sic] claims for equitable adjustment attributable to such facts and circumstances giving rise to the

incorporation of the above stated change. The contractor specifically waives any [sic] all claims which it has or may have against the Government related to any delay resulting from the incorporation of the stated changes into the contract.

(alterations added).[80] The parties' usage of both the "no additional cost" and "contractor hereby waives" clauses in Task Order 0003, Modification 05 is consistent with the court's interpretation of the terms of each clause. Because "[a] reasonable interpretation must assure that no contract provision is made inconsistent, superfluous, or redundant," the court must give these terms distinct meanings. Flint v. United States, 162 Fed. Cl. 91, 127 (2022) (quoting Dynetics, Inc. v Unites States, 121 Fed. Cl. at 512 (quoting Medlin Constr. Grp., Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed. Cir. 2006))) (alteration added; internal quotation marks omitted). Because term (6) represents plaintiff's waiver of its rights and claims pertaining to the change of Task Order 0003, Modification 05, term (4) means something else, i.e., not a waiver of plaintiff's rights and claims. Because the difference between term (4) of Task Order 0003, Modification 05, and term (3) of Task Order 0003, Modification 02, is only the subject of the sentence, term (3) of Task Order 0003, Modification 02 also means something other than a waiver of plaintiff's rights and claims pertaining to the incorporation of Work Plan Revision 1. Thus, plaintiff is not barred from asserting its right, as to Task Order 0003, Modification 02, under FAR 52.236-2 Differing Site Conditions, as incorporated into the Contract.

The Decommissioning Plan affirmatively indicates that:

Based on historical records provided by the BARC and the 2006 Characterization survey, the top five feet of overburden associated with each burial pit is considered uncontaminated soil. There is no known surface contamination.

The contract documents in the case currently before the court include the Solicitation and its amendments, the PWS, the 2009 Draft Decommissioning Plan, and the Waste Characterization Survey. While the court finds that the contract documents do present a not entirely clear picture regarding whether the overburden at the LLRBS contained contaminated waste or debris, the contract documents, as interpreted by a reasonable and prudent contractor, affirmatively represented that the overburden was uncontaminated.

The contract documents in the case currently under review contemplate the possible existence of contaminated soil in the overburden. The Government response to contractor question (i), in Solicitation Amendment 0002, states that the overburden is "probably not contaminated; however, offerors should consider it as part of the total volume for disposal." Additionally, Cabrera's Daily Field Reports for April 20, May 3, and June 6, 2006, and Weekly Summary for the week ending May 26, 2006, indicate that waste was encountered at five and one-half feet, between six and seven feet, less than

---

[80] The waiver language is also included in Task Order 0003, Modification 07.

one foot, and approximately four feet below ground surface for Pits 1, 14, 26, and 34, respectively. The Government later clarified its response to contractor question (i), stating that "[a]s stated in the response to Question i of Amendment 0002, the backfill material is probably not contaminated; therefore, it should be assumed that it has no impact to the total volume percentages of the waste material." Furthermore, defendant had a legal duty to submit a decommissioning plan to the NRC that was "complete and accurate in all material respects," in which defendant represented that the "top five feet of overburden associated with each burial pit is considered uncontaminated soil. There is no known surface contamination."

The Decommissioning Plan's statement characterizing the overburden is unambiguous and the parties have not argued that "considered uncontaminated" is a term of art. Therefore, the court interprets the term by applying its plain and ordinary meaning. "Considered" is commonly defined as "matured by extended deliberative thought." Considered, merriam-webster.com, https://www.merriam-webster.com/dictionary/considered (last visited March 28, 2025). Thus, as opposed to a mere statement of anticipated conditions, defendant's Decommissioning Plan's statement was a clear and unequivocal representation of the USDA's clear determination that the soil conditions at the LLRBS that, in the Decommissioning Plan, indicates that the USDA had concluded, and represented to potential offerors, the LLRBS was without surface contamination.

In addition, the record before the court includes the testimony of the NRC's lead inspector assigned to the LLRBS, who characterized the NRC's Safety Evaluation Report, which states the pits were "reportedly backfilled to surface grade with at least 5 feet of clean soil," as "accurate to the best of our knowledge at the time it was prepared." The record also includes the testimony of Mr. Jensen, a Radiation Safety Officer at the USDA and the employee who personally submitted the Decommissioning Plan to the NRC. He stated that having five feet of fill on top of each disposal pit had special meaning because, to his understanding, having five feet of overburden "would be in accordance with the regulatory requirement for the burial."[81] Mr. Jensen also confirmed "that's how it was required to be done."[82] Moreover, at trial, upon examination of Mr. Young, who was

---

[81] While the court takes into consideration this portion of Mr. Jensen's testimony, the court does not presume plaintiff had contemporaneous knowledge of Mr. Horner's 1993 Memorandum to the EPA because, despite the Decommissioning Plan's reference to "a draft summary of the LLRBS produced by Mr. Horner of USDA in the early 1990s," the facts do not indicate that plaintiff obtained and reviewed Mr. Horner's Memorandum. See Comtrol, Inc. v. United States, 294 F.3d at 1363-64 (Fed. Cir. 2002) (holding that plaintiff had "failed to obtain and review this contract document, and cannot now rely on that document to support either its differing site conditions or defective specification theory").

[82] The court notes that the AEC required, as of January 1, 1958, that:

assisting Cabrera develop a proposal based on these same contracting documents, the Apex reports, and the EnTech report, recalled that Cabrera also assumed the LLRBS would have five feet of clean overburden. Finally, the court considers that the USDA represented to the NRC in the 2009 Draft Decommissioning Plan that the overburden was considered uncontaminated despite Mr. Jackson's report of "a statistically significant amount of broken and intact lab glassware on the surface on areas of [Cabrera's] excavation" in December 2008. Thus, despite the contract provisions that raise the possibility of the existence of contaminated soil and despite the pre-Solicitation discovery of lab glassware on the surface of the LLRBS, defendant and the NRC considered the overburden to be uncontaminated. Therefore, a reasonable contractor reading the contract documents as a whole would interpret the USDA's complete and accurate statement to the NRC that the "top five feet of overburden associated with each burial pit is considered uncontaminated soil" as making a representation as to the site conditions after multiple, affirmative indications of the expected condition.

Whether the difference between expected and encountered conditions is material is "primarily factual in nature." Weeks Dredging & Constr. v. United States, 13 Cl. Ct. 193, 228 (1987), aff'd, 861 F.2d 728 (Fed. Cir. 1988). Plaintiff appears to argue that encountering waste in the overburden constitutes a material difference because "it is undisputed that TPMC found waste in the overburden," which is indistinguishable from an immaterial difference. Defendant argues, however, that "[a] difference in actual site conditions that has no impact on the contractor's operations can hardly be said to be 'material.'" (internal quotation marks omitted).

In this case, plaintiff's operations were impacted, and because plaintiff changed its remediation approach and the mobilization period was delayed because of the changed condition, the changed condition was material. See Roscoe–Ajax Constr. Co. v. United States, 198 Ct. Cl. 133, 142 (1972) (holding that "any increased costs that the alleged changed condition caused in the installation of the well-point system can also be considered following the determination of whether such a condition in fact existed" (emphasis added)). The court also notes that the post-award, but prior to April 2013, discovery of debris on the surface of the LLRBS was material enough of a change for the contracting officer's representative to schedule a teleconference on April 16, 2013 – twenty-nine months after award – to advise plaintiff that plaintiff "needs to consider that

_____

Disposal of burial in soil. No licensee shall dispose of licensed material by burial in soil unless:

…

(b) Burial is at a minimum depth of four feet; and
(c) Successive burials are separated by distances of at least six feet and not more than 12 burials are made in any year.

10 C.F.R. § 20.304 (1958) (emphasis in original; omission added).

some of the waste pit debris could have migrated up," that the upward migration "might impact the approach to removing the overburden," and that "more days might need to be added [to the mobilization]. (alteration added). For these reasons, the court finds that the changed condition of waste or debris on the surface of the LLRBS was materially different from the expected condition of no waste or debris in the overburden.

The United States Court of Appeals for the Federal Circuit interpreted the contract in Metcalf Constr. Co. v. United States, 742 F.3d 984 (Fed. Cir. 2014), which included in its contract the same language of FAR 52.236-2 Differing Site Conditions and was a contract to construct military housing. See Metcalf Constr. Co. v. United States, 742 F.3d 984, 995 (citing "FAR 52.236, which is entitled 'Differing Site Conditions'"). According to a pre-bid, government study in Metcalf, which was incorporated into the RFP, the potential for soil swelling was "slight" and the study itself was "for preliminary information only." Id. at 988, 996 (internal quotation marks omitted). Additionally, the RFP represented that "[r]emediation actions are not required since [chlordane] levels are acceptable." Id. at 995 (alterations in original). The Metcalf court stated that:

> On both issues, the contract also anticipated that Metcalf would test and investigate the soil in the process of performance. But a pre-bid question-and-answer stated in plain terms that material deviations from the government's report on swelling potential would be "dealt with by change order" and that "[n]o remediation action of the Chlordane contaminated soil is required.

Id. at 996. Following award, Metcalf's soil investigation "reported that the soil's swelling potential was 'moderate to high,' not 'slight' (as the pre-bid government study had said)," resulting in "increased costs" and "[d]elays in construction also resulted from the presence in the soil of more of a chemical contaminant—chlordane—than had been expected." Id. at 988-89 (alteration added).

In holding that the trial court misinterpreted the contract the Metcalf court, found that the trial

> court held that a reasonable contractor reading the contract documents as a whole would not interpret them as making a representation as to the site conditions because "the Contract required Metcalf to conduct an independent soil analysis [and so] Metcalf was on notice that it could not rely on the 'information only' report."

Id. at 995 (alteration in original). The Metcalf court also found that the trial "court held that the fact that Metcalf would itself need to assess the soil meant that Metcalf could not rely on the representations that remediation was not required; the company 'was on notice to seek more information.'" Id. "The [trial] court thus treated the contract as placing on Metcalf the risk and costs of dealing with newly discovered conditions different from those stated by the government before the contract became binding." Id. (alteration added).

"These rulings about an important allocation of risk were based on a misinterpretation of the contract," according to the Metcalf court, because:

> Nothing in the contract's general requirements that Metcalf check the site as part of designing and building the housing units, after the contract was entered into, expressly or implicitly warned Metcalf that it could not rely on, and that instead it bore the risk of error in, the government's affirmative representations about the soil conditions. To the "contrary, the government made those representations in the RFP and in pre-bid questions-and-answers for bidders" use in estimating costs and therefore in submitting bids that, if accepted, would create a binding contract. The natural meaning of the representations was that, while Metcalf would investigate conditions once the work began, it did not bear the risk of significant errors in the pre-contract assertions by the government about the subsurface site conditions.
>
> FAR 52.236-2, incorporated into the contract, reinforces that meaning. It exists precisely in order to "take at least some of the gamble on subsurface conditions out of bidding": instead of requiring high prices that must insure against the risks inherent in unavoidably limited pre-bid knowledge, the provision allows the parties to deal with actual subsurface conditions once, when work begins, "more accurate" information about them can reasonably be uncovered. For that reason, even requirements for pre-bid inspection by the contractor have been interpreted cautiously regarding conditions that are hard to identify accurately before work begins, so that "the duty to make an inspection of the site does not negate the changed conditions clause by putting the contractor at peril to discover hidden subsurface conditions or those beyond the limits of an inspection appropriate to the time available."
>
> The conclusion is not changed by the statement in a revised RFP that the expansive-soil report was "for preliminary information only." That statement merely signals that the information might change (it is "preliminary"). It does not say that Metcalf bears the risk if the "preliminary" information turns out to be inaccurate. We do not think that the language can fairly be taken to shift that risk to Metcalf, especially when read together with the other government pronouncements, much less when read against the longstanding background presumption against finding broad disclaimers "of liability for changed conditions."

Id. at 995-96 (citations omitted).

Like the plaintiff in Metcalf, plaintiff in this case was provided information by defendant upon which to base and price its proposal. The PWS states:

> The contractor shall perform all work and the final radiological release survey within the guidelines of the attached Decommissioning Plan (DP), Final Site Survey Plan (FSS) and Site Characterization Survey (SCS)

[WCS]. . . . The SCS is provided for historical information and to assist with the proposal.

(alteration added). The PWS separately states: "The contractor shall conduct the work efforts under a formally approved NRC decommissioning plan." The Solicitations states: "Proposals will be submitted based on the draft Decommission [sic] Plan." Solicitation Amendment 0001, Government Response (o) states: "Offerors are instructed to develop their proposals based on the information contained in the draft DP. Changes to the draft DP are not permissible." Solicitation Amendment 0002, Government Response (i), states that "offerors should consider it [the overburden] as part of the total volume for disposal." (alteration added). Solicitation Amendment 0003, Government Response (e), states:

For additional clarification to question 6i of Amendment 0002, the backfill material will be identified as either clean or waste. If the offeror chooses to sample the back fill material and analysis determines the material to be clean, then yes, it can be used to backfill the hole instead of being managed as waste; however the clean backfill material may not be blended with the wastes to lower the concentration on [sic] contamination. If the offeror decides to assume the back fill [sic] material is contaminated/waste, then the material shall be handled as such.

(alterations added). But Government Response (al) states directs contractors to "assume the pits to be 12 x 10 x 10 with 5 of cover and 6 of side wall material." Solicitation Amendment 0004, Government Response (i) states that "the backfill material is probably not contaminated; therefore, it should be assumed that it has no impact to the total volume percentages of the waste material." In other words, the likelihood of contamination in the overburden was represented to offerors as at least unlikely enough that offerors were to assume the overburden was clean for the purpose of estimating costs and when submitting bids that, if accepted, would create the contract, if awarded.

Like the contract documents in <u>Metcalf</u>, the contract documents in plaintiff's case do not contain any pre-bid inspection requirement and did not allow for soil sampling, although plaintiff did attend the only site visit, but at which the facts indicate that plaintiff could not have discovered the lab glassware positioned on the surface of the LLRBS. The contract documents in this case also do not contain any provision indicating plaintiff bears the risk if defendant's directed assumption turned out to be inaccurate, as it proved to be.

Moreover, unlike the defendant in <u>Metcalf</u>, defendant in the current plaintiff's case submitted a decommissioning plan to the NRC. The Draft Decommissioning Plan, submitted to the NRC and shared with prospective offerors prior to issuance of the Solicitation, and the Final Decommissioning Plan, submitted after award, are identical to each other, with respect to the issues of this case. The Decommissioning Plan states that "[b]ased on data collected during the Characterization Survey, the DP has been updated." (alteration added). Section 3.4 of the Decommissioning Plan, entitled "Surface Soil Contamination," states in its entirety: "Based on historical records provided by the BARC and the 2006 Characterization survey, the top five feet of overburden associated with

each burial pit is considered uncontaminated soil. There is no known surface contamination." The plain meaning of these representations was that, while the awardee would ensure the overburden would eventually satisfy the Final Status Survey Design Plan Derived Concentration Guideline Limit conditions following remediation of the site by confirming defendant's assumption that the overburden was uncontaminated, the top five feet, or overburden, was considered free of contamination. Thus, the awardee should not bear the risk of significant errors in the pre-contract assertions by the defendant that plaintiff utilized to make an offer and agree to enter into the Contract, including that the overburden would not be contaminated.

More importantly, while plaintiff claims the unexpected changed condition forming the basis of this differing site conditions claim is "that TPMC found waste in the overburden," the operative facts indicate that defendant identified the materially different, changed condition, not plaintiff. Defendant approved Work Plan Revision 0 on March 7, 2013 and issued Task Order 0003 on April 4, 2013. Then, defendant invited plaintiff to a teleconference scheduled for April 16, 2013. The contracting officer's representative stated, in the invitation to the teleconference, "that the mobilization schedule seems a little aggressive" and that "Dana Jackson[, the USDA's senior remedial project manager,] will be leading that discussion." (alteration added). The contracting officer's representative also stated in the invitation that "some of the waste pit debris could have migrated up towards the surface," which "might impact the approach to removing the overburden." Because the contracting officer's representative testified that he stated that some debris may have migrated up towards the surface out of "concern based on materials that we found on the surface of the north field," the impetus for the April 2013 teleconference appears to have been Mr. Jackson's discovery of broken and intact lab glassware, which occurred on or before December 2, 2008. Based on the above discussion, plaintiff should not bear the risk of material errors in the pre-contract assertions made by the defendant as to conditions on site. The court, therefore, finds that the changed condition of waste or debris on the surface of the LLRBS was reasonably unforeseeable.

The United States Court of Appeals for the Federal Circuit has stated:

We review the question of whether a contractor reasonably relied upon a representation as a question of fact. See Renda Marine, 509 F.3d at 1378. Reliance is unreasonable when a contractor has reason to doubt the accuracy of a representation, such as knowledge of a flaw in the information underlying the representation. For example, in H.B. Mac, logs of underground borings made about three hundred yards from the site where an underground tank was to be constructed were too far away from the site to be reasonably relied upon because expert testimony indicated that visible surface conditions at the worksite would have alerted a reasonable contractor to the likelihood of highly variable subsurface conditions.

Int'l Tech. Corp. v. Winter, 523 F.3d at 1352 (citing H.B. Mac, Inc. v. United States, 153 F.3d at 1347 (holding, according to Int'l Tech. Corp. v. Winter, 523 F.3d at 1352, that "underground borings made about three hundred yards from the site . . . were too far

away from the site to be reasonably relied upon because . . . visible surface conditions at the worksite would have alerted a reasonable contractor to the likelihood of highly variable subsurface conditions" (omissions added))).

Cabrera's Daily Reports and Weekly Project Summaries clearly indicate the "presence of waste materials within 1 foot of the surface, instead of at 5 feet, as planned" for Pit 26 and the "[t]op of the pit [Pit 34] was aprox 4' below grade." (alterations added). These two reports were incorporated into the PWS, which was incorporated into the Solicitation and the Contract. These indications by Cabrera, when read in conjunction with the Decommissioning Plan's assertion that the overburden was considered uncontaminated, constituted a patent ambiguity within the contract documents such that plaintiff "ha[d] a duty to seek clarification." Comtrol, Inc. v. United States, 294 F.3d at 1365 (defining "patent ambiguity" as "one that is glaring, substantial, or patently obvious").

The offerors in this case did seek clarification. Government Responses to Contractor Questions addressed the question of waste in the overburden in Solicitation Amendments 0002-0004, ending with defendant's instruction to contractors that the overburden "is probably not contaminated; therefore, it should be assumed that it has no impact to the total volume percentages of the waste material." Furthermore, defendant had received Cabrera's reports before it represented to the NRC and the offerors that the overburden was considered uncontaminated.

Defendant asserts that a contractor's "interpretation is not reasonable if it is unsupported by the contract's indications or is based on 'cherry-picking' favorable contract documents," citing to United States Army Corps of Engineers v. John C. Grimberg Co., 817 F. App'x 960 (Fed. Cir. 2020). In that case, the United States Court of Appeals for the Federal Circuit reversed the Armed Services Board of Contract Appeals (ASBCA), which had held the plaintiff was entitled to an equitable adjustment based on a Type I Differing Site Condition despite unreasonably interpreting the contract documents. United States Army Corps of Eng'rs v. John C. Grimberg Co., 817 F. App'x at 964. The court in John C. Grimberg Co. stated that "[t]he Board found that Grimberg's reliance on just two borings, DH-11 and DH-12, was unreasonable" and quoted the Board in a parenthetical citation, stating "[c]onfronted with the plethora of cautionary contractual indications, 'cherry picking' a subset of 2 of 46 borings, regardless of their proximity to the Biolab foundation, was unjustifiable in the circumstances of this case." (alterations added; internal quotation marks omitted).[83] Id. at 962. Similarly, defendant cites Meyers Cos. v. United States, 41 Fed. Cl. 303 (1998), for the proposition that "a contractor will be found to have interpreted the contract unreasonably where it can be shown that its interpretation is unsupported by the contract indications or that it is based on one contract indication to the exclusion of others." Meyers Cos. v. United States, 41 Fed. Cl. 303, 310 (1998) (citing

---

[83] The court in John C. Grimberg Co. reversed the Board's decision but did not disturb the Board's determination that the plaintiff's reliance on just two borings was unreasonable. See United States Army Corps of Eng'rs v. John C. Grimberg Co., 817 F. App'x at 963-64.

John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 506 (3d ed. 1995)) (internal quotation marks omitted).

Defendant's arguments, however, are unpersuasive in the current case under review. The interpretation of the contract documents concluding that the overburden was uncontaminated was not plaintiff's interpretation but the USDA's, which the USDA represented in the Decommissioning Plan to the NRC. The USDA's interpretation, which was adopted not just by plaintiff but was also an assumption adopted by Cabrera, was the result of the USDA's extended, deliberative thought and concluded after Cabrera's field reports were appended to the Waste Characterization Survey, indicating the USDA considered the overburden to be uncontaminated despite Cabrera's field reports.

Because (1) defendant instructed contractors "to develop their proposals based on the information contained in the draft DP [Decommissioning Plan,]" (2) the Draft Decommissioning Plan, which was required to be complete and accurate in all material respects, considered the overburden uncontaminated, and (3) the Contract included a differing site conditions clause, the court finds that plaintiff reasonably relied upon its interpretation of the contract documents. To find otherwise would result in the court inappropriately reallocating the risk of inaccurate pre-contract assertions by the defendant to plaintiff, and any other potential offerors, upon which plaintiff offered its proposal and signed the Contract.

For the purpose of determining liability, plaintiff has shown by a preponderance of the evidence that it was damaged by the changed condition of contamination in the overburden and that plaintiff incurred increased costs, as suggested by the contracting officer's representative's teleconference invitation email, and because the mobilization period was delayed while defendant considered approving Work Plan Revision 1. Thus, the court finds that plaintiff is entitled to an equitable adjustment, pursuant to the regulation at FAR 52.236-2 Differing Site Conditions.

    b.  LSVs Dispersed Within the Soil

Plaintiff argues the Decommissioning Plan "affirmatively indicated that "[l]iquid scintillation vials [had been] placed on vial trays and packaged in cardboard boxes for disposal, or placed loose in large plastic bags, then in cardboard boxes" and that "Mr. Young again confirmed this statement to be accurate." (alterations in original). Plaintiff further argues that "[a]s to actual conditions, it is also undisputed that TPMC found LSVs dispersed in the soil." (alteration added).

Plaintiff claims the expected conditions materially differed from the conditions encountered because the contract documents had "affirmatively indicated LSVs had been 'placed on vial trays and packaged in cardboard boxes for disposal, or placed loose in large plastic bags, then in cardboard boxes.'"

Finding LSVs dispersed in the soil, according to plaintiff, was reasonably unforeseeable because of the Decommissioning Plan's affirmative representation and

because there was no written information to the contrary offered to plaintiff prior to signing the Contract. Plaintiff claims that the contracting officer's representative agreed that the Waste Characterization Survey's narrative "did not mention finding LSVs dispersed in the soil." Additionally, plaintiff highlights that Cabrera's field reports, as included in the Waste Characterization Survey, "did not identify finding LSVs dispersed in the soil" but either "said nothing about finding LSVs" or stated that Cabrera discovered "'LSV (bagged and boxed).'" Finally, plaintiff argues that its expert witness, Lawrence Jacobi, testified that "I think it [relying upon the description of LSVs as the LSVs were identified in the Decommissioning Plan] was reasonable because that's the way it's done in the industry. It would have been unreasonable to think that they were thrown in a cell individually. That's just not done that way." (alteration added).

Plaintiff argues it reasonably relied upon its interpretation of the solicitation and contract documents because its interpretation was shared by Mr. Young, the Cabrera employee, citing Mr. Young's testimony. In forming his opinion that plaintiff reasonably relied upon the Decommissioning Plan's affirmative representation regarding the LSVs, plaintiff's expert, according to plaintiff, "compared how LSVs were discussed in the 2005 Draft DP, 2009 Draft DP, and 2012 Final DP." Plaintiff states that, "Mr. Jacobi noted that the description of LSV disposal did not change from the 2005 Draft DP to the 2012 Final DP." Finally, plaintiff argues that because "the 2009 Draft DP and 2012 Final DP were submitted to the NRC," the plans were represented as and required "to be accurate and complete," at the time they were submitted.

Plaintiff claims it was damaged by the material variation between the expected and encountered conditions such that plaintiff incurred costs, citing CLINs 1 – Work Plan Revision 2, 3 – Site Remediation, and 4 – Site Sampling, totaling $3,017,050.48.

Defendant argues that, while the Decommissioning Plan states that "'[l]iquid scintillation vials were either placed on vial trays and packaged in cardboard boxes for disposal, or placed loose in large plastic bags, then in cardboard boxes' . . . this statement makes no affirmative indication as to the <u>current</u> subsurface conditions." (emphasis in original; alteration and omission added). Defendant adds that "the contract documents never affirmatively represented that LSVs would be found packaged in intact cardboard boxes many years after burial in unlined pits. Indeed, information contained in the contract documents such as the WCS indicated the exact opposite." In support of the contention that the contract documents represent the conditions at the time of material was buried, without representing the conditions of the material many decades later, defendant states that "photographs included with the WCS show that LSVs were found in varying conditions, including unpackaged LSVs mixed in soil." Defendant also states that the contracting officer denied plaintiff's certified claim regarding LSVs loose in the soil, in part, because "the contract documents 'indicated in several places that the wastes excavated [by Cabrera] were not readily separable from soil.'" (alteration in original).

Defendant claims there was no material difference between expected and encountered conditions because "the contract documents represented that this was a possibility." Defendant cites to the Solicitation, Amendment 0002, which defendant quotes

as saying "there are no clear records as to [how wastes] were packaged up th[r]ouh pits dug in the 1970s." (alterations in original; internal quotation marks omitted). Defendant also states that "photographs of the excavation conducted during the WCS show that LSVs were found in varying conditions, including unpackaged LSVs mixed in soil." Defendant argues that

> Cabrera, which had "excavated approximately 10% of the 50 known burial pits at the LLRBS" stated that, based "on the work completed thus far, it is anticipated that the nature and extent of the waste in the remaining pits will be <u>highly variable</u>." (emphasis added). Similarly, TPMC's own proposal indicated that it expected to find some LSVs loose in the soil.

(emphasis in original; citations omitted).

Defendant claims that the encountered condition of the LSVs was reasonably foreseeable, arguing that "the contract documents repeatedly informed offerors that records of waste disposal packaging were non-existent during the bulk of the operation of the burial site." Defendant also argues that:

> The 2009 Draft DP further informed offerors that these cardboard boxes would be placed in the pits, which remained open "until a sufficient volume of waste was contained." And TPMC understood that these pits could be open and uncovered for entire seasons, during which they would be exposed to the elements.

(citations omitted). Adding that "offerors were informed that 'waste was placed in a hole and covered up' with no engineered barrier or protective cover" and that plaintiff "knew that Cabrera found water in one of the five pits it was excavating, which 'saturate[d] waste within the pit,'" defendant states that "any reasonable contractor would foresee some degree of deterioration and decomposition of the LSV cardboard containers used from the 1950s to the 1980s." (alteration in original; citation omitted). Finally, defendant argues that "it was reasonably foreseeable that TPMC would encounter loose vials dispersed in the soil" because of "the conditions depicted in these photographs [included with the Waste Characterization Survey]." (alteration added).

Defendant challenges plaintiff's characterization of Mr. Young's testimony, the veracity of Mr. Jacobi's opinion, plaintiff's expert, and plaintiff's interpretation of the narrative portions of the Decommissioning Plan and the Waste Characterization Survey. Defendant acknowledges that "Mr. Young testified that he 'assume[d LSVs] would be grouped to some extent in the soil," but defendant also claims that "Mr. Young did not testify as to whether he assumed LSVs would be found loose in the soil or packaged in cardboard boxes" and "that he did not assume LSVs would be containerized." (alteration in original). Defendant claims that "Mr. Jacobi's opinion rests exclusively on two sentences in the 2009 Draft DP that discuss the historical disposal of LSVs" but "never engages with the conditions of the LSVs that Cabrera encountered during the WCS and

reported in the contract documents." Finally, defendant argues the narrative portion of the Decommissioning Plan and Waste Characterization Survey

> informed offerors that LSVs had historically been disposed in cardboard boxes and placed in burial pits, which were generally left uncovered until a sufficient volume of waste was added to the pit. A reasonable contractor would thus expect that over the course of many decades, water infiltrated the burial pits and degraded the cardboard containers. And one need not be an expert to know what happens to wet cardboard.

(citations omitted).

Defendant argues that plaintiff could not have reasonably rely upon its interpretation of the contract documents because

> TPMC unreasonably interpreted the contract documents as affirmatively indicating that all LSVs in the pits would be packaged in cardboard boxes or otherwise containerized. The only statement in the contract documents on which TPMC bases this interpretation describes "how LSVs were disposed" historically. Indeed, even that historical information was limited, because "there are no clear records as to exactly what materials are present or how they were packaged up th[r]ough pits dug in the 1970s." No reasonable contractor would interpret a statement about the reported method of LSV disposal in the 1980s as an affirmative indication of the current subsurface conditions of every buried LSV.

(alteration in original; internal references omitted). "[A] reasonable contractor," defendant reasons "would at a minimum rely on the recently gathered information in the WCS, including the photographs attached as Appendix C." (alteration added). According to defendant:

> These photographs provide important insight into the current condition of LSVs at the burial site. For example, one photograph is captioned: "Pit 1 debris consisted primarily of pieces of plastics, small plastic vials and tubes." Upon viewing this exhibit, Dr. Caputo testified that the photograph shows a non-containerized, small plastic container, possibly an LSV. Another photograph shows LSVs in a cardboard box, but one that was "degraded." Other photographs show LSVs with no packaging or container. In one photograph of Pit 26, Dr. Caputo agreed that the LSVs appear to be loose in a 55-gallon drum and loosely dispersed in the soil. Based on these photographs, which Dr. Caputo admitted showed loose "vials embedded in the soil," it was unreasonable for TPMC to assume at the time of contracting that it would not encounter any loose vials dispersed in the soil.

(citations omitted).

112

Defendant further argues that "what little information there was in the contract documents about the site conditions was inconsistent." Highlighting that plaintiff relied upon Table 1 in the 2009 Draft Decommissioning Plan,[84] defendant points out that "more than 20% of the pits have no information." Defendant also points out that Table 1 indicates Pit 14 contained 1,000 LSVs and Pits 26 and 34 contained no LSVS, but Table 4[85] indicates Cabrera remediated "no LSVs" from Pit 14 and "Pits 26 and 34 had significant amounts of LSVs." "As a result," according to defendant, "TPMC's decision to rely on the spotty historical information reflected in Table 1, with no apparent regard for the up-to-date and verified information in Table 4, is unreasonable." Finally, defendant argues that Solicitation Amendment 0005 reinforces "the uncertainty and variability inherent in this remediation project" because it states that "offerors should understand that certain tasks will be awarded as task orders on a fixed unit rate and not as firm fixed-price <u>because of the unknowns at the site</u>." (alteration added; emphasis in original).

The Decommissioning Plan affirmatively indicates that:

The USDA's license, and then-current regulations, required only the maintenance of radionuclide and activity records for wastes disposed at the LLRBS. As a result, there is no record of waste container type, waste type, chemical form, or physical form. Interviews with employees present when the LLRBS was active have revealed that most of the waste materials were placed into cardboard boxes prior to disposal in the pits. Bulk liquid wastes were transferred into plastic or glass carboys and packaged in cardboard boxes with some cushioning and absorbent material. Liquid scintillation vials were either placed on vial trays and packaged in cardboard boxes for disposal, or placed loose in large plastic bags, then in cardboard boxes.

The Waste Characterization Survey indicates that Cabrera discovered LSVs bagged & boxed in Pit 26. Cabrera's May 22, 2006 Daily Report states: "The debris in the north wall and pit floor is consistent with that found in earlier activities. LSV (bagged & boxed), loose pipettes & other broken glass debris, lab packs with containerized liquid waste, plastic bottles and misc. debris." Because Cabrera's Daily Report for the following day, May 23, 2006, states that "[t]he volume of waste is equal to earlier pit excavations and the type of waste has been consistent during characterization activities for this pit (LSV & Lab packs)" and because Cabrera "removed the remaining soil/debris from Pit #26" on May 23, 2006, a prudent contractor could reasonably interpret Cabrera's reports for Pit 26 to mean LSVs were consistently found bagged and boxed. (alteration added). Additionally, Pit 26 was the pit in which Cabrera encountered perched water. Cabrera remediated LSVs from Pit 34 after its Pit 26 activities. Cabrera's field reports for Pit 34 do not describe the conditions of the LSVs in Pit 34, and the Waste Characterization Survey

---

[84] According to the 2009 Decommissioning Plan, "Table 1 provides a summary of the information that was compiled describing each of the burials."

[85] According to the 2009 Decommissioning Plan, "Table 4 summarizes the volumes of wastes recovered [by Cabrera]." (alteration added).

did not include photographs of Pit 34, but the Weekly Project Summary for the week ending June 9, 2006, states that "***DIFFICULTIES ENCOUNTERED***" were "[n]one." (alteration added; capitalization emphasis in original).

The Decommissioning Plan indicates that LSVs "were either placed on vial trays and packaged in cardboard boxes for disposal, or placed loose in large plastic bags, then in cardboard boxes." The trial record indicates that Cabrera remediated Pits 1, 14, 26, 34, and 34C.[86] Cabrera's Daily Report for May 22, 2006, indicates that the debris in Pit 26, the third pit excavated, was "consistent with that found in earlier activities. LSV (bagged & boxed). . . ." The photographs Pit 26, included in the Waste Characterization Survey, show LSVs boxed, or otherwise grouped together. The Waste Characterization Survey contains no photographs of Pits 34 or 34C, which were excavated after Pit 19. Additionally, The Weekly Project Summary for the week ending June 9, 2006, states that no difficulties were encountered and does not otherwise indicate the LSVs remediated from Pit 34 were found in a more adverse condition than those of Pit 19. For these reasons, the Decommissioning Plan affirmatively indicated LSVs were secured and then boxed and buried, i.e., double-wrapped, and the Waste Characterization Survey affirmatively indicated that LSVs were discovered by Cabrera in a similar condition.

Plaintiff's notification of differing site condition, provided to defendant on April 17, 2014, and including a photograph of LSVs in Pit 28, depicts LSVs that appear to be neither bagged nor boxed and of a greater quantity, by an order of magnitude, than the LSVs depicted in the photographs included in the Waste Characterization Survey. The photograph included in the Waste Characterization Survey that is most supportive of defendant's arguments is the fourth of six photographs, captioned "Liquid scintillation vials and debris being removed from Pit 26." Dr. Caputo testified that he would have reviewed this photograph and that the photograph appeared to show LSVs embedded in the soil, not in a degraded box. The fourth photograph depicts a relatively small number of LSVs. Of the other five photographs, the second photograph, captioned "Pit 26 vials identified west of original location," does not appear to contain any readily identifiable LSVs; the first photograph, captioned "Pit 1 debris consisted primarily of pieces of plastic, small plastic vials and tubes," appears to depict one plastic container that might be an LSV;[87] the sixth photograph, captioned "Various debris (vials, tubes, needles, and plastic) extracted from Pit 26," appears to show less than ten LSVs, which could be the same LSVs depicted in the fourth photograph, after being placed into a 55-gallon drum; and photographs three and five, captioned "Liquid scintillation vials and other various debris in Pit 26" and "Excavation of Pit 26 debris," respectively, shows a significant amount of LSVs that are contained in vial trays such that they could be more easily identified and transported. (capitalization in original). None of the photographs included in the Waste

---

[86] According to TPMC's certified claim, Pits 26 and 34C were mislabeled by Cabrera: "Pit 26 was actually Pit 19. Pit 34C was actually Pit 27."

[87] Table 4 of the Decommissioning Plan, entitled "SUMMARY OF WASTES EXCAVATED DURING CHARACTERIZATION SURVEY" indicates that zero cubic yards of LSVs were excavated from Pit 1.

Characterization Survey depict loose vials to the extent loose vials are depicted in plaintiff's notification of a differing site condition, dated April 17, 2014.

The court notes that the Waste Characterization Survey does not include any photographs depicting Cabrera's discovery of LSVs in Pits 34 or 34C, but the field reports describe Pit 34 as "the best defined pit" and indicates that LSVs were stored with dry active waste, stating that "[w]aste contents are mainly DAW [Dry Active Waste] w/some lab packs and LSV." (alterations added). If Cabrera did discover empty LSVs stored with dry active waste, that discovery would be consistent with the Decommissioning Plan's statement that LSVs not containing the liquid cocktail "when identifiable, were grouped with DAW [dry active waste]." (alterations added). Regardless, the Waste Characterization Survey's narrative provides little notice of the disposition of LSVs in Pit 34, and Pit 34's waste is not depicted in any of the photographs. This lack of specific information is especially noteworthy, considering, according to Table 4 of the Decommissioning Plan, more than two-thirds of all LSVs remediated by Cabrera were excavated from Pits 34 and 34C.[88]

The difference between the expected condition of finding nearly all LSVs grouped together in the soil and the encountered condition of finding LSVs largely dispersed was material. The material difference between the expected and the encountered conditions is apparent when comparing the volume and distribution of LSVs depicted in the photograph most supportive of defendant's arguments, dated May 19, 2006, and the photograph included in plaintiff's notification of a differing site condition:

---

[88] According to the 2009 Decommissioning Plan, "Table 4 summarizes the volumes of wastes recovered [by Cabrera]." (alteration added). According to Table 4, the remediation efforts during the Waste Characterization Survey yielded 1.9 cubic yards (CY) from Pit 26, 2.7 CY from Pit 34, and 1.9 CY from Pit 34C.





Additionally, plaintiff's operations were impacted by the different condition, such that plaintiff drafted Work Plan Revision 2 and the time required to complete CLIN 3 – Site Remediation and CLIN 4 – Site Sampling was longer than anticipated.

The encountered condition of largely dispersed LSVs, as documented by plaintiff, was reasonably unforeseeable, based upon all the contract documents, and plaintiff reasonably relied upon its interpretation of the contract documents. Defendant's argument that the contract documents "repeatedly informed offerors that records of waste disposal packaging were non-existent" is unpersuasive because immediately after informing offerors of the lack of records of how waste was containerized, the Decommissioning Plan states that "[l]iquid scintillation vials were either placed on vial trays and packaged in cardboard boxes for disposal, or placed loose in large plastic bags, then in cardboard boxes." (alteration added). This statement from the Decommissioning Plan, crafted from "[i]nterviews with employees present when the LLRBS was active," appears to be confirmed by Cabrera's field reports and photographs included in the Waste Characterization Survey. (alteration added). Similarly, defendant's claim that a contractor should foresee "some degree of deterioration and decomposition of the LSV cardboard containers" is unpersuasive because, even if the outer box had completely deteriorated, the LSVs would still be on vial trays, as indicated in Cabrera's photographs of Pit 26 – the pit that contained a pool of perch water that was eight feet deep, or in a plastic bag.

While defendant argues that the contracting officer denied plaintiff's claim in part because "the contract documents 'indicated in several places that the wastes excavated [by Cabrera] were not readily separable from soil,'" this argument also appears to be the result of defendant's imprecise reading of the contract documents. (alteration in original). The full sentence from the Waste Characterization Survey states that:

> Waste materials that have been encountered include laboratory trash (gloves, paper, metals, plastics, laboratory glassware, and other wastes generated during the process of performing laboratory analyses), <u>LSVs</u>, radioactive sources, <u>bulk soils containing small amounts of waste or debris not readily separable from soil</u>, animal remains, and bulk liquids in their original containers.

(emphasis added). This sentence lists waste materials discovered by Cabrera, and the list identifies LSVs and debris not readily separable from the soil as separate items. Because "LSVs" exists on its own within the list, a reasonably prudent contractor reading the Waste Characterization Survey would not interpret the sentence to mean that LSVs were part of the "waste or debris not readily separable from the soil," especially when read in conjunction with the other affirmative indications contained in the contract documents.

Defendant mischaracterizes Mr. Young's testimony, a Cabrera employee.[89] When asked whether he assumed the LSVs would be "containerized for the purposes of that [Cabrera's] proposal," Mr. Young responded: "No. As I recall, our approach was to segregate the waste and – well, in a manner, yes." (alteration added). When asked whether Mr. Young "assume[d] they [the LSVs] would be grouped to some extent in the soil," Mr. Young replied: "That's right, and that's based on the single pit that we encountered with a large volume of in situ water and a large volume of vials." (alterations added). If the LSVs excavated from Pit 26, which contained large volumes of perch water, were still largely grouped on vial trays, as related by Cabrera's field reports and photographs, a reasonably prudent contractor would not foresee the condition of largely dispersed LSVs depicted in plaintiff's notice of differing site condition.

For the foregoing reasons, the court finds that Cabrera's field reports and photographs contained in the Waste Characterization Survey support the Decommissioning Plan's description of LSV disposal at the LLRBS without relying upon Mr. Jacobi's testimony. Because the LSVs were placed in vial trays or plastic bags before being put into cardboard boxes, the court finds defendant's argument that the cardboard boxes would be degraded after many decades underground not to be of consequence because, even if the cardboard boxes had completely degraded, a reasonable contractor would still anticipate the LSVs would be grouped in the vial trays or bags, as depicted in the photographs included within the Waste Characterization Survey.

The court also finds that plaintiff reasonably relied upon the information in the Waste Characterization Survey. Plaintiff's proposal intended to use the onsite Waste Sorting and Segregation Facility "for the hand sorting and segregation of all containerized waste and liquids, LSVs, radioactive sources, and other heterogeneous materials" and the Conveyor Scan System "to segregate debris from soil, then to segregate the soil based on the gross beta/gamma radiation levels." Thus, plaintiff intended to segregate LSVs as part of a process separate and distinct from the process by which plaintiff planned to segregate debris from bulk soils.

Given the affirmative indications in the contract documents and the lack of indications to the contrary, a reasonably prudent contractor would have interpreted the contract documents to mean that LSVs buried at the LLRBS would be grouped together prior to burial. The photographs and reports in the Waste Characterization Survey

---

[89] According to the parties' Witness List:

Mr. Young used to work for Cabrera Service, Inc., who prepared the Draft Decommissioning Plan, Waste Characterization Survey, and Final Decommissioning Plan. Mr. Young was involved with the preparation of these documents submitted to the Nuclear Regulatory Commission and will testify as to how they were prepared. Plaintiff will call Mr. Young to testify about his knowledge of the conditions at the LLRBS, preparation of a proposal by Cabrera Service, Inc. for the Solicitation, and the other issues as to which he testified to in his deposition.

reinforced this interpretation. As a result, the condition of the LSVs encountered by plaintiff was reasonably unforeseeable. Because plaintiff's proposed technical approach conformed to plaintiff's expected condition of the LSVs, plaintiff reasonably relied upon its interpretation.

For the purpose of determining liability, plaintiff has shown by a preponderance of the evidence that it was damaged by the changed condition of contamination in the overburden. Plaintiff incurred costs to write Work Plan Revision 2. Thus, plaintiff is entitled to an equitable adjustment, pursuant to the regulation at FAR 52.236-2 Differing Site Conditions.

III.    Superior Knowledge

The United States Court of Appeals for the Federal Circuit has stated that the government can be held liable for a breach of contract for non-disclosure of superior knowledge when:

> (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

Scott Timber Co. v. United States, 692 F.3d 1365, 1373 (Fed. Cir. 2012) (quoting Hercules Inc. v. United States, 24 F.3d 188, 196 (Fed. Cir. 1994) (internal quotation marks omitted in original), aff'd, 516 U.S. 417 (1996)), reh'g and reh'g en banc denied (Fed. Cir. 2013); see also AT&T Communications, Inc. v. Perry, 296 F.3d 1307, 1312 (Fed. Cir. 2002); Giesler v. United States, 232 F.3d 864, 876 (Fed. Cir. 2000); GAF Corp. v. United States, 932 F.2d 947, 949 (Fed. Cir. 1991) (quoting Lopez v. A.C. & S., Inc., 858 F.2d 712, 717 (Fed. Cir. 1988), cert. denied sub nom. Eagle-Picher Indus., Inc. v. United States, 491 U.S. 904 (1989)), cert. denied, 502 U.S. 1071 (1992). The first three of the four factors elaborated in Scott Timber Company create a duty on the government to disclose its superior knowledge. See Northrup Gruman Corp., Military Aircraft Div. v. United States, 63 Fed. Cl. 12, 16 (2004). "The fourth factor addresses whether the government has breached that duty to disclose. If all four factors are present, the government can be found liable for a breach of contract under the doctrine of superior knowledge." Id. Therefore, whether the government has a duty to disclose is not a "threshold question," independent of the above test; rather, determining whether the government should be subject to a superior knowledge inquiry for failure to disclose is determined by addressing the first three elements elaborated in Scott Timber Company. See id.

Plaintiff argues two bases for its theory of defendant's breach of contract, that defendant knew but failed to disclose that "(1) LSVs [were] dispersed in the soil and (2) the lack of five feet of clean overburden." (alteration added). Had plaintiff understood

these two facts, plaintiff claims it would have been able "to estimate the cost of performance more accurately because later discovery of these facts significantly slowed productivity and greatly increased costs."

Plaintiff states that defendant was aware that plaintiff did not know either of these facts "after reviewing its Technical proposal, which assumed five feet of clean overburden and grouped LSVs." Regarding contamination in the overburden, plaintiff claims that defendant's use of the "slide from TPMC's Technical Proposal showing no waste in the five feet of the overburden and grouped LSVs" at the public presentation confirmed defendant's awareness of plaintiff's lack of knowledge. Plaintiff further claims that the contracting officer's representative's disclosure after contract award and "right before mobilization" that plaintiff "'need[ed] to consider that some of the waste pit debris could have migrated up towards the surface and that careful consideration is needed when removing the overburden,' which 'might impact the approach to removing the overburden' . . . demonstrates that the Government knew TPMC did not have knowledge of waste in the overburden." (alteration in original; omission added).

Plaintiff further states that "Contract specifications affirmatively misled TPMC as to the actual conditions." Plaintiff argues that it was misled because "[t]he 2009 Draft DP represented there was no surface contamination, five feet of clean overburden, and LSVs disposed in trays, boxes, or bags," and because "the 2009 Draft DP was updated after completion of the WCS," the Decommissioning Plan's representations provided "the most accurate information." (alteration added). Furthermore, according to plaintiff, the Solicitation instructed "offerors that '[p]roposals will be submitted based on the [2009 Draft DP].'" (alterations in original). Finally, plaintiff claims it "was not on any notice to inquire" because the Decommissioning Plan was required "to be accurate and complete."

Plaintiff also claims "[t]he Government failed to provide relevant facts as to dispersed LSVs and waste in the overburden." To support this claim, regarding dispersed LSVs, plaintiff states that

> the USDA knew there was a significant number of loose LSVs that would make excavation more difficult and expensive. The USDA even explored alternative approaches, such as crushing LSVs, and developed an estimate that loose LSVs would raise the project cost to $70 million. The Government did not provide these relevant facts to TPMC and instead, only provided historical information as to packaged or grouped LSVs.

Regarding waste in the overburden, plaintiff argues that "Mr. Jovanovich believed there was waste within one foot of the ground surface, contradicting Cabrera's reported understanding, and understood this condition was significant enough to include in internal updates. Nevertheless, the Government did not disclose these facts prior to contracting." Instead, plaintiff adds, defendant "provided relevant information to TPMC regarding the overburden in 2013, which was more than three years after award and shortly before mobilization. This demonstrates the Government's understanding that these facts were relevant to performance and had not previously been disclosed."

Defendant argues that "because the Government provided to TPMC all the knowledge it had regarding both the contents of the pits, including LSVs, and the possibility of waste in the overburden, TPMC's superior knowledge claim fails," claiming that "TPMC's own proposal underscored the fact that 'the pit contents are of a highly hetero-geneous [sic] nature with the potential for a wide variety of waste types [including] laboratory glassware,' as well as the possibility of waste in the overburden." (alterations in original). Citing to Wm. T. Thompson Co. v. United States, 26 Cl. Ct. 17 (1992), aff'd sub nom. Hercules Inc. v. United States, 24 F.3d 188 (Fed. Cir. 1994), defendant also argues that "[t]o 'satisfy the requirements of the [superior knowledge] doctrine, the vital knowledge, which the Government possesses and the contractor does not, must be a fact that affects performance costs or duration of performance.'" (first alteration added).

Defendant supports its argument, stating "the contract documents informed offerors of the possibility of LSVs dispersed in the soil and waste in the overburden, and the considerable uncertainty surrounding these aspects of the LLRBS." Regarding the dispersion of LSVs, defendant points to Solicitation Amendment 0002's statement that "there are no clear records as to [how wastes] were packaged up th[r]ough pits dug in the 1970s." (alterations in original). Defendant further references photographs included in the Waste Characterization Survey that defendant asserts "show that LSVs were found in varying conditions, including unpackaged LSVs mixed in soil." Defendant states that these photographs contradict plaintiff's argument – that defendant failed to inform plaintiff "that [the] 'USDA knew there was a significant number of loose LSVs that would make excavation more difficult and expensive'" – because "this information was conveyed to offerors via the photographs in the WCS, which Dr. Caputo admitted showed loose LSVs." Finally, defendant quotes the Waste Characterization Survey and cites Dr. Caputo's trial testimony to show that plaintiff understood that Cabrera, having "excavated approximately 10% of the 50 known burial pits at the LLRBS," concluded that "it is anticipated that the nature and extent of the waste in the remaining pits will be highly variable." (emphasis in original; internal quotation marks omitted).

With regard to the overburden, defendant claims the Solicitation warned offerors "that the overburden was 'probably not contaminated; however, offerors should consider it as part of the total volume for disposal'" or that contractors were required "to 'sample the backfill material' to determine that it was clean," before using it as backfill. (emphasis in original). Additionally, according to defendant, the Waste Characterization Survey "identified two of the five pits that Cabrera excavated where it found waste in the overburden." Defendant challenges plaintiff's assertion that USDA officials failed to disclose their knowledge of waste within one foot of the ground surface, claiming that Cabrera's "Field Reports, explicitly informed offerors of this fact."

Defendant challenges plaintiff's assertion that "the 'Government was aware of TPMC's lack of knowledge after reviewing its Technical Proposal, which assumed five feet of clean overburden and grouped LSVs,'" stating that "TPMC mischaracterizes its own proposal." Defendant claims that because plaintiff's Technical Proposal states "that TPMC 'will utilize a power-actuated box screen . . . to separate loose soil from debris,

including . . . LS[V]s," plaintiff's "proposal indicates that it expected that all waste, including LSVs, could be found throughout the site in varying conditions." (alteration and omissions in original). Defendant offers further support for this claim from plaintiff's Technical Proposal, which states "the pit contents are of a highly hetero-geneous [sic] nature with the potential for a wide variety of waste types," arguing that because plaintiff expected to discover waste throughout the site, "TPMC proposed using its 'innovative' CSS [Conveyor Scan System] procedure to separate loose soil from debris, including LSVs." (alterations added). Likewise, defendant argues "TPMC's proposal recognized uncertainty in the condition and depth of the overburden." Defendant highlights that plaintiff's proposal describes "'Zone 1' as the 'presumed clean overburden to a depth of <u>approximately</u> 5 feet [below ground surface] bgs'" and "recognized that the overburden was merely 'presumed' clean and would require testing to confirm." (alteration and emphasis in original). Finally, defendant cites to plaintiff's proposal, arguing "TPMC noted a high potential for contamination in the one foot of overburden directly above the pits."

Regarding plaintiff's reliance upon defendant's use of plaintiff's slide at the 2012 public presentation, defendant reiterates its previous argument that "the image used in this slide was taken from TPMC's technical proposal and as TPMC itself recognized, represented an 'idealized model' of subsurface conditions, from which 'actual site conditions may vary.'"

Finally, defendant states that

even if the Government withheld information from TPMC on the overburden, its superior knowledge claim still fails because TPMC cannot show causation. "To recover damages under the superior knowledge doctrine, a contractor also 'must show that the nondisclosure caused its additional expenditures.'" <u>Renda Marine, Inc. v. United States</u>, 66 Fed. Cl. 639, 721 & n.80 (2005) (quoting <u>J.A. Jones Constr. Co. v. United States</u>, 390 F.2d 886, 893 (Ct. Cl. 1968)) (cleaned up).

Defendant further argues that Mr. Clayman

made the decision to switch excavation approaches "early in the project when [he] arrived because [he] felt that removing five feet of soil from the entire field [as required under Work Plan Revision 0] . . . would remove all the vegetation and topsoil and it would create a wet sloppy mess." (emphasis added) [sic]. Mr. Clayman believed that excavating the overburden pit-by-pit would create a "safer work surface." TPMC confirmed this motivation in a letter dated July 18, 2013. (acknowledging that under TPMC's initial approach, "the majority of the pits [would] be exposed during waste pit remediation," resulting "in a greater potential . . . for the migration of contamination due to erosion and particularly during precipitation events"). Additionally, TPMC considered "the alternative excavation approach . . . to be process improvements and not a substantive change to its proposed technical approach." TPMC concluded that regardless of which

strategy was used, "the expected amount of material requiring excavation remains the same; therefore [TPMC's] level of effort and proposed cost also remains the same." Thus, the reason for the change in the workplan – and any associated delay – was not the undisclosed presence of waste in the overburden, as TPMC now contends.

(third alteration added; omissions in original). For these reasons, defendant argues, plaintiff initiated changing "its excavation approach because the new excavation approach was technically superior, not because of waste in the overburden." (emphasis in original).

The court finds that plaintiff lacked vital knowledge as to the extent to which LSVs were dispersed within the waste pits and the existence of contamination in the overburden. Because the Contract was for the purpose of removing buried material at a government-controlled waste site, plaintiff's actual knowledge of the subterranean conditions was derived largely, if not entirely, from the contract documents. In this case, plaintiff also was not allowed to walk the north field during the site visit and neither party alleges that plaintiff gained subterranean knowledge of the LLRBS from some other source. Thus, if plaintiff knew that LSVs were loose in the soil or that there was contamination in the overburden, the source of that knowledge should be found in the contract documents.

Defendant's argument that because the contract documents informed offerors of "considerable uncertainty" is not persuasive. While an expression of uncertainty might indicate whether plaintiff was on notice to inquire about a vital fact, informing offerors that "there are no clear records as to exactly what materials are present or how they were packaged," "the nature and extent of the waste in the remaining pits will be highly variable," or that "the backfill material is probably not contaminated" discloses neither that the LSVs would be loose within the soil nor that the overburden would be contaminated. To the contrary, while the Decommissioning Plan informed offerors that "there is no record of waste container type, waste type, chemical form, or physical form," the very next sentence states that "[i]nterviews with employees present when the LLRBS was active have revealed that most of the waste materials were placed into cardboard boxes prior to disposal in the pits."(alteration added). Two sentences later, the Decommissioning Plan states that "[l]iquid scintillation vials were either placed on vial trays and packaged in cardboard boxes for disposal, or placed loose in large plastic bags, then in cardboard boxes." (alteration added). Also, contrary to defendant's contention, the plain meaning of Cabrera's statement that "it is anticipated that the nature and extent of the waste in the remaining pits will be highly variable" simply indicates that each pit might have different types of and/or different amounts of waste, not that the manner of disposal of the wastes would vary. More importantly, Amendment 0004 to the Solicitation directed offerors to assume the overburden was not contaminated, stating: "As stated in the response to Question i of Amendment 0002, the backfill material is probably not contaminated; therefore, it should be assumed that it has no impact to the total volume percentages of the waste material." (emphasis added).

Similarly, neither the photographs included in the Waste Characterization Survey nor Cabrera's Field Reports demonstrate that plaintiff had vital knowledge as to the disposition of the LSVs within the pits or that the overburden would be contaminated. Defendant counsel's examination of Dr. Caputo at trial included the six photographs from the Waste Characterization Survey discussed above. Because none of the photographs included in the Waste Characterization Survey depict loose vials to the extent loose vials are depicted in the photograph included in plaintiff's notification of a differing site condition, dated April 17, 2014, none of the six photographs included in the Waste Characterization Survey reasonably communicated the USDA's knowledge, as stated by Mr. Prevar in his June 12, 2008, email, that "[e]xcavating the cells is difficult to accomplish without crushing vials, which are not neatly packaged in the soil—test pits revealed that they are loose." (alteration added).

Cabrera's Field Reports, which were included in the Waste Characterization Survey, also did not inform offerors either that the LSVs would be loose in the soil or that the unremediated overburden contained waste, as defendant claims. The reports corresponding to Pits 1 and 14 appear to confirm five feet of clean overburden and do not mention the presence of LSVs. The reports for Pit 26 clearly state that Cabrera encountered waste within the overburden, but the report for May 22, 2006, indicates that the LSVs discovered in the north wall and pit floor were "bagged & boxed" and that this was "consistent with that found in earlier activities," substantiating the interviews with previous employees identified in the Decommissioning Plan. The reports for Pit 34 identify the top of the pit at "aprox 4'" and that the pit contained "some lab packs and LSV." (alteration added). While Cabrera included no description of the how the LSVs were found within Pit 34, the Weekly Project Summary corresponding to Pit 34 affirmatively indicates no difficulties were encountered.

The July 2008 Waste Characterization Survey informed the writing of the July 2009 Decommissioning Plan and was available to offerors during contract formation. Neither of these documents, or any of the other contract documents, informed offerors of Mr. Prevar's observation that LSVs were "not neatly packaged in the soil—test pits revealed that they are loose." The fact that a couple of photographs depict a small number of loose LSVs on the ground or in the soil does not overcome the presumption created by the remainder of the photographs, the narrative of Cabrera's Field Reports, and the results of the interviews provided in the Decommissioning Plan. Similarly, while Cabrera's Field Reports indicate Pits 26 and 34 were found to have a contaminated overburden, that debris was remediated by Cabrera, and none of the contract documents indicate the overburden would be contaminated elsewhere. Instead, as discussed above, defendant considered the information known to it, which includes all the contract documents prior to the Solicitation, and nevertheless considered the overburden to be uncontaminated. As for the Solicitation, the last Government Response discussing the overburden, directed offerors to assume the overburden would not affect the percentages of waste, i.e., that it was not contaminated. Furthermore, the Decommissioning Plan states "[t]here is no known surface contamination." (alteration added). For these reasons, plaintiff has demonstrated that, when it undertook to perform the Contract, it did not have vital knowledge of the facts that a significant number of LSV would not be neatly packaged in

the soil, known by defendant since Cabrera's field operations in 2006, or that the overburden was contaminated, known by defendant since Mr. Jackson's 2008 discovery of lab glassware on the surface of the LLRBS.

Defendant's claim that "even if the Government withheld information from TPMC on the overburden, its superior knowledge claim still fails because TPMC cannot show causation" likewise is not persuasive. The court acknowledges that Work Plan Revision 1 may be a better approach than Work Plan Revision 0 in aspects not relating to waste in the overburden, in that Work Plan Revision 1 provides advantages relating to water mitigation and protecting the waste pits from the proximity of heavy equipment, and that Mr. Clayman testified that he wanted to avoid a wet, sloppy mess. But defendant's argument does not address plaintiff's risk analysis contemporaneously explained in plaintiff's notification of intent to revise its work plan. Plaintiff's notification of intent to revise its work plan states that the primary benefit of Work Plan Revision 0 "allow[ed] for the low-risk overburden to be removed quickly with a low risk of cross-contamination from the debris buried below the overburden," and the primary risk of Work Plan Revision 0 was that "the majority of the pits will be exposed during waste pit remediation," resulting "in a greater potential, when compared to the alternative strategy [Work Plan Revision 1], for the migration of contamination due to erosion and particularly during precipitation events . . . ." (alterations and omission added). The substantive difference between Work Plan Revision 0 and Work Plan Revision 1 was that Work Plan Revision 1 "[did] not dictate removal of the [overburden] over the entire north field prior to excavating waste pits." (alteration added). The relatively higher risk of Work Plan Revision 1 was an "elevated risk of contaminating overburden material with waste pit material because the operation will cycle from cover removal to waste pit remediation until waste pit remediation is complete." But because of "[t]he presumption that the overburden material is free of contaminated material has been challenged," plaintiff does not appear to have initiated a work plan change simply because it wished to avoid a wet, sloppy mess, but because reversing the assumption that the overburden was clean appears to have also reversed the risk-to-benefit comparison between Work Plan Revisions 0 and 1. (alteration added).

Additionally, defendant's theory that plaintiff initiated the work plan change for some reason other than "the undisclosed presence of waste in the overburden" is not supported by the timeline. A draft of Work Plan Revision 0 was submitted to defendant by Mr. Clayman on September 11, 2012. Work Plan Revision 0 was accepted by defendant on March 7, 2013. Sometime after March 7, 2013, and before April 17, 2013, defendant notified plaintiff of the potential for waste in the overburden. Thereafter, plaintiff submitted its notification of intent to revise its work plan, dated July 18, 2013. While Mr. Clayman testified, almost ten years after the fact, that he decided to "change[ the original technical approach] early in the project when I arrived because I felt that removing five feet of soil from the entire field would have created a . . . wet, sloppy mess," Mr. Clayman had the opportunity to make the change before he submitted the Work Plan Revision 0 draft. (alteration added). Instead, the record appears to reflect that plaintiff maintained its pre-offer risk analysis until defendant disclosed vital knowledge, i.e., that the overburden might be contaminated, and only then did plaintiff initiate the change to Work Plan Revision 1.

The court determines that plaintiff's proposal made defendant aware, or at least should have, that plaintiff did not know the LSVs were not neatly packaged in the soil or that the overburden was contaminated. Plaintiff's proposal does appear to consider that at least some LSVs would be discovered in a condition other than neatly packaged in the soil, evinced by the Work Plan Revision 0's approach and as argued by defendant, to "utilize a power-actuated box screen and a variable speed-sorting conveyor to separate loose soil from debris, including DAW, and LSC vials." Plaintiff's proposal, however, made clear that utilizing the conveyor scan system was one "of two distinct approaches to scanning, sorting, and segregating waste removed from the LLRBS." Additionally, the proposal states that the conveyor scan system "applies to bulk soils" and was intended "for in-process debris separation, soil scanning, and waste minimization sorting during excavation activities." The alternative approach was to use the on-site Waste Sorting and Segregation Facility "for the hand sorting and segregation of all containerized waste and liquids, LSVs, radioactive sources, and other heterogeneous materials." Plaintiff's proposal is consistent with the court's analysis of the contract documents, that the contract documents indicate that LSVs would largely be grouped in the soil, either in vial trays or bags. As to the overburden, plaintiff's proposal states that "[u]nconsolidated surface soils (i.e., overburden) will be removed using a bulldozer and front-end loader for transport to the clean soils staging area." (alteration added).

Defendant's argument that "TPMC noted a high potential for contamination in the one foot of overburden directly above the pits" appears to be in reference to the portion of plaintiff's proposal that states:

> The first 5 feet of overburden will be stockpiled on-site in the south field until FSS results are available to determine if the soil can be used for backfill in the north field. Overburden with the highest potential to be contaminated is the 1-foot lift (5 to 6 feet bgs) immediately above the waste pits. The 1-foot lift immediately above the waste material in disposal pits will be classified as MARSSIM Class 2. The Class 2 soil lift will have a total of 20 random samples taken. This lift will be stockpiled separately from the other overburden. Based on the previously analyzed sample results and the radiation walkover surveys, this soil will be either stockpiled for reuse or packaged for disposal.

(emphasis added). The court agrees that defendant's interpretation of the emphasized sentence is likely what was intended by plaintiff, but the explanatory parenthetical creates an inconsistency because it identifies the one-foot layer from five to six feet below ground surface, not the one-foot layer from four to five feet. Plaintiff's statement that the one-foot layer of soil immediately above the pits had the highest potential to be contaminated, though, is not incompatible with defendant's directed assumption that the overburden was considered uncontaminated. Regardless, the contract documents and plaintiff's proposal overwhelmingly indicate that plaintiff did not know that the assumption of an uncontaminated overburden had been challenged, when it offered its proposal.

Because the evidence showing defendant knew the LSVs were not neatly packaged in the soil and that the overburden may be contaminated were internal emails and because that same information was not included in the contract documents, defendant also knew, or should have known, that plaintiff had no means to obtain these vital facts.

For the reasons stated above, the contract documents misled plaintiff, failing to identify both vital facts at issue. With regard to contamination in the overburden, Cabrera's Field Reports raised sufficient doubt to require offerors to inquire further about the overburden. Any duty plaintiff had to further question defendant's considered conclusion that the overburden was not contaminated was discharged, however, during contract formation. Solicitation Amendments 0002-0004 contain Contractor Questions and Government Responses that specifically addressed the question of contamination in the overburden, concluding that, while "offerors should consider it [the overburden] as part of the total volume for disposal," "it should be assumed that it has no impact to the total volume percentages of the waste material." (alteration added). In other words, offerors were to increase the volume of cubic yards to be disposed without that volume increase affecting the percentages of waste being disposed, which has the same meaning as the Decommissioning Plan's statement that "[t]here is no known surface contamination." Thus, to the extent the contract documents put plaintiff on notice to inquire about the status of the overburden, plaintiff did get sufficient information from the answers to questions not to inquire further, such that plaintiff's duty was discharged. The court determines that no contract document put plaintiff on notice to inquire further about the level of dispersion of LSVs in the soil. As noted above, the contract documents repeatedly informed offerors that the LSVs would be placed on vial trays or loose in large plastic bags, which was consistent with Cabrera's Field Reports.

Because plaintiff undertook to perform without having been given vital knowledge of facts affecting performance costs or duration, facts which defendant knew or should have known and plaintiff had no knowledge and because the contract documents misled plaintiff, defendant, having knowledge of both vital facts, had a duty to disclose those facts. Defendant claims it provided "TPMC all the knowledge it had regarding both the contents of the pits, including LSVs, and the possibility of waste in the overburden." The evidence does not support defendant's claim.

Regarding the dispersion of LSVs, defendant had knowledge, gained by observations made by government employees during Cabrera's field operations, that the LSVs "are not neatly packaged in the soil—test pits revealed that they are loose." Defendant's inclusion of the six photographs appended to the Waste Characterization Survey did not serve to disclose defendant's superior knowledge. To the contrary, the vast majority of the LSVs depicted in the six photographs appear to be neatly packaged in the soil. Additionally, Cabrera's field reports, upon which the court relies to provide context to the photographs taken during Cabrera's field operations, state that "the debris in the north wall and pit floor [of Pit 26] is consistent with that found in earlier activities. LSV[s] (bagged & boxed), loose pipettes & other broken glass debris, lab packs with

containerized liquid waste, plastic bottles and misc. debris" and that the difficulties encountered while excavating Pit 34 were "[n]one." (alterations added).

Regarding contamination in the overburden, defendant knew, approximately nine months before issuing the solicitation, that broken and intact lab glassware was on the surface on areas of Cabrera's excavation. That fact was not disclosed to offerors. Cabrera's Field Reports, recording the discovery of waste or debris in the overburden above Pits 26 and 34 fail to discharge defendant's duty to disclose. According to testimony at trial, the parties understood that, after Cabrera characterized the waste it discovered during its field operations, Cabrera shipped that waste offsite for disposal; Cabrera did not put the waste back into the pits. More importantly, plaintiff claims damages for the increased cost of rewriting the work plan and for their protracted mobilization period. Each of these costs occurred before plaintiff began to remove the overburden and after defendant held the teleconference in April 2013, which was based upon Mr. Jackson's discovery of glassware on the surface of the LLRBS.

Because defendant failed to disclose its superior knowledge that the LSVs were not neatly packaged in the soil, the court holds that defendant failed to discharge its duty to disclose superior knowledge as to the disposition of the LSVs. Because defendant disclosed its superior knowledge of the potential for waste in the overburden in April 2013, knowledge defendant held since prior to issuing the Solicitation, the court holds that defendant failed to discharge its duty to disclose superior knowledge as to the overburden. For these reasons, defendant is liable for breach of contract under the doctrine of superior knowledge.

## IV.    Good Faith and Fair Dealing

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.". Alabama v. North Carolina, 560 U.S. 330, 351 (2010) (quoting Restatement (Second) of Contracts § 205 (1981)) (alteration omitted); see also Authentic Apparel Grp. v. United States, 989 F.3d at 1018 (citing Dobyns v. United States, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing Metcalf Constr. Co. v. United States, 742 F.3d at 990))); Precision Pine & Timber, Inc. v. United States, 596 F.3d at 828; P.R. Burke Corp. v. United States, 277 F.3d 1346, 1360 (Fed. Cir. 2002); Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000); Scott Timber Co. v. United States, 692 F.3d at 1372; Keyes Helium Co., LLC v. United States, 167 Fed. Cl. 283, 292 (2023); 27-35 Jackson Ave LLC v. United States, 162 Fed. Cl. 550, 560 (2022), aff'd, 127 F.4th 1314 (Fed. Cir. 2025) (citing Lakeshore Eng'g Servs. v. United States, 748 F.3d 1341, 1349 (Fed. Cir. 2014)).

"A party breaches the contract when it fails to abide by this implied duty [of good faith and fair dealing], which includes 'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" Dobyns v. United States, 915 F.3d at 739 (quoting Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2005)) (alteration added); see also LaBatte v. United States,

899 F.3d 1373, 1379 (Fed. Cir. 2018); Metcalf Constr. Co. v. United States, 742 F.3d at 990; Agility Public Warehousing Co. KSCP v. Mattis, 852 F.3d 1370, 1383–84 (Fed. Cir. 2017); Precision Pine & Timber, Inc. v. United States, 596 F.3d at 820 n.1; Baistar Mechanical, Inc. v. United States, 128 Fed. Cl. 504, 525 (2016). As indicated by a Judge of the United States Court of Federal Claims, "[t]he court applies a reasonableness standard in assessing whether a party breached its duty to cooperate, which requires a factual inquiry that depends upon 'the particular contract, its context, and its surrounding circumstances.'" Baistar Mechanical, Inc. v. United States, 128 Fed. Cl. at 525 (quoting Axion Corp. v. United States, 75 Fed. Cl. 99, 121 (2007)). "The Federal Circuit has stated that a party must establish a breach of this covenant [of good faith and fair dealing] by clear and convincing evidence." 27-35 Jackson Ave LLC v. United States, 162 Fed. Cl. at 560 (citing Rd. & Highway Builders, LLC v. United States, 702 F.3d 1365, 1368–69 (Fed. Cir. 2012) and Long Lane Ltd. P'ship v. Bibb, 159 F. App'x 189, 192 (Fed. Cir. 2005) (alteration added)).

"[A] specific promise must be undermined for the implied duty [of good faith and fair dealing] to be violated." Dobyns v. United States, 915 F.3d at 739 (alterations added); see also Aries Constr. Corp. v. United States, 164 Fed. Cl. 290, 294 (2023); Helix Elec., Inc. v. United States, 68 Fed. Cl. 571, 587 (2005). Thus, "'[t]he implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions.'" Dobyns v. United States, 915 F.3d at 739 (quoting Precision Pine & Timber, Inc. v. United States, 596 F.3d at 831) (alteration in original); see also Centex Corp. v. United States, 395 F.3d at 1304–06; Agility Public Warehousing Co. KSCP v. Mattis, 852 F.3d at 1384; Jarvis v. United States, 43 Fed. Cl. 529, 534 ("The implied duty of good faith and fair dealing does not form the basis for wholly new contract terms, particularly terms which would be inconsistent with the express terms of the agreement."), recons. denied, 45 Fed. Cl. 19 (1999). As explained by the Federal Circuit, "while the implied duty exists because it is rarely possible to anticipate in contract language every possible action or omission by a party that undermines the bargain, the nature of that bargain is central to keeping the duty focused on 'honoring the reasonable expectations created by the autonomous expressions of the contracting parties.'" Metcalf Constr. Co. v. United States, 742 F.3d at 991 (quoting Tymshare, Inc. Covell, 727 F.2d 1145, 1152 (D.C. Cir. 1984)); see also CanPro Invs. Ltd. v. United States, 130 Fed. Cl. at 350.

In Precision Pine & Timber, Inc., the United States Court of Appeals for the Federal Circuit indicated that "[n]ot all misbehavior, however, breaches the implied duty of good faith and fair dealing owed to other parties to a contract." Precision Pine & Timber, Inc. v. United States, 596 F.3d at 829. The Federal Circuit further explained that:

> Cases in which the government has been found to violate the implied duty of good faith and fair dealing typically involve some variation on the old bait-and-switch. First, the government enters into a contract that awards a significant benefit in exchange for consideration. Then, the government eliminates or rescinds that contractual provision or benefit through a subsequent action directed at the existing contract. See, e.g., id. at 1350–

51; Centex Corp. v. United States, 395 F.3d 1283, 1304–07 (Fed. Cir. 2005); see also Hercules, 516 U.S. 417, 116 S. Ct. 981, 134 L.Ed.2d 47. The government may be liable for damages when the subsequent government action is specifically designed to reappropriate the benefits the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract.

Id. at 829 (citing Centex Corp. v. United States, 395 F.3d at 1311). The Federal Circuit subsequently expanded on the language of Precision Pine & Timber, Inc., after finding a Judge of the United States Court of Federal Claims had read the language of the decision too narrowly. In Metcalf, the Federal Circuit explained:

> The trial court misread Precision Pine, which does not impose a specific-targeting requirement applicable across the board or in this case. The cited portion of Precision Pine does not purport to define the scope of good-faith-and-fair-dealing claims for all cases, let alone alter earlier standards. The passage cited by the trial court, after saying as a descriptive matter that cases of breach "typically involve some variation on the old bait-and-switch," Precision Pine, 596 F.3d at 829, says that the government "may be liable"—not that it is liable only—when a subsequent government action is "specifically designed to reappropriate the benefits the other party expected to obtain from the transaction." Id. (emphasis added). Precision Pine then states its holding as rejecting breach for two reasons combined: the challenged government actions "were (1) not 'specifically targeted[' at the contracts,] and (2) did not reappropriate any 'benefit' guaranteed by the contracts." Id.

> As that statement indicates, the court in Precision Pine did not hold that the absence of specific targeting, by itself, would defeat a claim of breach of the implied duty—i.e., that proof of specific targeting was a requirement for a showing of breach. When the court said that specific targeting would have been required for breach of the duty in that case, id. at 830, it did so in a context in which the more general bargain-impairment grounds for breach of the duty were unavailable, because the suspension-by-court-order provision expressly authorized the suspension, without limitation on the time of compliance with the order. That is enough to make clear that specific targeting is not a general requirement. In addition, the challenged government conduct in Precision Pine occurred in implementing a separate government authority and duty independent of the contract, namely, enforcement of and compliance with the injunction. In that context—as in the legislative context from which Precision Pine borrowed its reference to specific targeting, 596 F.3d at 830 (citing Centex and First Nationwide Bank)—the "specifically targeted" language protects against use of the implied contract duty to trench on the authority of other government entities or on responsibilities imposed on the contracting agency independent of contracts. The present case involves no such concern.

Metcalf Constr. Co. v. United States, 742 F.3d at 993 (alteration and emphasis in original). In Metcalf, the Federal Circuit instructed the trial court to focus on the broader language of the Federal Circuit's earlier opinions, and specifically:

> The covenant of good faith and fair dealing . . . imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005) (emphases added). "Both the duty not to hinder and the duty to cooperate are aspects of the implied duty of good faith and fair dealing." Precision Pine, 596 F.3d at 820 n.1. What is promised or disclaimed in a contract helps define what constitutes "lack of diligence and interference with or failure to cooperate in the other party's performance." Malone, 849 F.2d at 1445.

Id. at 991, 993 (emphasis and omission in original).

In the case currently under review, plaintiff claims defendant's "actions in forcing TPMC to enter into Mod. 7 to DO 0003 as a condition to approving WP [Work Plan] Rev. 2 is a breach of the implied duty good [sic] faith and fair dealing and therefore, a breach of the Contract." (alterations added). Responding to "differing site conditions," according to plaintiff, "TPMC employed a new methodology in April 2014 that greatly increased productivity." Plaintiff argues that the contracting officer, knowing plaintiff was employing the Work Plan Revision 2 excavation methodology prior to that plan's approval, "never stopped TPMC from using the new methodology," but "when a separate invoicing dispute arose in early June 2014, the Contractor Officer threatened TPMC that if it '[did] not agree to use the escalated 12.2% rates, that decision may have an adverse affect [sic] on any possibility that the Revised Work Plan would be approved by the Government.'" (first alteration in original). Plaintiff also alleges that "the Contractor Officer conceded there was no relationship" between the escalation rate dispute and plaintiff's request for a work plan revision. Under these circumstances, plaintiff claims that defendant

> used the separate issue of approving WP Rev. 2 to force TPMC to capitulate as to the invoicing dispute. The intent of the Government was laid bare by the admission that "[Rock Island] is holding TES over the fire to make sure that the Government is getting the best value. Dr. Caputo ultimately signed Mod. 7 to DO 0003 because "[TPMC] had no other option" as it was incurring unnecessary costs and coming up on the 90-day window for mixed waste storage.

(alterations in original; citations omitted).

Plaintiff also claims that because "TPMC demobilized from the LLRBS by August 15, 2014 pending the Government obtaining approval from the NRC and EPA" and because "TPMC cannot perform the final work until EPA approval is obtained," defendant

has breached the implied duty of good faith and fair dealing by "[d]elaying TPMC's final work for years." (alteration added).

According to defendant, "[t]he Government did not breach the duty of good faith when it sought to resolve an invoicing dispute with TPMC at the same time it considered Work Plan Revision 2 because that revision could have drastically increased the Government's costs of remediation." (alteration added). Defendant argues that under the Contract, plaintiff was segregating waste material at the LLRBS and "only waste material was to be shipped offsite for disposal." (emphasis in original). Furthermore, according to defendant, plaintiff was to be paid a fixed unit rate based upon "the quantities of waste material that would be packaged, transported, and disposed of offsite." (emphasis in original).

Defendant argues that Work Plan Revision 2 "sought to change the fundamental nature of that process" by moving "the sorting and segregating of soil offsite." (emphasis in original). This change, according to defendant, "had the potential to increase disposal costs" for defendant for three reasons: defendant understood the contract to be paid based upon a fixed unit rate, the plan considered shipping "unsorted and uncontaminated soil," and the plan might result in increased costs "if unpackaged LSVs broke during transportation and converted an entire intermodal container of soil to mixed waste." Therefore, before the contracting officer would approve Work Plan Revision 2, defendant states "the Government sought several assurances from TPMC:" (1) plaintiff would be paid by waste type after sorting and segregating waste at the alternate location, not based on the material transported; (2) "the parties agreed to limit the amount of mixed waste for which the Government could be charged if unpackaged LSVs broke during transportation and contaminated an entire intermodal container;" and that (3) defendant would pay plaintiff "the correct rates—the contractual rates from the 'Alternate Approach' price proposal escalated by 12.22%—rather than the erroneous escalated rates from November 2012." Regarding this third assurance, defendant states that:

> Correcting the rate error was particularly important to the approval of Work Plan Revision 2 because the rate being used to charge the Government for each unit packaged/staged, transported, and treated/disposed of under CLINs 0005, 0006, and 0007 was an essential factor in determining the cost impact of TPMC's proposed revision. In fact, the Government determined that implementing the proposed revision to the work plan without correcting the rates would cost it an additional $800,000. Thus, to approve TPMC's proposal, the contracting officer needed to ensure that TPMC was billing the Government using the correct rates so that the Government would not be charged extra for a change in technical approach that was not necessary for technical or safety reasons.

In light of these arguments, defendant claims that its attempt to ensure plaintiff's "voluntary work plan revision did not result in increased Government costs" was not only reasonable but also that defendant's efforts "did not interfere with TPMC's contractual rights." Defendant states that "TPMC had no contractual right to unconditional approval

of a work plan" and that "in this case, the Government had an express contractual right to determine whether to approve a work plan (or a revision) in the first instance." "Thus," according to defendant, "the actions that TPMC alleges violated the Government's duty of good faith and fair dealing merely reflect the Government's exercise of its contractual rights."

Regarding plaintiff's allegation of coercion, defendant states that "TPMC now asserts that correcting the contractual rates was unrelated to the approval of Work Plan Revision 2, and that the Government inappropriately leveraged the rates issue during the approval process." Defendant, however, argues that "this assertion fails to recognize the risk to the Government from TPMC's proposed revisions to the previously approved work plan." Defendant further argues that "TPMC presented neither evidence that the Government 'forced' it to propose any changes in the work plan nor evidence that TPMC could not have continued to operate under the already-approved work plan." While conceding that "there was potential for RCRA non-compliance," defendant states that "that was only because TPMC was using unapproved procedures and storing mixed waste on site, which it could not transport until the revised work plan was approved." Defendant concludes that:

> In any event, the RCRA concern is a red herring because the Government resolved the issue with the EPA. Mr. Kurth testified that "USDA representatives worked with EPA and they came to some agreement where EPA was not planning to cite any type of violation." Thus, TPMC's claim that the Government used the threat of RCRA noncompliance to strongarm TPMC into agreeing to corrected invoicing rates is incorrect; the Government took affirmative steps to help TPMC avoid RCRA non-compliance.

(citations omitted).

Regarding plaintiff's claim that defendant had delayed obtaining EPA approval for the free release of the LLRBS, defendant argues that "TPMC has waived this claim because it was not raised prior to TPMC's post-trial brief," "TPMC fails to identify any contractual requirement that the EPA approve the final status survey in a particular timeframe or explain how the USDA or the Army has hindered TPMC's performance or expectations in this regard," and "[t]here is also no record evidence that the Government has purposely delayed obtaining EPA approval or otherwise hindered the process." (alteration added).

In response to defendant's arguments, plaintiff claims "[t]here was no legitimate invoicing dispute as the CLINs in question were firm-fixed price, meaning that TPMC was responsible for any increased cost in the proposed modification[s to the work plan,]" and that "[d]uring this delay, the Government also withheld information regarding an alleged RCRA waiver that it had purportedly obtained from the EPA." (alterations added).

Plaintiff argues that

> the Government knew that TPMC was vulnerable to delay in approving WP. Rev. 2 because of the mounting costs associated with the prolonged storage of the waste material, losing railway access, and more importantly, the approaching EPA deadline to ship the stored waste off the LLRBS to avoid RCRA violations.

While plaintiff acknowledges that the contracting officer's representative testified that defendant obtained a waiver from the EPA, plaintiff alleges that "the Government never produced any record of the Government's alleged conversation with the EPA" and that "[i]f the Government obtained the RCRA waiver, it failed to reveal that information to keep 'TPMC over the fire' regarding the threat." (alteration added). Thus, according to plaintiff, "[t]he Government's use of the RCRA threat and failure to inform TPMC of the alleged RCRA waiver from the EPA to force TPMC to sign Mod. 7 to DO 0003 violated the implied duty of good faith and fair dealing." (alteration added).

The parties' different understandings of the allocation of risk in the Contract was the foundation for the parties' disagreement over whether the billing dispute should be resolved simultaneously with defendant's consideration of plaintiff's work plan revision request. As the doctrine of the implied duty of good faith and fair dealing requires the court to apply a reasonableness standard to evaluate defendant's conduct, the court recognizes that defendant believed the contract allocated the risk of the amounts and types of waste buried at the LLRBS to defendant because defendant understood CLINs 0005-0007 were to be paid at a fixed unit rate.

Plaintiff's claim that the contracting officer never stopped plaintiff from utilizing an unapproved methodology is not persuasive. The day after plaintiff proposed the work plan change, March 26, 2014, the contracting officer requested an analysis of the cost impact associated with implementing the plan and instructed plaintiff that it was "required to continue operations under the current approved work plan until such time the government has had adequate time to review the revised plan." Eight days after plaintiff began the second work period, employing the Work Plan Revision 2 methodology, the contracting officer informed plaintiff that "[u]ntil such time a determination has been made to accept the Revised Work Plan, TES is required [sic] continue working under the Approved Work Plan." (alterations added; capitalization in original). Fourteen days after plaintiff began the second work period, the contracting officer informed plaintiff that "TES is required to continue working under the approved work plan until such time [sic] a determination has been made on the revised work plan," to which Dr. Caputo responded "[w]e continue to work under existing plans and procedures." (alterations added). Mr. Clayman then made clear that plaintiff was, at least in a technical sense, still employing Work Plan Revision 1, but instead of immediately sorting and segregating LSVs mixed with soil at the LLRBS, plaintiff was packaging LSVs with soil in intermodals with the expectation that Work Plan Revision 2 would be approved before the 90-day RCRA storage requirement lapsed. As stated by Mr. Clayman, "[t]his process of partial sorting and segregation followed by eventual sorting and segregation of LSVs following a storage interval is consistent with

the requirements of the current revision to the work plans." (alteration added). Similarly, the court finds no evidence in the record to support plaintiff's claim that "the Contractor [sic] Officer conceded there was no relationship" between the escalation rate dispute and plaintiff's request for a work plan revision. (alteration added).

The contracting officer, believing Task Order 0003 to be a fixed unit rate task order, had a responsibility to evaluate whether the proposed work plan revision would result in increased cost to defendant. The PWS, however, which was incorporated into the Contract, allocated the costs of implementing the work plan to the contractor, stating:

> The Government will review the WP [work plan] for its ability to meet project objectives, specific requirements, and for proper and safe application of procedures and equipment utilized. . . . Additional comments may be provided for the Contractor's review and consideration that relate to economy and efficiency, which the Contractor may choose to incorporate; however, the Contractor is responsible for any impact this may have, positive or negative.

(alteration and omission added). Because the project objective for Task 5 only considered that the contractor would "[p]ackage, containerize, stage and prepare to transport contaminated soil, liquids, mixed waste, etc. to the appropriate disposal site," plaintiff's Work Plan Revision 2 did "s[eek] to change the fundamental nature of [the disposal] process," but once any applicable objectives and requirements were resolved and the procedures were confirmed as proper, defendant's considerations regarding the economic efficiency of the work plan were to be viewed as recommendations because of cost allocation to plaintiff. (alterations added).

Defendant estimated that Work Plan Revision 2's transportation and disposal strategy would cost defendant an additional $800,000.00, assuming in its calculation that each of 100 intermodals contained "95% LLRW and 5% mixed waste." Therefore defendant's seeking assurances that plaintiff's request to fundamentally deviate from the PWS would not result in additional costs to defendant was reasonable. Likewise, the PWS did not consider that defendant would pay for uncontaminated soil to be transported from the LLRBS. Furthermore, because the contracting officer believed defendant was required to "pay[] a fixed unit rate based on the actual amount of material that was packaged and transported," defendant's seeking assurances that the work plan change would not result in additional cost to defendant was reasonable. (alteration added). Plaintiff provided those assurances on May 29, 2014, stating:

> Per our discussion today, TES commits to the following conditions regarding the revised BARC work plan.
>
> 1. Invoice CLINS 5 and 6 for packaging and shipment of revised work plan waste as Mixed Waste (MW) with disposal invoiced at actual waste stream once segregated at Clive.

2. Invoicing for MW will be limited to up to 5% of individual containers with the remaining waste, per container, being invoiced as LLRW.

3. TES will obtain authorization for government officials working the BARC project to observe waste sorting and segregation activities at the Energy Solutions Clive Disposal site.

We will provide a response to Mike Kurth's invoicing question by tomorrow, 30 May 14.

(capitalization in original). Plaintiff also assured defendant that plaintiff would provide access to the Utah facility for government officials associated with the LLRBS project so that defendant may "observe waste sorting and segregation activities" in Utah.

Because plaintiff had agreed to apply these controls to its invoicing of CLINs 0005-0007, the court sees no difference in cost considerations for defendant, given the Contract's work plan review provisions, between plaintiff segregating waste at the LLRBS versus plaintiff segregating the waste at the facility in Clive, UT. In other words, under the assurances plaintiff assumed the cost of transporting clean soil and the cost of disposing mixed waste exceeding five percent per intermodal. Therefore, defendant's conditioning its approval of Work Plan Revision 2 upon resolving the parties' contract interpretation question was not reasonable under the circumstances. Nevertheless, nearly one month after plaintiff provided defendant these assurances, the contracting officer also conditioned approval of Work Plan Revision 2 on plaintiff's "adjust[ing] all previously paid invoices to reflect the rates" believed accurate by defendant. While the court determines that defendant unreasonably attached this fourth condition, asserted by the contracting officer, to the approval of Work Plan Revision 2, the court does not hold that this action alone is sufficient to constitute a breach of the implied warranty of good faith and fair dealing.

Defendant emailed a draft of the modification incorporating Work Plan Revision 2 to plaintiff on July 11, 2014, forty-four days after plaintiff had stipulated to all the reasonable assurances defendant requested. The trial record currently before the court does not include the draft copy of the modification, but Task Order 0003, Modification 07, includes the following two clauses:

6. The revised work plan will be at no addition [sic] cost to the Government."

. . .

8. The contractor herby [sic] waives any and all rights [sic] claims for equitable adjustment attributable to such facts and circumstances giving rise to the incorporation of the above stated change. The contractor specifically waives any and all claims which it has or may have against the Government related to any delay resulting from the incorporation of the stated changes into the contract.

(alterations added). The court determined above that these two clauses have differing meanings.

The contracting officer's refusal to remove the waiver clause, at plaintiff's request, was not reasonable under the circumstances. Dr. Caputo's July 11, 2014 email stated plaintiff's intent was to defer its right to resolve invoicing dispute, stating:

> As you are aware, we have a differing opinion on how the contract is structured. We believe it is based on a firm fixed price, and you believe it is a fixed unit rate contract. We have agreed to continue working towards completion of the project, while resolving our differences through the normal channels. We have further agreed to invoice progress payments based on the fixed unit rates you believe are correct. Our issue with the language is that it appears to force us to revoke our right for dispute on how we view the contract. We don't believe it is in alignment with our earlier agreement, and we simply ask that it be removed or modified such that the spirit of our agreement is still intact.

The contracting officer's intent was to ensure that the work plan change was at no additional cost to the government, stating that "[t]he Government has stated several times to TES that we would not accept the Revised Work Plan if there would be additional cost to the Government." (alteration added; capitalization in original). Given that defendant realized its goal by including clause (6) quoted above, defendant's insistence that plaintiff also waived its right to an equitable adjustment, a right for which plaintiff had bargained in the Contract, defendant's insistence was not reasonable under the circumstances. Because the PWS explained the methodology defendant would apply in its review of work plans, because that methodology did not include resolving unrelated disputes, and because plaintiff's three assurances, described above, ensured plaintiff the assumed cost of transporting materials other than waste and the risk of creating mixed waste greater than five percent per intermodal, defendant's insistence that plaintiff waive its right to an equitable adjustment appears to rise to the level of misconduct that breaches the implied covenant of good faith and fair dealing.

Defendant's leveraging the threat of fines for exceeding the RCRA's ninety-day storage limit, the court determines, does rise to the level of misconduct that breaches the implied covenant of good faith and fair dealing. Defendant's argument, that plaintiff's strongarm argument is incorrect because "the Government took affirmative steps to help TPMC avoid RCRA non-compliance" belies the result. The court accepts that the USDA coordinated with the EPA to create some arrangement in order that plaintiff would not be cited for violating the subject storage regulation, but, as plaintiff argues, "the Government also withheld information regarding an alleged RCRA waiver." Indeed, nothing in the record currently before the court indicates that defendant informed plaintiff that the EPA had either waived the ninety-day requirement or provided an extension of the storage limit. Instead, the record before the court indicates that defendant held plaintiff "over the fire to make sure that the Government is getting the best value."

The Contract to which plaintiff and defendant agreed established a clear line of communication between plaintiff and the EPA. Of the deficiencies identified by defendant in plaintiff's original proposal, the second deficiency was that plaintiff "did not clearly state that TES will not engage directly with the NRC or EPA without USDA knowledge and approval." Plaintiff corrected its proposal by stating that:

> It is TES' intent to work closely with and take direction from our client (JMC/USDA) regarding any and all communications with the NRC and/or the EPA. Any communications will be documented in writing and at no time during the project lifecycle will any TES representative initiative [sic] communications with the NRC and/or the EPA unless authorized by JMC/USDA.

The court interprets this part of the parties' agreement to mean that plaintiff would initiate communications to the EPA by working with defendant and defendant would complete the communication process by transmitting information from the EPA back to plaintiff, but defendant would be relieved of its duty to communicate, if it first authorized plaintiff to initiate communications with the EPA. Regarding the RCRA's ninety-day storage limit, the contracting officer's representative testified that plaintiff communicated plaintiff's concern to defendant and that defendant "worked with EPA and they came to some agreement where the EPA was not planning to cite any type of violation." (omission added). Based upon the trial records, plaintiff's lack of knowledge of this agreement between defendant and the EPA negatively impacted plaintiff's performance of the Contract because the parties understood that, under Work Plan Revision 1, plaintiff would need to unpackage, sort, and segregate the intermodals stored at the LLRBS before the ninety-day deadline to avoid a citation from the EPA. Thus, while plaintiff "assumed the risk that stored waste may have to be re-processed for LSVs at no additional cost to the government" and because defendant failed to communicate the EPA's position regarding a concern raised by plaintiff, defendant either interfered with plaintiff's performance, destroyed the reasonable expectation of plaintiff regarding the fruits of the Contract, or failed in its duty to cooperate. Therefore, the court determines that defendant breached the implied covenant of good faith and fair dealing. See Metcalf Constr. Co. v. United States, 742 F.3d at 991 (holding that "[t]he covenant of good faith and fair dealing . . . imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract (alteration added; emphasis and in original)) (quoting Centex Corp. v. United States, 395 F.3d at 1304).

The court determines that plaintiff's claim that defendant breached the implied covenant of good faith and fair dealing because the EPA did not approve the free release of the LLRBS is without merit. Because the ordering period for the Contract ended on November 8, 2013, and because plaintiff was not ordered to perform the final work by any Task Order prior to the ending of the ordering period, plaintiff is under no obligation to perform further work. Furthermore, plaintiff has not pointed to any contract provision that provides, expressly or implicitly, an expected timeline for EPA approval.

V.    Economic Duress

The United States Court of Appeals for the Federal Circuit has indicated that "[t]o render a contract unenforceable for duress, a party must establish (1) that it involuntarily accepted the other party's terms, (2) that circumstances permitted no other alternative, and (3) that such circumstances were the result of the other party's coercive acts." N. Star Steel Co. v. United States, 477 F.3d 1324, 1334 (Fed. Cir. 2007) (citing Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1329 (Fed. Cir.), aff'd and reh'g denied, 346 F.3d 1359 (Fed. Cir. 2003), cert. denied 541 U.S. 987 (2004)); see also Dureiko v. United States, 209 F.3d 1345, 1358 (Fed. Cir. 2000); Emp'rs Ins. of Wausau v. United States, 764 F.2d 1572, 1576 (Fed. Cir. 1985) (quoting Fruhauf Sw. Garment Co. v. United States, 111 F. Supp. 945, 126 Ct. Cl. 51, 62 (1953) ("[T]he requirements to establish duress are exacting. Three elements must be found: '(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party.'")); Waverley View Inv'rs, LLC v. United States, 135 Fed. Cl. 750, 793 (2018) (quoting Dureiko v. United States, 209 F.3d at 1358), aff'd, 767 F. App'x 996 (Fed. Cir. 2019); IMS Engineers-Architects, P.C. v. United States, 92 Fed. Cl. 52, 66 (2010), aff'd, 418 F. App'x 920, reh'g and reh'g en banc denied (Fed. Cir. 2011); Aboo v. United States, 86 Fed. Cl. 618, 632, aff'd, 347 F. App'x 581 (Fed. Cir. 2009). "Duress occurs when a party involuntarily accepts another party's terms because the circumstances permitted no alternative and such circumstances were the result of the other party's coercive acts." Pew Forest Prods. v. United States, 105 Fed. Cl. 59, 67 (2012) (citing N. Star Steel Co. v. United States, 477 F.3d at 1334).

"A comprehensive definition of the circumstances constituting duress is impossible; this court has pointed out that each case must be decided on its own facts." Johnson, Drake & Piper v. United States, 531 F.2d 1037, 1042, 209 Ct. Cl. 313, 321 (1976) (citing Fruhauf Sw. Garment Co. v. United States, 111 F. Supp. 945, 126 Ct. Cl. 51). As noted by a Judge of the United States Court of Federal Claims, "[t]his Court's jurisprudence has shown that the bar for establishing duress is a high one." Starr Int'l Co. v. United States, 106 Fed. Cl. 50, 77 (2012), aff'd in part, vacated in part on other grounds, 856 F.3d 953 (Fed. Cir. 2017). The United States Court of Appeals for the Federal Circuit has stated that:

> Our past decisions make clear in the procurement context proof of coercion requires proof of wrongful action by the government. For example, in Johnson, Drake & Piper, Inc. v. United States, our predecessor court emphasized that "economic pressure and even the threat of considerable financial loss are not duress." 531 F.2d 1037, 1042, 209 Ct. Cl. 313 (Ct. Cl. 1976) (internal citation omitted). Rather, for a government action to be coercive, "some wrongful conduct must be shown." Id. at 1043. In other words, "to render an agreement voidable on the grounds of duress it must be shown that the party's manifestation of assent was induced by an improper threat which left the recipient with no reasonable alternative save

to agree." David Nassif Assoc. v. United States, 226 Ct. Cl. 372, 644 F.2d 4, 12 (Ct. Cl. 1981).

Rumsfeld v. Freedom NY, Inc., 329 F.3d at 1330. The court in Johnson, Drake & Piper further stated that:

> Economic pressure and "even the threat of considerable financial loss" are not duress. Int'l Tel. & Tel. Corp. v. United States, 206 Ct. Cl. 37, 52, n.11, 509 F.2d 541, n.11 (1975). "Economic duress may not be implied merely from the making of a hard bargain." Aircraft Associates & Mfg. Co., Inc. v. United States, 174 Ct. Cl. 886, 896, 357 F. 2d 373, 378 (1966). The mere stress of business conditions will not constitute duress where the defendant was not responsible for the conditions. Fruhauf Southwest Garment Co. v. United States, supra, 126 Ct. Cl. at 62, 111 F. Supp. At 951. "Some wrongful conduct must be shown, to shift to defendant the responsibility for bargains made by plaintiff under the stress of financial necessity." La Crosse Garment Mfg. Co. v. United States, 193 Ct. Cl. 168, 177, 432 F.2d 1377, 1382 (1970).

Johnson, Drake & Piper v. United States, 531 F.2d at 1042-43. Government conduct is wrongful when the conduct is "(1) illegal, (2) a breach of an express provision of the contract without a good-faith belief that the action was permissible under the contract, or (3) a breach of the implied covenant of good faith and fair dealing." Rumsfeld v. Freedom NY, Inc., 329 F.3d at 1330.

Plaintiff asks the court to void Task Order 0003, Modification 07, asserting that defendant "coerced TPMC into accepting Mod. 7 to DO 0003 by threatening not to approve WP Rev. 2, even though the Government knew TPMC had used the revised methodology since April 2014 to address the dispersed LSVs." The first prong of the Economic Duress Test is satisfied because plaintiff clearly indicated that it felt it was being coerced before it signed Task Order 0003, Modification 07, and because defendant does not challenge plaintiff's claim that plaintiff agreed to the modification involuntarily. Instead, defendant argues that "TPMC's duress argument fails the second and third prongs of the test in North Star Steel Co." Because the court determines that defendant breached the implied covenant of good faith and fair dealing, the third prong of the economic duress test is also satisfied. The court also needs to determine whether plaintiff was left "with no reasonable alternative save to agree." Id. at 1330.

Plaintiff argues:

> As to the second element, the circumstance permitted no alternative but for TPMC to accept Mod. 7 to DO 0003. TPMC faced the issue of the intermodals causing non-compliance with RCRA and continuing to incur additional costs associated with intermodals. TPMC also could not ship the intermodals without the Government's consent.

(citation omitted).

Defendant argues plaintiff did have alternatives. First, defendant references the contracting officer's email of June 26, 2014, twelve days before plaintiff would violate the RCRA's ninety-day storage limit, which states that "[s]ince the current work plan, with the sorting and seg[regating] at Beltsville, is technically acceptable and there have been no safety issues, the Government cannot justify paying more for TES [sic] complete the contractually [sic] efforts as approved." (alterations added). In support of this argument, defendant cites to <u>Waverley View Invs., LLC v. United States</u>, 135 Fed. Cl. 750 (2018). Second, defendant argues that "[n]or was a RCRA violation inevitable: TPMC could have worked with the Government to request an extension from the EPA for any RCRA deadlines." (alteration added). Defendant concludes that "[t]he fact that TPMC had alternatives negates any litigation-driven claim of duress."

Defendant's reliance upon <u>Waverly View Investors, LLC v. United States</u> is misplaced. That case, affirmed without opinion, was not in the procurement context but considered a property owner's "suit under the Takings Clause of the Fifth Amendment to the United States Constitution." <u>Waverly View Invrs., LLC v. United States</u>, 135 Fed. Cl. at 754. The United States Army and the EPA had demanded "access to the property to install wells for the testing and monitoring of groundwater contamination" under the EPA's authority under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA). <u>Id.</u> at 754. Defendant's demand, in that case, came in the form of a letter, which "described relevant CERCLA provisions and the EPA's authority thereunder, including that the EPA had legal authority to access the [property], with or without [plaintiff's] consent." <u>Id.</u> at 794 (alterations added). The court in <u>Waverly</u> determined that "some evidence suggests that [plaintiff] signed the [agreement to allow defendant's access to the property] 'under protest,'" but the plaintiff "nevertheless failed to establish the second and third elements of the duress test." <u>Id.</u> at 793 (alterations added).

The court in <u>Waverly</u> held that the plaintiff

could have refused to sign the [agreement]. Although such refusal may have subjected [plaintiff] to liability for "investigation and cleanup costs" under CERCLA as described in the EPA's February 8, 2013 letter, the "threat of considerable financial loss" is not sufficient to establish duress (see <u>Rumsfeld v. Freedom NY, Inc.</u>, 329 F.3d 1320, 1330 (Fed. Cir. 2003))."

(alterations added). <u>Id.</u> That court further held that the defendant had not acted illegally or issued an "improper threat,"

defining "improper threat" as "threats to commit a crime or a tort . . . [or] that would accomplish . . . economic duress . . . includ[ing] threats that would breach a duty of good faith and fair dealing under a contract as well as threats which, though lawful in themselves, are enhanced in their

141

effectiveness in inducing assent to unfair terms[,] because they exploit prior unfair dealing on the part of the party making the threat."

Id. at 793-94 (quoting David Nassif Assocs. v. United States, 644 F.2d 4, 12, 226 Ct. Cl. 372 (1981)) (alterations in original). That court eventually held that the plaintiff also "consented to the terms of that agreement," meaning the plaintiff failed to satisfy any of the three prongs of the test. Id. at 794.

The facts in the case currently before the court are distinguishable from the facts in Waverly. In this case, plaintiff satisfies prongs one and three because defendant does not assert plaintiff voluntarily agreed to Task Order 0003, Modification 07, and because the court has determined defendant breached the implied covenant of good faith and fair dealing. Additionally, this case is brought under the Contract Disputes Act, not the Fifth Amendment to the United States Constitution.

In Rumsfeld v. Freedom NY, Inc., the Federal Circuit held that "economic pressure and even the threat of considerable financial loss are not duress" and "some wrongful conduct must be shown." Rumsfeld v. Freedom NY, Inc., 329 F.3d at 1330 (quoting Johnson, Drake & Piper v. United States, 531 F.2d at 1042) (internal quotations omitted); see also Johnson, Drake & Piper v. United States, 531 F.2d at 1042 (holding that "[t]he mere stress of business conditions will not constitute duress where the defendant was not responsible for the conditions" (alteration and emphasis added)). In the case currently before the court, defendant acknowledged plaintiff's memorandum requesting approval of Work Plan Revision 2 on March 26, 2014, 104 days before plaintiff would have violated the RCRA ninety-day storage limit. Plaintiff, while technically in compliance with Work Plan Revision 1, began deferring the sorting and segregation of waste when the second work period began on April 9, 2014, or ninety days before a violation. On May 30, 2014, or forty days before a violation, plaintiff agreed to all reasonable assurances, regarding Work Plan Revision 2, requested by defendant. Pursuant to the process for work plan approval, as detailed by the PWS, any of defendant's comments "relat[ing] to economy and efficiency" were only "provided for the Contractor's review and consideration." Additionally, no part of the record indicates plaintiff ever objected to including the clause stating that "[t]he revised work plan will be at no additional cost to the Government." (alteration added). Because the agreed upon process for approving a work plan, as detailed in the PWS, had been satisfied and because defendant failed to identify any other reasonable objections to Work Plan Revision 2 after plaintiff agreed to all the requested assurances, plaintiff reasonably anticipated Work Plan Revision 2 would be approved and defendant was responsible for the conditions giving rise to the plaintiff's economic duress claim, for the forty days prior to any potential violation.

Plaintiff contemporaneously protested conditioning the approval of Work Plan Revision 2 upon resolution of the rate dispute and including the waiver of rights and claims clause in Task Order 0003, Modification 07. Plaintiff faced economic pressure and threat of considerable financial loss, if it had declined to agree to Task Order 0003, Modification 07, leaving plaintiff no reasonable alternative. Furthermore, as determined above, the economic pressure created by the inefficiencies of Work Plan Revision 1 were the result

of defendant's withholding of vital knowledge as to the actual conditions regarding LSVs in the soil. The threat of considerable financial loss – potential fines from the looming RCRA violations, risk of incurring rental charges on containers, and potential loss of access to rail conveyances – were the product of defendant's leveraging the threat of RCRA violations and holding plaintiff's feet to the fire in that regard. The RCRA violation threat, however, was a fiction, realized by defendant, and defendant's failure to inform plaintiff of the EPA's agreement to waive the storage limitation constituted a breach of the implied covenant of good faith and fair dealing. Because the record currently before the court indicates plaintiff would not have agreed to resolve the rate dispute or include the waiver clause included in Task Order 0003, Modification 07, but for the economic pressure and threat of considerable financial loss leveraged by defendant and not understanding defendant's negotiation with the EPA on RCRA enforcement, the court determines plaintiff had no reasonable alternative and the agreement is voidable. Thus, the court will not enforce the terms of Task Order 0003, Modification 07.

## DAMAGES

The parties chose not to include expert reports regarding damages in the trial record. At trial, the court informed the parties that, if the court could not discern from the post-trial briefs or from the evidence a way to quantify damages, the court would "undoubtedly come back to you" for quantification arguments. Such is the case.

## CONCLUSION

For the reasons stated above, this court finds defendant liable to plaintiff for damages related to plaintiff's claims for equitable adjustment based upon Type I Differing Site Conditions, breach of contract based upon Superior Knowledge, and breach of contract based upon breach of the Covenant of Good Faith and Fair Dealing. The court further finds that the terms of Task Order 0003, Modification 07, are unenforceable.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**